IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

NATHANIEL HIERS,

*Plaintiff*,

v.

The Board of Regents of the University of North Texas System—**CHAIR LAURA WRIGHT, VICE CHAIRMAN MILTON LEE, MELISA DENIS, MARY DENNY, DANIEL FEEHAN, A.K. MAGO, CARLOS MUNGUIA, BRINT RYAN,** and **JOHN SCOTT JR.**—all individually and all in their official capacities; **LESA ROE,** Chancellor of the University of North Texas System; **NEAL SMATRESK,** President of the University of North Texas; **JENNIFER EVANS-COWLEY,** Provost and Vice President for Academic Affairs of the University of North Texas; **SU GAO,** Dean of the College of Science of the University of North Texas; **RALF SCHMIDT,** Chair of the Department of Mathematics of the University of North Texas; and **WILLIAM CHERRY,** Associate Chair of the Department of Mathematics of the University of North Texas, all individually and in their official capacities,

*Defendants.*

Civil Case No.:

**VERIFIED COMPLAINT**

**Jury Trial Demanded**

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff Nathaniel Hiers, for his Verified Complaint against Defendants, states:

### INTRODUCTION

1.    The cornerstone of higher education is the ability of professors to participate freely in the "marketplace of ideas," where all viewpoints can be debated on their merits. That marketplace depends on free and vigorous debate among professors, a debate that often casts doubt on ideas, theories, and positions that many may consider accepted or "settled." That marketplace is important both inside and outside the classroom, and includes a broad spectrum of academic, social, and political issues.

2.    Seeking to participate in this marketplace, Plaintiff Nathaniel Hiers obtained his doctorate in Mathematics in May 2019 and began teaching full-time at the University of North Texas in the fall of 2019.

3.    But his career there met an untimely and unconstitutional end.

4.     In November 2019, someone anonymously left a stack of fliers warning about "microaggressions" in the mathematics department's faculty lounge.

5.     In the lounge, professors discuss all manner of topics and issues, often with a heavy dose of banter. In that manner, Dr. Hiers looked at the fliers, disagreed with what was said, and jokingly wrote on the chalkboard, "Don't leave garbage lying around," with an arrow pointing to the fliers.

6.     Rather than allow faculty members to engage each other like they do on any other issue, the new head of the mathematics department, Defendant Ralf Schmidt, scolded Dr. Hiers, saying that criticizing the papers was "stupid" and "cowardly."

7.     The next week, Defendant Schmidt fired Dr. Hiers without notice by cancelling a contract for Dr. Hiers to teach in the spring.

8.     When Dr. Hiers asked for a reason, Defendant Schmidt gave several, all related to Dr. Hiers' critique of "microaggressions." He said it was because Dr. Hiers refused to recant his beliefs, because he would not attend additional diversity training, and because "[his] actions and response are not compatible with the values of this department."

9.     Defendant Schmidt took this retaliatory action, which all other Defendants ratified, to ensure that neither Dr. Hiers nor anyone else dares to express viewpoints on "microaggressions," or other topics, that Defendants find objectionable.

10.     By retaliating against Dr. Hiers for exercising his First Amendment rights, Defendants violated his First Amendment right to free speech, placed unconstitutional conditions on Dr. Hiers' employment, deprived him of due process and equal protection of law, and breached its contract with him.

### JURISDICTION & VENUE

11.     This is a civil rights action that raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

12.     This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over state claims under 28 U.S.C. § 1367.

13.     This Court can award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201–02; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

14.     Venue is proper in this District and this Division under 28 U.S.C. § 1391(b) because Defendants reside in this district and because all the acts described in this Complaint occurred in this District and this Division.

## PLAINTIFF

15.     Plaintiff Nathaniel Hiers is a resident of Texas and a former professor at the University of North Texas Mathematics Department.

## DEFENDANTS

16.     Defendants Laura Wright, Milton Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia, Brint Ryan, and John Scott Jr. (collectively, the "Board Defendants"), are and were at all times relevant to this Complaint, members of the Board of Regents of the University of North Texas System ("University System"), a public university organized and existing under the laws of Texas.

17.     The University System comprises the University of North Texas Health Science Center at Fort Worth, a smaller University of North Texas at Dallas campus, and its "flagship" institution, the University of North Texas at Denton ("University").

18.     The Board Defendants are responsible for adopting the Board of Regents Rules, which govern all institutions in the University System. A true, accurate, and complete copy of excerpts from the Board of Regents Rules is attached as Exhibit 1.

19.     The Board Defendants are responsible for "[t]he organization, control, and management of the University of North Texas System and each component institution of the system." TEX. EDUC. CODE § 105.051; Ex. 1 at 1.

20.     The Board has the power to "employ and discharge personnel, including faculty" and to review, modify, or overturn an employment decision made by faculty and other University employees. TEX. EDUC. CODE § 105.101(b)(3); Ex. 1 at 1, Regents Rule 03.801(2)(c).

21.    The Board has the power to "adopt rules and policies" to exercise those powers, and it has the authority to delegate those duties to other University System officials. TEX. EDUC. CODE § 105.101(b)(4), (8); Ex. 1 at 1–2, Regents Rule 03.801(2)(d), (h).

22.    Each Board Defendant is responsible for enacting, amending, and repealing the Board of Regents' Rules.

23.    Defendant Lesa Roe is, and was at all relevant times, the Chancellor of the University System, of which the University of North Texas at Denton is a part.

24.    The Board Defendants have delegated to Defendant Roe "direct responsibility for all aspects of the System's operations." Ex. 1 at 5, Regents Rule 04.101.

25.    Defendant Roe's responsibilities include general oversight of all University System faculty and other employees.

26.    Defendant Neal Smatresk is, and was at all relevant times, the President of University of North Texas at Denton.

27.    The Board Defendants have delegated to Defendant Smatresk the power to exercise discretionary authority and perform duties vested in the Board Defendants related to the operation, control, and management of the University. Ex. 1 at 3, Regents Rule 03.803(2).

28.    Defendant Smatresk's responsibilities includes the authority to "develop procedures and standards for personnel administration . . . and conditions of employment in conformity with the law." Ex. 1 at 8–9, Regents Rule 04.302(4).

29.    Defendant Smatresk also has "the authority to appoint, evaluate, promote, transfer, and terminate the Institution's employees in accordance with Institution policies," including the power to review, approve, or reject those same types of actions made by other University officials. Ex. 1 at 3, Regents Rule 03.803(2); *see also* Ex. 1 at 15, Regents Rule 03.909(2)(a).

30.    Defendant Smatresk has the authority to delegate these authorities among subordinates.

31.    Defendant Jennifer Evans-Cowley is, and was at all relevant times, the Provost and Vice President for Academic Affairs at the University.

32.    Defendant Evans-Cowley oversees all of the University's academic programs, including

its College of Science, which in turn oversees the mathematics department.

33.   Defendant Evans-Cowley has the authority to oversee and control University faculty, including the authority to authorize, execute, and implement policies governing University faculty.

34.   Defendant Su Gao is, and was at all relevant times, the Dean of the College of Science at the University. Defendant Gao oversees all faculty in the University's College of Science, including those in the mathematics department.

35.   The Board Defendants and Defendants Roe, Smatresk, Evans-Cowley, and Gao are and were aware of the retaliatory and unconstitutional actions taken against Dr. Hiers and did not instruct University personnel, including the other Defendants, to change or reverse those actions to comply with constitutional mandates.

36.   The Board Defendants and Defendants Roe, Smatresk, Evans-Cowley, and Gao, independently and in consultation with each other, are responsible for the retaliatory and unconstitutional actions taken against Dr. Hiers.

37.   The Board Defendants and Defendants Roe, Smatresk, Evans-Cowley, and Gao, independently and in consultation with each other, participated in the retaliatory and unconstitutional firing of Dr. Hiers challenged here.

38.   Defendant Ralf Schmidt is, and has been since July 2019, the Chair of the Department of Mathematics for the University's College of Science.

39.   Defendant Schmidt oversees and manages all faculty in the mathematics department.

40.   Defendant Schmidt's duties included overseeing Dr. Hiers when he taught in the University's mathematics department in the Fall of 2019.

41.   Defendant Schmidt oversees hiring, firing, renewal contracts, and other contracts for faculty in the mathematics department.

42.   Defendant Schmidt has the authority to investigate, recommend disciplinary actions, and impose disciplinary actions on faculty in the mathematics department.

43.   Defendant William Cherry is, and has been since July 2019, the Associate Department Chair of the Department of Mathematics for the University's College of Science.

44.     Defendant Cherry also assigns faculty to teach mathematics department courses and handles other aspects of scheduling all mathematics department courses.

45.     Defendant Cherry's duties included hiring Dr. Hiers, offering him classes to teach, and overseeing Dr. Hiers' teaching in the Fall of 2019.

46.     Defendant Cherry has the authority to investigate, recommend disciplinary actions, and impose disciplinary actions on faculty in the mathematics department.

47.     Defendants Schmidt and Cherry are responsible for discriminating and retaliating against Dr. Hiers because Dr. Hiers engaged in protected speech and because of Dr. Hiers' viewpoint.

48.     Each and every Defendant is sued in his or her individual and official capacities.

**FACTUAL BACKGROUND**

## I.     Defendants' Unconstitutional Faculty Restrictions

49.     Defendants' unconstitutional faculty restrictions include two sets of policies, portions of which Dr. Hiers challenges as-applied: (1) Defendants' unrestricted authority to punish faculty; and (2) Defendants' *Faculty Misconduct and Discipline Policy*.

### A.     Defendants' Unrestricted Authority to Punish Faculty

50.     The Board Defendants are ultimately responsible for "[t]he organization, control, and management of the University of North Texas System and each component institution of the system." TEX. EDUC. CODE § 105.051; Ex. 1 at 1.

51.     Defendants Roe and Smatresk have general oversight of all University faculty and other employees at the main campus. *See supra* ¶¶ 23–30.

52.     Defendant Smatresk has the authority to delegate this authority among subordinates. *See supra* ¶ 30.

53.     On information and belief, Defendant Smatresk has delegated general oversight of math department faculty and employees to Defendants Evans-Cowley, Gao, Schmidt, and Cherry.

54.     On information and belief, the University has a policy or practice of allowing Defendants and other officials with oversight authority to fire, discipline, threaten, or otherwise punish faculty for any reason.

55.    On information and belief, the University has a policy or practice of allowing Defendants and other officials with oversight authority to fire, discipline, threaten, or otherwise punish faculty without following any specified procedures.

56.    The University does not restrain the discretion of its officials or otherwise prohibit officials from punishing or retaliating against a faculty member for engaging in constitutionally protected conduct or expression.

57.    Defendants exercised this unrestricted authority to punish Dr. Hiers for engaging in constitutionally protected speech.

58.    Dr. Hiers challenges this unrestricted authority to punish faculty members as-applied.

**B.  Defendants' Faculty Misconduct and Discipline Policy**

59.    Defendants can punish faculty members under their *Faculty Misconduct and Discipline Policy* ("*Misconduct Policy*"), a true, accurate, and complete copy of which is attached as Exhibit 2.

60.    Dr. Hiers' challenges, as-applied, the provisions of Defendants' *Misconduct Policy* that define "misconduct" broadly and non-exhaustively, *see infra* ¶¶ 64–69, and that allow officials to impose any type of discipline on a faculty member found to have engaged in misconduct, *see infra* ¶ 71.

61.    Defendants' *Misconduct Policy* applies to "faculty members," which it defines as "a person who is employed by the University of North Texas as a member of the faculty or staff and whose duties include teaching, research, administration including professional librarianship, and/or the performance of professional services."

62.    Defendants' *Academic Titles Policy* also states that "[a]n adjunct is a non-tenured faculty member." A true, complete, and accurate copy of Defendants' *Academic Titles Policy* is attached as Exhibit 3.

63.    Defendants' *Misconduct Policy* promises that certain "administrative procedures must be followed when a faculty member is alleged to have engaged in behavior or conduct that warrants corrective action," *i.e.* misconduct. Ex. 2 at 2.

64.    Defendants' *Misconduct Policy* states: "Misconduct refers to behavior that significantly

impairs the function of teaching, research and creative activity, or service." Ex. 2 at 2.

65.    Defendants' *Misconduct Policy* states that misconduct "include[s], but [is] not limited to," four types of actions: (1) "failure to perform the terms of employment," (2) "[v]iolation of the Board of Regents rules, university policies, or state or federal law," (3) [v]iolation of professional and personal conduct related to resource use," and (4) "[a]ction(s) that impair or prevent other members of the university community from fulfilling their responsibilities or that create a clear and present danger to members of the university community." Ex. 2 at 1–2.

66.    Defendants' *Misconduct Policy* does not provide any comprehensive or objective guidance on what kinds of actions "impair or prevent" other persons at the university from fulfilling responsibilities or what kinds of actions "create a clear and present danger" to others.

67.    Defendants' *Misconduct Policy* also punishes faculty even for off-duty conduct: "A faculty member's conduct that falls outside the scope of employment shall constitute misconduct when the activity adversely affects the mission or reputation of the university." Ex. 2 at 2.

68.    Defendants' *Misconduct Policy* does not provide any comprehensive or objective guidance on how to determine if a faculty member has "adversely affect[ed] the mission or reputation of the university."

69.    Defendants' *Misconduct Policy* also does not limit "misconduct" to the categories or types of actions above.

70.    Defendants' *Misconduct Policy* thus grants officials unbridled discretion to determine what kind of "behavior . . . significantly impairs the functions of teaching, research and creative activity, or service." Ex. 2 at 1.

71.    Defendants' *Misconduct Policy* also allows officials to impose virtually any type of discipline on a faculty member found to have engaged in misconduct, as the list of possible corrective actions is non-exhaustive and ranges from an oral reprimand to termination. Ex. 2 at 4.

**II.    Defendants' Enforcement of Their Unconstitutional Policies**

   **A.  Dr. Hiers' Distinguished Career at the University**

72.    Dr. Hiers was a mathematics professor at the University until recently, when Defendants

fired him because he disagreed with a flier discussing the alleged harmfulness of "microaggressions," expressed his views, and refused to disavow his beliefs.

73.   Dr. Hiers has devoted over a decade and his entire career to the study of mathematics. In 2010, he obtained bachelor's degrees in mathematics and computer science at Valdosta State University in Georgia. He then went to Baylor University and obtained his master's degree in mathematics in 2013. While there, he also taught business precalculus in the spring of 2013.

74.   In the fall of 2013, Dr. Hiers entered the University's doctoral program for mathematics.

75.   While in the doctoral program, Dr. Hiers taught undergraduate courses, including trigonometry, precalculus, calculus, calculus II, and linear algebra, every semester from the fall of 2013 until he completed the program in the spring of 2019.

76.   Dr. Hiers also taught summer courses at the University in 2014, 2017, 2018, and 2019.

77.   In 2017, Dr. Hiers also played a key role in an extensive research project on the 2-Rothberger Game. He presented the results in Warsaw, Poland, at the Frontiers of Selection Principles conference and, soon after, at an American Mathematics Society meeting.

78.   Dr. Hiers successfully completed and defended his doctoral dissertation in March 2019.

79.   Dr. Hiers obtained his Ph.D. in Mathematics from the University in May 2019.

80.   On July 18, 2019, the University offered Dr. Hiers a position as an Adjunct Faculty in the University's mathematics department. A true, accurate, and complete copy of this offer letter is attached as Exhibit 4.

81.   Dr. Hiers accepted and began teaching the three sections of linear algebra the University initially offered him. Ex. 4.

82.   Dr. Hiers also taught another section of business calculus that Defendant Cherry offered him on July 21. A true, accurate, and complete copy of the July 21 email is attached as Exhibit 5.

83.   When the University hired Dr. Hiers as an Adjunct Professor, he became entitled to the various protections for University faculty and subject to various policies regulating them, including the policies challenged here.

84.   On November 18, 2019, Defendant Cherry extended an offer via email for Dr. Hiers "to

take Math 2700 sections 6 and 9 in the spring," *i.e.* to teach two sections of Linear Algebra in the spring of 2020.

85.    On November 19, Dr. Hiers accepted Defendant Cherry's offer to teach at the University in the spring of 2020 via email. A true, complete, and accurate copy of Defendant Cherry's offer and Dr. Hiers' acceptance is attached as Exhibit 6.

86.    Defendant Cherry also offered all the adjuncts a single section of Math 1780, Probability Models, via email on November 26, 2019.

87.    One minute after the email was sent, Dr. Hiers accepted this offer. A true, complete, and accurate copy of these emails is attached as Exhibit 7.

88.    Upon information and belief, Dr. Hiers was the first adjunct to accept this offer.

89.    Before December 2, 2019, Dr. Hiers was never the subject of any disciplinary action at the University.

**B. Dr. Hiers' Efforts to Exercise His First Amendment Rights**

**1. Dr. Hiers' Critique of an Anonymous Flier while in the Faculty Lounge**

90.    On November 25, Dr. Hiers was off duty in the staff lounge during department "tea time" around 3:30 p.m. He was waiting for a colloquium to start and also remained on campus to teach his 5:30 p.m. course.

91.    While there, he noticed there was a stack of fliers discussing the alleged harmfulness of "microaggressions." A true, accurate, and complete copy of this flier is attached as Exhibit 8.

92.    The fliers were not endorsed by the University, a part of any University program, or in any other way an official University document.

93.    The fliers instead appeared to be left behind by a professor who was expressing his or her personal opinions to the other professors.

94.     These four-page fliers describe "microaggressions" broadly as "verbal and nonverbal behaviors" that "communicate negative, hostile, and derogatory messages to people rooted in their marginalized group membership (based on gender, race, ethnicity, sexuality, etc.)." Ex. 8 at 1.

95.     "Microaggressions," the flier states, "can be intentional or unintentional." Ex. 8 at 1.

96. The flier identifies multiple forms and types of "microaggressions," as well as challenges in identifying and addressing them. "Microaggressions," it notes, "tend to be subtle, indirect, and unintentional," especially since "other rationales for prejudicial behavior can be offered." Ex. 8 at 2.

97. The flier urges everyone not to minimize the harm of "microaggressions," but instead to note the serious negative impacts of "microaggressions" on "standard of living," "physical health," and "psychological health." Ex. 8 at 2.

98. The flier gives examples of and condemns several statements it contends are "microaggressions," including: "America is a melting pot," "I believe the most qualified person should get the job," and "America is the land of opportunity." Ex. 8 at 3.

99. Such statements, according to the flier, propagate the "myth of meritocracy" and promote "color blindness." Ex. 8 at 3.

100. The flier also states that such messages "target persons based solely upon their marginalized group membership." Ex. 8 at 3.

101. Dr. Hiers inspected the fliers briefly, chatted with his colleagues, and then went to the colloquium before teaching his evening class from 5:30 p.m. to 6:50 p.m.

102. After his evening class, he returned to the faculty lounge to wash his coffee mug.

103. While he was washing his mug, he noticed that the fliers were still here, picked one of them up, and further inspected it.

104. Dr. Hiers then noticed the "sexist/heterosexist" list of "microaggressions," which condemns "sexist/heterosexist language," like "[b]eing forced to choose Male or Female when completing basic forms." Ex. 8 at 4.

105. Dr. Hiers firmly rejects bias and prejudice against any person or group of people, including marginalized groups. He believes that the University should encourage all people, regardless of background, to learn how to communicate effectively with one another and to contribute to the vibrant array of ideas and expression on campus.

106. Dr. Hiers believes that the concept of "microaggressions," while purporting to serve those ends, actually hurts diversity and tolerance. This mode of thinking teaches people to see the worst

in other people, promotes a culture of victimhood, and suppresses alternative viewpoints instead of encouraging growth and dialogue.

107.  Dr. Hiers believes that many of the statements that the flier condemns as "microaggressions" can (and should) be interpreted in a benign or positive manner. But the fliers teach people to focus on the worst possible interpretation of the statement, to disregard the speaker's intent, and to impute a discriminatory motive to others.

108.  Dr. Hiers is not alone in this view. Jonathan Haidt, a prominent social psychologist and professor at New York University, and Greg Lukianoff, President of Foundation for Individual Rights in Education, recently explained the problems associated with the theory of "microaggressions":

> A portion of what is derided as "political correctness" is just an effort to promote polite and respectful interactions by discouraging the use of terms that are reasonably taken to be demeaning. But if you teach students that intention doesn't matter, and you *also* encourage students to find more things offensive (leading them to experience more negative impacts), and you *also* tell them that whoever says or does the things they find offensive are "aggressors" who have committed acts of bigotry against them, then you are probably fostering feelings of victimization, anger, and hopelessness in your students. They will come to see the world—and even their university—as a hostile place where things never seem to get better.
>
> If someone wanted to create an environment of perpetual anger and intergroup conflict, this would be an effective way to do it. Teaching students to use the least generous interpretations possible is likely to engender precisely the feelings of marginalization and oppression that almost everyone wants to eliminate.

GREG LUKIANOFF & JONATHAN HAIDT, THE CODDLING OF THE AMERICAN MIND: HOW GOOD INTENTIONS AND BAD IDEAS ARE SETTING UP A GENERATION FOR FAILURE 46 (2018).

109.  The concept of microaggressions is an important and contentious issue and a matter of great public concern at universities and colleges all over the country.

110.  Dr. Hiers believes that someone can say, "America is a melting pot," to convey that America blends many different cultures, races, religions, and other people groups together in a way that is beneficial for everyone and that promotes tolerance of other peoples' beliefs and values.

111.  But according to the flier, that statement is a "microaggression" because someone *might* really be stating it to minimize racial, cultural, or other value differences, or because the listener might *subjectively* interpret it in that manner regardless of the speaker's intent.

112.  Because Dr. Hiers values diversity, tolerance, and growth, and because he believes that the fliers undermined those values, he jokingly wrote, "Please don't leave garbage lying around," on the chalk board with an arrow pointing to one of the fliers. A true and accurate picture of the chalk board with the above writing on it is attached as Exhibit 9.

113.  By criticizing "microaggressions," Dr. Hiers wanted to promote diversity, tolerance, and growth in the academic environment at the University generally and in the mathematics department specifically. He also wanted to express his thoughts on the concept of "microaggressions" and the mentality that this concept promotes.

114.  Dr. Hiers then left the lounge and went home.

115.  At no point during this time did Dr. Hiers deface, damage, or remove any of the fliers.

116.  These kinds of discussions happen often in the faculty lounge. Professors regularly discuss all manner of work-related and non-work-related topics, including political or social issues.

117.  Professors talk about these issues with one another in an informal manner, and often with a heavy dose of banter.

118.  Similarly, professors often use the faculty lounge's chalk board to make jokes and for other purposes. For example, the professors have written several spoofs of math riddles seen on Facebook as a way to poke fun at them.

119.  Professors often make remarks on the faculty lounge's chalkboard without signing their names or otherwise indicating who made the various remarks.

120.  No classes, appointments, or other events or services at the University or mathematics department were cancelled or disrupted as a result of Dr. Hiers' remarks on the faculty lounge's chalkboard.

121.  The morning after Dr. Hiers wrote on the chalkboard, Jana Watkins, Assistant to Ralf Schmidt, sent Dr. Hiers an 11:50 a.m. email, stating that his spring offer letters were ready for him to sign and asking him to "[p]lease stop by my office as soon as you can to sign the offer letter." A true, accurate, and complete copy of Ms. Watkins' email is attached as Exhibit 10.

122.  This offer letter would memorialize the written agreement between Defendant Cherry

and Dr. Hiers from November 18–19. Exs. 6, 7.

### 2. Dr. Hiers' Sudden Firing due to His Expression

123. At 3:34 p.m. on November 26, Defendant Schmidt emailed the entire mathematics department with a picture of Dr. Hiers' chalkboard inscription and stated, "Would the person who did this please stop being a coward and see me in the chair's office immediately. Thank you." A true, accurate, and complete copy of this email and Dr. Hiers' response is attached as Exhibit 11.

124. Dr. Hiers was surprised and upset that Defendant Schmidt was interfering in a discussion about topics between Dr. Hiers and other faculty members.

125. Dr. Hiers was also upset that Defendant Schmidt criticized Dr. Hiers' expression as cowardly. Although Dr. Hiers jokingly teased the professor who left the fliers, he seriously disagrees with the concept of "microaggressions" because he believes it is harmful to students and the University's learning environment.

126. At 4:10 p.m., Dr. Hiers responded by email to Defendant Schmidt, saying: "I'll be by in a few minutes. I don't see anything 'cowardly' about commenting on silly political fliers left lying in the lounge. If it's fine for someone to leave stacks of them around the lounge, criticizing them should be fine too." Ex. 11 at 1.

127. Dr. Hiers then met with Defendant Schmidt. During that conversation, Defendant Schmidt made it clear that he opposed and objected to the viewpoint and content of Dr. Hiers' message criticizing the "microaggressions" flier.

128. During that same conversation, Defendant Schmidt said that the message on the chalkboard was "stupid" and was "the nuclear option."

129. Defendant Schmidt also pressured Dr. Hiers to apologize for expressing his views regarding "microaggressions."

130. Defendant Schmidt never explained why Dr. Hiers needed to apologize.

131. Dr. Hiers told Defendant Schmidt that he saw no reason to apologize and that he stood by his criticism of the documents.

132. Defendant Schmidt then asked if Dr. Hiers would be "interested" in diversity training

beyond what the University already required.

133.  Defendant Schmidt did not state or even imply that this additional diversity training was mandatory or that Dr. Hiers would suffer adverse consequences if he failed to do the additional diversity training.

134.  Dr. Hiers said that he was not interested. He was already scheduled to take the University's required diversity training in a few days.

135.  Dr. Hiers also asked Defendant Schmidt who left the fliers, and Defendant Schmidt responded that he did not know where they came from.

136.  Defendant Schmidt did not give Dr. Hiers any indication that he would take any sort of disciplinary action for the incident.

137.  On December 1, 2019, the first workday after Thanksgiving break, Dr. Hiers completed mandatory diversity training for his employment.

138.  The next day, Dr. Hiers returned to work and visited the mathematics department office to sign the offer letter.

139.  After Dr. Hiers asked Defendant Cherry's assistant about the offer letters, the assistant told Dr. Hiers that "Ralf has your letters" and that he was not in the office right now.

140.  Later that day, Defendant Cherry emailed Dr. Hiers to let him know that the department had terminated his employment and would not employ him in the spring. A true, complete, and accurate copy of that email is attached as Exhibit 12.

141.  In that e-mail, Defendant Cherry stated:

Although I scheduled you to teach two sections of linear algebra in the spring, Professor Schmidt informed me that your employment with us will not continue in the spring term. Therefore, you should not expect to be employed here next semester. If you have questions about this, you should make an appointment to see Professor Schmidt.

Ex. 12 at 2.

142.   On information and belief, Defendant Cherry participated in the decision to fire Dr. Hiers.

143.   On information and belief, Defendant Cherry informed Dr. Hiers of his termination at the direction of or with the approval of Defendant Schmidt.

144. Until he received Defendant Cherry's email on December 2, Dr. Hiers expected Defendants to honor their written agreement from November 18–19 and had no idea that Defendant Schmidt planned to discipline him, much less to fire him.

145. After reviewing Defendant Cherry's email, Dr. Hiers emailed Defendant Schmidt on December 3 to ask why he could no longer teach in the spring. Ex. 12 at 2.

146. About an hour later, Defendant Schmidt responded by email, explaining at length why he ended Dr. Hiers' employment. Ex. 12 at 1–2.

147. Defendant Schmidt made it clear that he fired Dr. Hiers because of the views he expressed and in response to another person's views.

148. In the email, Defendant Schmidt stated, "My decision not to continue your employment in the spring semester was based on your actions in the grad lounge on 11/26, and your subsequent response." Ex. 12 at 1.

149. Defendant Schmidt laid out three specific reasons for firing Dr. Hiers.

150. First, Defendant Schmidt informed Dr. Hiers that the "microaggression" flier was not "political" and that the statements listed "make[] very much sense." Ex. 12 at 1.

151. Defendant Schmidt was expressing his own views on the topic of "microaggressions," disagreeing with Dr. Hiers' views, and punishing Dr. Hiers for expressing his views.

152. Dr. Hiers felt that it was demeaning for Defendant Schmidt to state his opinion—that the fliers were not political and that they made sense—as a fact.

153. Defendant Schmidt used his opinion to ignore reasonable views opposing the "microaggression" fliers and ultimately to punish Dr. Hiers for expressing his own opinion.

154. Second, Defendant Schmidt said that Dr. Hiers' chalkboard message "is upsetting, and can even be perceived as threatening" and that leaving behind anonymous messages is problematic because others "don't know who wrote this; it might be a faculty member, grad student or anyone else." Ex. 12 at 1.

155. Defendant Schmidt ignored the fact that the fliers themselves were an anonymous message.

156. On information and belief, Defendant Schmidt made no attempt to identify, let alone

discipline, whomever left the fliers in the faculty lounge in the first place.

157.  Defendant Schmidt has never disciplined any other professor who has made anonymous remarks on the faculty lounge's chalkboard.

158.  Nor did Defendant Schmidt understand the teasing, humorous manner in which Dr. Hiers expressed his views.

159.  Even though Dr. Hiers' writing never threatened anyone, Defendant Schmidt said, quite ironically, "The implicit message is, 'Don't you dare bring up nonsense like microaggressions, or else.'" Ex. 12 at 1.

160.  Defendant Schmidt ignored the fact that the explicit message of his statements to Dr. Hiers and of Defendants' actions in firing Dr. Hiers is: "Don't you dare disagree with me (or us) on microaggressions (and related issues), or else."

161.  Defendant Schmidt communicated this message that Dr. Hiers' views would not be tolerated because Defendant Schmidt disliked the views Dr. Hiers held and expressed.

162.  Third, Defendant Schmidt stated he fired Dr. Hiers because Dr. Hiers refused to recant his beliefs: "Everyone makes mistakes, and I'm all for forgiveness if actions are followed by honest regret. But you very much defended your actions, and stated clearly that you are not interested in any kind of diversity training." Ex. 12 at 1.

163.  Dr. Hiers already completed mandatory diversity training, and Dr. Schmidt never stated—or even suggested—that Dr. Hiers would have to engage in additional diversity training to maintain his future employment.

164.  Defendant Schmidt then summarized his reasons for firing Dr. Hiers, stating: "[Y]our actions and response are not compatible with the values of this department. So with regret I see no other choice than to not renew your employment." Ex. 12 at 1.

165.  In referencing Dr. Hiers' "actions," Defendant Schmidt referred to Dr. Hiers' expression on the faculty lounge's chalkboard.

166.  In referencing Dr. Hiers' "response," Defendant Schmidt referred to Dr. Hiers' decision not to change his views, recant his views, or apologize for expressing his views.

167.  Defendant Schmidt never gave Dr. Hiers a warning or put him on notice that he would fire him for expressing his views.

168.  By firing Dr. Hiers for his criticism of "microaggressions" and his refusal to recant that criticism, Defendants disciplined Dr. Hiers.

169.  But in doing so, Defendants did not follow any of the procedures in the *Misconduct Policy*. Ex. 2.

170.  The *Misconduct Policy* expressly guarantees that "[t]he University provides timely due process for faculty appeals at each level." Ex. 2 at 4.

171.  These due process protections are designed for "the protection of academic freedom," and they guarantee the faculty member "the right to present evidence on his or her behalf" and to "seek advice and assistance from a faculty associate." Ex. 2 at 2.

172.  Before taking any action against a faculty member, the *Misconduct Policy* requires the supervising University official to "notif[y] the faculty member in writing of the alleged misconduct, clearly identifying, with supporting evidence, which policies/procedures may have been violated." Ex. 2 at 3.

173.  The *Misconduct Policy* also provides the accused faculty member "the right to respond both orally and in writing to the allegations and any evidence presented" within ten business days of being notified of the alleged misconduct." Ex. 2 at 3.

174.  Here, the Defendants never notified Dr. Hiers in writing of what he had done wrong or what policy he allegedly violated before taking action against him.

175.  To date, Defendants have not identified any policy that Dr. Hiers allegedly violated.

176.  As such, Dr. Hiers never had an opportunity to seek advice from a faculty associate or to respond to the allegations.

177.  The *Misconduct Policy* also requires the official to notify "the Dean or other immediate supervisor in writing of the alleged offense or misconduct" and to indicate "any policies/procedures that may have been violated." Ex. 2 at 3.

178.  The *Misconduct Policy* also allows an official to review the accused faculty member's

response and "gather any additional information," and it allows the faculty member to respond to that new information, the right to respond to a final disciplinary decision, and the right to appeal that same decision. Ex. 2 at 3–4. Since Defendants did not follow the initial procedures in the *Misconduct Policy*, Dr. Hiers never had an adequate opportunity to respond to other information or to appeal the decision.

179. Defendants also took no action against Defendant Schmidt for disputing Hiers' characterization of the fliers as political. Defendant Schmidt expressed a different view on the subject and received Defendants' support to punish Dr. Hiers for not agreeing with that view.

180. Had Dr. Hiers not criticized the "microaggression" fliers, the University would not have fired him and would have allowed him to teach in the spring of 2020.

181. Because Dr. Hiers engaged in protected speech, Defendants silenced Dr. Hiers for his views.

182. Dr. Hiers' criticism of the fliers and of "microaggressions" did not disrupt the University's or the mathematics department's efficient provision of services to the public or its constituents.

183. No classes, appointments, or other events or services at the University or mathematics department were cancelled or disrupted as a result of Dr. Hiers' criticism of the fliers.

184. Defendants' actions have made it abundantly clear that Defendants will not tolerate dissent from their views on certain topics, including "microaggressions."

### III.   Effect of Defendants' Unconstitutional Actions on Dr. Hiers

185. Defendants' retaliatory actions against Dr. Hiers have caused him substantial harm in several ways.

186. Defendants' decision to fire Dr. Hiers severely affected his professional reputation. Dr. Hiers had a good record as a mathematics professor and a student. As a recent doctoral graduate, it was important for him to start his career as a mathematics professor on the right foot. Because Defendants have unfairly terminated him, they have severely harmed his professional reputation.

187. Because Defendants fired him, Dr. Hiers has also been unable to renew his American Mathematics Society membership. This has hindered his professional development by preventing

him from attending member meetings and receiving mathematics publications.

188.  Because Defendants fired him and inflicted financial hardship on him, Dr. Hiers has been unable to renew his American Mathematics Society membership that expired in December 2019. This has hindered his professional development by preventing him from attending member meetings and receiving mathematics publications.

189.  Subscribing to each journal is too expensive for most individuals, and particularly Dr. Hiers, since the University's discriminatory actions have caused him financial harm.

190.  Because of Defendants' actions, prospective employers also view Dr. Hiers less favorably.

191.  Dr. Hiers cannot rely on the University to give him a favorable recommendation, and the University's decision to fire him reflects poorly on his ability as a professor. This makes it more difficult, if not impossible for Dr. Hiers to obtain gainful employment as a mathematics professor.

192.  To date, Dr. Hiers has submitted applications for more than a dozen positions as a mathematics professor, as well as several others for non-academic jobs.

193.  Dr. Hiers is currently employed as a substitute teacher for the Denton Independent School District, but has not yet worked or obtained any wages because schools have shut down.

194.  Defendants' retaliatory actions have rendered it impossible for Dr. Hiers to transfer to an equivalent position commensurate with his level of expertise, achievement, and experience at a similarly prestigious university or college.

195.  Defendants' unconstitutional retaliation has harmed Dr. Hiers financially in several ways, including those mentioned previously.

196.  In addition, Dr. Hiers was scheduled to teach three classes in the spring, which would have earned him $10,800. *See* Ex. 4 at 1 (establishing rate of $3,600 per class). But because of Defendants' conduct, Dr. Hiers is not receiving this income, or teaching any classes, and is still searching for a job.

### ALLEGATIONS OF LAW

197.  At all times relevant to this Complaint, each and all of the acts alleged herein were attributed to the Defendants, who acted under color of a statute, regulation, custom, or usage of

the State of Texas.

198.  Defendants knew or should have known that they were violating Dr. Hiers' constitutional and contractual rights by firing him because of the views he expressed while off-duty and in his personal capacity.

199.  The policies challenged here that led to the violation of Dr. Hiers' constitutional and contractual rights remain in full force and effect.

200.  Dr. Hiers has suffered and is suffering irreparable harm from Defendants' retaliatory and discriminatory decisions challenged here.

201.  Dr. Hiers has no adequate or speedy remedy at law to correct the deprivation of his rights.

202.  Defendants' actions, as set forth above, do not serve any legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

203.  Defendants' retaliatory actions and policies are not narrowly tailored as applied to Dr. Hiers because Dr. Hiers' expression does not implicate any of the legitimate interests Defendants might have.

204.  Unless the decisions of Defendants are enjoined, Dr. Hiers will continue to suffer irreparable injury.

205.  Under 42 U.S.C. §§ 1983 and 1988, Dr. Hiers is entitled to appropriate relief invalidating Defendants' challenged decisions.

### FIRST CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech Retaliation
### (42 U.S.C. § 1983)

206.  Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

207.  By punishing Dr. Hiers for expressing his views regarding "microaggressions," Defendants have retaliated and are retaliating against Dr. Hiers for exercising his First Amendment rights.

208.  When Dr. Hiers communicated his views on "microaggressions" by writing on the chalkboard in the faculty lounge, he was off-duty and spoke as a citizen with his peers.

209.  Even if Dr. Hiers' critique of "microaggressions" were considered to fall within the scope

of his official duties, it is within the scope of his teaching and scholarship, and thus, he was speaking as a private citizen.

210.  When Dr. Hiers expressed his views on "microaggressions," he was speaking on a matter of public concern.

211.  Dr. Hiers' interest, as a professor at a public university, in discussing matters of public concern in the context of teaching and scholarship outweighs Defendants' interest in the efficient provision of services.

212.  Dr. Hiers' speech never prevented Defendants from efficiently providing services (or even threatened to do so).

213.  Dr. Hiers' speech, regardless of how it is delineated, is protected expression.

214.  Defendants took retaliatory and unconstitutional actions against Dr. Hiers pursuant to the unbridled authority that their unconstitutional faculty restrictions grant them.

215.  Defendants' retaliatory and unconstitutional actions taken against Dr. Hiers would deter a person of ordinary firmness from exercising his right to free speech in the future.

216.  Defendants' retaliatory and unconstitutional actions taken against Dr. Hiers constitute adverse employment actions.

217.  Defendants took these retaliatory and unconstitutional actions against Dr. Hiers because of the views he expressed regarding "microaggressions."

218.  Defendants took these retaliatory and unconstitutional actions because of the viewpoint and content of Dr. Hiers' speech.

219.  Defendants' retaliatory and unconstitutional actions against Dr. Hiers violate his right to free speech under the First Amendment to the U.S. Constitution.

### SECOND CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Content & Viewpoint Discrimination
### (42 U.S.C. § 1983)

220.  Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

221.  By punishing Dr. Hiers for expressing his views on "microaggressions," Defendants have

engaged in content and viewpoint discrimination in violation of the First Amendment.

222.  Defendants evaluated the content and viewpoint of Dr. Hiers' speech to determine whether they would take any adverse employment actions against him based on his speech regarding "microaggressions."

223.  Defendants considered the content and viewpoint of Dr. Hiers' expression when they decided to repudiate his teaching contract.

224.  Defendants retain unbridled discretion to discriminate based on content or viewpoint.

225.  Defendants exercised this unbridled discretion when they repudiated Dr. Hiers' contract and fired him because he expressed his views regarding "microaggressions."

226.  The First Amendment protects Dr. Hiers' expression regarding "microaggressions."

227.  Defendants took adverse employment actions against Dr. Hiers pursuant to the unbridled authority granted that their unconstitutional faculty restrictions grant them.

228.  Defendants have punished Dr. Hiers for engaging in expression the First Amendment protects and have engaged in impermissible viewpoint- and content-based discrimination.

229.  Defendants' retaliatory and unconstitutional actions against Dr. Hiers violate his right to free speech under the First Amendment to the U.S. Constitution.

### THIRD CAUSE OF ACTION
### Violation of Plaintiff's First Amendment Right to Freedom of Speech
### Compelled Speech
### (42 U.S.C. § 1983)

230.  Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

231.  By punishing and threatening to punish Dr. Hiers for refusing to recant his views on "microaggressions," Defendants have attempted and are attempting to compel Dr. Hiers' speech in violation of his rights under the First Amendment.

232.  Defendant Schmidt stated that one of the reasons he repudiated Dr. Hiers' contract was because Dr. Hiers did not express "honest regret," because he did not attend remedial diversity training, and because he did not apologize for his views on "microaggressions."

233.  Defendant Schmidt made these determinations pursuant to the unbridled authority that

Defendants' unconstitutional faculty restrictions grants him.

234.   Defendant Schmidt also made this determination based on the authority granted to him by other Defendants and in consultation with other Defendants.

235.   Defendants have attempted and are attempting to compel Dr. Hiers to communicate messages about "microaggressions" that he does not hold and that he does not wish to communicate.

236.   Dr. Hiers' expression is protected under the First Amendment.

237.   Defendants' policies and their enforcement of those policies violate Dr. Hiers' right to free speech under the First Amendment to the U.S. Constitution.

FOURTH CAUSE OF ACTION
**Violation of Plaintiff's First Amendment Right to Freedom of Speech
Overbreadth
(42 U.S.C. § 1983)**

238.   Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

239.   Defendants' *Misconduct Policy* and their enforcement of that policy is overbroad because it restricts a significant amount of constitutionally protected speech.

240.   Specifically, Defendants' definition of "misconduct" reaches a substantial amount of constitutionally protected speech.

241.   By defining "misconduct" non-exhaustively and with terms like "behavior that significantly impairs the function of teaching, research and creative activity, or service," "[a]ction(s) that impair or prevent other members of the university community from fulfilling their responsibilities or that create a clear and present danger to members of the university community," and "activity adversely affects the mission or reputation of the university," Ex. 2 at 1–2, the University can punish virtually any protected expression as "misconduct."

242.   The overbreadth of this *Misconduct Policy* chills Dr. Hiers' speech.

243.   To the extent that Defendants classified Dr. Hiers' expression on "microaggressions" as "misconduct," Defendants have unconstitutionally discriminated against Dr. Hiers for engaging in protected expression and restricted his expression.

244. Defendants' *Misconduct Policy* and their enforcement of this policy is therefore unconstitutionally overbroad as-applied and violates Dr. Hiers' right to free speech under the First Amendment of the U.S. Constitution.

**FIFTH CAUSE OF ACTION**
**Violation of Plaintiff's Right to be Free from Unconstitutional Conditions**
**(42 U.S.C. § 1983)**

245. Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

246. By conditioning Dr. Hiers' employment at the University on his willingness to surrender his constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on him in violation of his First Amendment rights.

247. Defendants' retaliatory and unconstitutional actions against Dr. Hiers were made pursuant to the unbridled authority that their unconstitutional faculty restrictions grant them.

248. Their actions impose an unconstitutional condition upon faculty members' right to free speech and their receipt of state benefits (*e.g.*, avoiding disciplinary actions up to and including termination).

249. Defendants required Dr. Hiers to surrender his constitutionally protected rights to freedom of speech, due process, and equal protection to avoid disciplinary actions.

250. Defendants' retaliatory and unconstitutional actions against Dr. Hiers violate his right to be free from unconstitutional conditions.

**SIXTH CAUSE OF ACTION**
**Violation of Plaintiff's Fourteenth Amendment Right to**
**Due Process of Law**
**(42 U.S.C. § 1983)**

251. Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

252. By punishing Dr. Hiers under vague and overbroad standards through the retaliatory actions mentioned above, including terminating his contract, Defendants have violated and are violating Dr. Hiers' right to due process of law under the Fourteenth Amendment.

253. Dr. Hiers' speech regarding "microaggressions" is protected by the First Amendment.

254. By taking adverse employment actions against Dr. Hiers, Defendants have punished him for engaging in protected speech.

255. Again, the *Misconduct Policy* defines "misconduct" non-exhaustively and with subjective and unclear terms. *See* supra ¶¶ 64–69.

256. Defendants' *Misconduct Policy* and enforcement of it against Dr. Hiers are unconstitutionally vague because (i) they grant University officials unbridled discretion in deciding what viewpoints regarding "microaggressions" (and other topics) may be expressed without risking one's job, (ii) they rely on assessments that are inherently subjective and elude any precise or objective measurement that would be consistent from one official or professor to another, (iii) they are incapable of providing meaningful guidance to Defendants or other University officials, and (iv) they force professors to guess whether expression that the First Amendment protects is in fact allowed on campus.

257. Defendants' adverse employment actions against Dr. Hiers punished him for engaging in constitutionally protected expression in violation of Dr. Hiers' right to due process of law under the Fourteenth Amendment.

258. The lack of objective criteria, factors, or standards to define "misconduct" renders the *Misconduct Policy* unconstitutionally vague as-applied and a violation of Dr. Hiers' right to due process of law under the Fourteenth Amendment.

### SEVENTH CAUSE OF ACTION
### Violation of Plaintiff's Fourteenth Amendment Right to
### Procedural Due Process of Law
### (42 U.S.C. § 1983)

259. Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

260. As a professor at the University, Dr. Hiers had a property interest in his continued employment for the term of his contract, including the contract he entered in when he accepted two spring 2020 classes on November 19 and the additional class on November 26.

261. Procedural due process requires, before a public-university professor like Dr. Hiers can be terminated, that he be given notice and an opportunity for a hearing before an impartial tribunal.

262. The University's *Misconduct Policy* also requires the University to abide by certain procedures, such as notice and a hearing, before it can fire Dr. Hiers.

263.   By failing to give Dr. Hiers notice or an opportunity to respond in advance of firing him, and by failing to follow the procedures in the University's *Misconduct Policy*, Defendants have denied Dr. Hiers adequate procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution.

### EIGHTH CAUSE OF ACTION
### Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection of the Law
### (42 U.S.C. § 1983)

264.  Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

265.  By punishing Dr. Hiers for expressing his views on "microaggressions," but not punishing professors who express opposite views on those same subjects, Defendants have violated and are violating Dr. Hiers' right to equal protection under the Fourteenth Amendment.

266.  Dr. Hiers is similarly situated to other professors in the mathematics department, the College of Science, the University, and the University System.

267.  Defendants take no adverse employment actions against professors or other members of the University who support "microaggressions," but they take adverse employment action against professors, like Dr. Hiers, who question that paradigm.

268.  Defendants took this action pursuant to the unbridled authority that their unconstitutional faculty restrictions grant them.

269.  Since Defendants have retaliated against Dr. Hiers because of his protected expression, have placed unconstitutional conditions on his employment, and have violated his right to due process of law, discriminatory intent is presumed.

270.  Defendants' retaliatory and unconstitutional actions against Dr. Hiers burden Dr. Hiers' fundamental rights and have no rational basis.

271.  Defendants' retaliatory and unconstitutional actions against Dr. Hiers are underinclusive, prohibiting some expression while leaving other expression equally harmful to the University's asserted interests unprohibited.

272.  Defendants took adverse employment actions against Dr. Hiers in a discriminatory and

unequal manner, granting other professors the right to express their views on issues related to "microaggressions" while denying that right to Dr. Hiers, in direct violation of Dr. Hiers' equal protection rights.

### NINTH CAUSE OF ACTION
### Breach of Contract

273.  Plaintiff repeats and realleges each of the allegations in paragraphs 1–205.

274.  Defendants have breached their contract with Dr. Hiers for at least two reasons: (1) they refused to honor the written agreement between Defendants and Dr. Hiers for Dr. Hiers to teach in the spring 2020 semester, and (2) they disciplined Dr. Hiers without notice and without any of the procedural protections he was guaranteed under the University's *Misconduct Policy*.

275.  First, under Texas law, Defendant Cherry's written offers for Dr. Hiers to teach Linear Algebra and Probability Models in the Spring 2020 semester and Dr. Hiers' written acceptances formed an enforceable contract between the University and Dr. Hiers.

276.  By firing Dr. Hiers, the University has refused to honor that contract.

277.  Defendants have no legal excuse for breaching this contract.

278.  Second, under Texas law, the University's *Misconduct Policy* is an enforceable contract between the University and Dr. Hiers.

279.  As an Adjunct Professor, Dr. Hiers was entitled to procedural protections in the University's *Misconduct Policy*, particularly the requirements that he be given specific notice of his alleged misconduct and that he be allowed to respond to the allegations against him.

280.  By firing Dr. Hiers with no notice and repudiating Dr. Hiers' contract to teach in the spring of 2020, the University punished him for alleged misconduct. But the University did not follow the procedures laid out in the *Misconduct Policy*.

281.  By subjecting Dr. Hiers to disciplinary action without following those procedures, Defendants breached their own policies and thus denied Dr. Hiers the protections he was promised when he became a professor at the University.

282.  Defendants have no legal excuse for breaching the policies and the contract they represent.

283.  Plaintiff is entitled to recover reasonable attorney fees because this is a claim on a written contract within the meaning of TEX. CIV. PRAC. & REM. CODE § 38.001. As a result of Defendants' breach of the agreement, Plaintiff has been required to retain the services of the undersigned counsel to prosecute this action and is suing for the reasonable and necessary fees and costs it incurs to pursue this present action.  All conditions precedent to recovery of the requested attorneys' fees have been fulfilled.

### PRAYER FOR RELIEF

Dr. Hiers respectfully requests that this Court enter judgment against Defendants and provide Dr. Hiers with the following relief:

A.  A declaratory judgment that Defendants violated the First and Fourteenth Amendments, and breached their contracts with Dr. Hiers because he engaged in protected speech;

B.  A preliminary and permanent injunction ordering Defendants sued in their official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf:

   1.  To restore Dr. Hiers to his position as a faculty member in the University's mathematics department;

   2.  To honor Dr. Hiers' contracts as a faculty member of the University's mathematics department; and

   3.  To purge any and every reference to this entire incident, including the University's retaliatory actions, from Dr. Hiers' personnel file;

C.  A preliminary and permanent injunction prohibiting Defendants sued in their official capacities, their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the challenged provisions of their *Misconduct Policy*;

D.  Nominal, compensatory, and punitive damages for the violation of Dr. Hiers' First and Fourteenth Amendment and contractual rights, including lost wages;

E.  Dr. Hiers' reasonable attorneys' fees, costs, and other costs and disbursements in this action under 42 U.S.C. § 1988 and §38.001 et.seq. of the TEX. PRAC. & REM. CODE; and

F.  All other further relief to which Dr. Hiers may be entitled.

Respectfully submitted on the 15th day of April, 2020,

*/s/ Thomas S. Brandon, Jr.*

Thomas S. Brandon, Jr.
Texas Bar No. 02881400
WHITAKER CHALK SWINDLE &
SCHWARTZ, PLLC
301 Commerce Street, Suite 3500
Fort Worth, TX 76102
Telephone:  (817) 878-0532
Facsimile:  (817) 878-0501
tbrandon@whitakerchalk.com

David A. Cortman
Georgia Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
Telephone:  (770) 339-0774
Facsimile:  (770) 339-6744
dcortman@ADFlegal.org

Michael R. Ross*
*Lead Counsel*
Tennessee Bar No. 035304
Tyson C. Langhofer*
Kansas Bar No. 19241
ALLIANCE DEFENDING FREEDOM
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
Telephone:  (316) 265-8800
Facsimile:  (316) 265-1349
tlanghofer@ADFlegal.org
mross@ADFlegal.org

*Attorneys for Plaintiff Nathaniel Hiers*

*\*Pro hac vice applications forthcoming.*

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a jury by trial for all issues so triable.

*/s/ Thomas S. Brandon, Jr.*

THOMAS S. BRANDON, JR.
*Attorney for Plaintiff*

## DECLARATION UNDER PENALTY OF PERJURY

I, NATHANIEL HIERS, a citizen of the United States and a resident of the State of Texas, declare

under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of

my knowledge.

Executed this _____ day of April, 2020, at _____, Texas.

*/s/ see attached signature page*

NATHANIEL HIERS

Facsimile:  (817) 878-0501
tbrandon@whitakerchalk.com

David A. Cortman
Georgia Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
Telephone:  (770) 339-0774
Facsimile:  (770) 339-6744
dcortman@ADFlegal.org

Ashburn, VA 20147
Telephone:  (316) 265-8800
Facsimile:  (316) 265-1349
tlanghofer@ADFlegal.org
mross@ADFlegal.org

*Attorneys for Plaintiff Nathaniel Hiers*

*\*Pro hac vice applications forthcoming.*

### DEMAND FOR TRIAL BY JURY

Plaintiff demands a jury by trial for all issues so triable.

/s/ Thomas S. Brandon, Jr.

THOMAS S. BRANDON, JR.
*Attorney for Plaintiff*

### DECLARATION UNDER PENALTY OF PERJURY

I, NATHANIEL HIERS, a citizen of the United States and a resident of the State of Texas, declare under penalty of perjury under 28 U.S.C. § 1746 that the above is true and correct to the best of my knowledge.

Executed this ⏮14 day of April, 2020, at ⎯Denton⎯, Texas.

NATHANIEL HIERS

30