# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

NATHANIEL HIERS,

     *Plaintiff,*

v.

THE BOARD OF REGENTS OF THE
UNIVERSITY OF NORTH TEXAS SYSTEM,
et al.,

     *Defendants.*

Civil Case No. 4:20-cv-00321-SDJ

## PLAINTIFF'S RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

## Table of Contents

Table of Authorities .......................................................................................... iv

Introduction ...................................................................................................... 1

   I.  Dr. Hiers criticized the microaggressions fliers. ................................... 2

   II. Dr. Hiers defends his criticism, refuses to recant, and is fired for it. ............... 3

Response to Defendants' Statement of the Issues ........................................... 5

Legal Standard ................................................................................................. 6

Argument .......................................................................................................... 7

   I.  The Complaint pleads that Defendants violated Dr. Hiers' free speech rights in five ways. ................................................................................. 9

      A.  The Complaint pleads that Defendants retaliated against Dr. Hiers because of his speech. ..................................................................... 10

         1.  The Complaint pleads that Dr. Hiers' speech addressed a classic matter of public concern. .................................................. 11

         2.  The Complaint pleads facts that easily satisfy the other requirements to demonstrate his speech was constitutionally protected. ......................... 17

      B.  The Complaint pleads that Defendants subjected Dr. Hiers to unconstitutional conditions by demanding that he recant his views .......... 19

      C.  The Complaint pleads that Defendants compelled Dr. Hiers to speak an unwanted message by demanding that he recant his views and complete diversity training ............................................................... 21

      D.  The Complaint pleads that Defendants fired Dr. Hiers for the content and viewpoint of his speech. ................................................................. 23

      E.  The Complaint pleads that Defendants enforced overbroad speech restrictions. ...................................................................................... 25

   II. The Complaint pleads that Defendants violated Dr. Hiers' Fourteenth Amendment rights by enforcing vague policies, denying him procedural due process, and violating his equal protection rights. ........................... 26

      A.  The Complaint pleads that Defendants punished Dr. Hiers with a misconduct policy that is unconstitutionally vague ..................................... 26

      B.  The Complaint pleads that Defendants denied the minimal and required procedural due process protections before firing Dr. Hiers without notice. 28

         1.  The Complaint pleads that Dr. Hiers had a reasonable expectation of continued employment because he had a contract to teach for the spring 2020 semester. ............................................................ 29

    2. The Complaint pleads that Defendants denied Dr. Hiers any procedural due process. ............................................................................... 31

  C. The Complaint pleads that Defendants violated Dr. Hiers' equal protection rights because they treat similarly situated professors differently. ............ 32

III. The Complaint pleads that Defendants breached an enforceable contract and can fix that breach by reappointing Dr. Hiers as a professor. ......................... 32

IV. The Complaint pleads that all Defendants are personally liable as they enacted and enforced unconstitutional policies against Dr. Hiers. .................. 33

V. Sovereign immunity offers Defendants no refuge. ............................................ 35

VI. The Complaint pleads facts showing that Defendants do not deserve qualified immunity at all. ................................................................................... 36

  A. The Complaint pleads that Defendants violated clearly established First Amendment law by firing Dr. Hiers. .............................................. 36

  B. The Complaint pleads facts showing that Hiers' remaining claims rest on clearly established law. ................................................................. 39

Conclusion ............................................................................................................... 39

**Cases:**                                                                                      **Pgs**

*1320/1390 Don Haskins, Ltd. v. Xerox Commercial Solutions, LLC,*
   584 S.W.3d 53 (Tex. App. 2018) ............................................................... 29

*Adams v. Trustees of the University of N.C.-Wilmington,*
   640 F.3d 550 (4th Cir. 2011) ................................................................... 18

*Agency for International Development. v. Alliance for Open Society International,*
   Inc.,
   570 U.S. 205 (2013) ............................................................................. 22

*Aguilar v. Texas Department of Criminal Justice,*
   160 F.3d 1052 (5th Cir. 1998) ........................................................... 6, 35

*Anderson v. Pasadena Independent School District,*
   184 F.3d 439 (5th Cir. 1999) ................................................................ 34

*Arnette v. Kennedy,*
   416 U.S. 134 (1974) .............................................................................. 26

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011) .............................................................................. 36

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................... 6, 13

*Axson-Flynn v. Johnson,*
   356 F.3d 1277 (10th Cir. 2004) ........................................................... 22

*Bauer v. Sampson,*
   261 F.3d 775 (9th Cir. 2001) ................................................................ 19

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................... 6

*Board of County Commissioners, Wabaunsee County. v. Umbehr,*
   518 U.S. 668 (1996) .............................................................................. 20

*Boddie v. Connecticut,*
   401 U.S. 371 (1971) ..................................................................... 29, 38,39

*Breaux v. City of Garland,*
   205 F.3d 150 (5th Cir. 2000) ................................................................ 10

*Brooks v. Denver Public Schools,*
   No. 17–cv–01968–REB–MEH, 2017 WL 5495793 (D. Colo. Nov. 16, 2017) ........ 16

*Buker v. Howard County,*
   No. MJG–13–3046,Cty., 2015 WL 3456757, (D. Md. May 27, 2015)................... 16

iv

*Burnham v. Ianni,*
119 F.3d 668 (8th Cir. 1997) .................................................................. 24

*City of Chicago v. Morales,*
527 U.S. 41 (1999) ........................................................................... 5, 27

*City of Cleburne v. Cleburne Living Center,*
473 U.S. 432 (1985) .......................................................................... 5, 32

*Click v. Copeland,*
970 F.2d 106 (5th Cir. 1992) ................................................................. 19

*Coats v. Pierre,*
890 F.2d 728 (5th Cir. 1989) ................................................................. 28

*Cockrel v. Shelby County School District,*
270 F.3d 1036 (6th Cir. 2001) ............................................................... 19

*Cohen v. California,*
403 U.S. 15 (1971) ....................................................................... 7, 15, 16

*Cornelius v. NAACP Legal Defense & Education Fund, Inc.,*
473 U.S. 788 (1985) ........................................................................... 24

*Cutler v. Stephen F. Austin State University,*
767 F.3d 462 (5th Cir. 2014) ................................................................. 37

*Demers v. Austin,*
746 F.3d 402 (9th Cir. 2014) ................................................................. 18

*Department of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Commission,*
760 F.3d 427 (5th Cir. 2014) ................................................................. 20

*Ferguson v. Thomas,*
430 F.2d 852 (5th Cir. 1970) .......................................................... 5, 8, 28, 39

*Fire Fighters Association v. Barry,*
742 F. Supp. 1182 (D.D.C. 1990)............................................................. 16

*Gasparinetti v. Kerr,*
568 F.2d 311 (3d Cir. 1977)................................................................... 25

*Givhan v. Western Line Consolidated School District,*
439 U.S. 410 (1979) ....................................................................... 10, 21

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ........................................................................... 27

*Graziosi v. City of Greenville, Miss.,*
775 F.3d 731 (5th Cir. 2015) ................................................................. 13

*Harris v. Victoria Independent School District,*
168 F.3d 216 (5th Cir. 1999) ................................................................. 12

*Houston Federation of Teachers, Local 2415 v. Houston Independent School District*,
  251 F. Supp. 3d 1168 (S.D. Tex. 2017) .................................................................... 28

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019) .................................................................................................. 24

*Janus v. American Federation of State, County, and Municipal Employment,
  Council 31*,
  138 S. Ct. 2338 (2018) ............................................................................................ 11–12

*Juarez v. Aguilar*,
  666 F.3d 325 (5th Cir. 2011) ...................................................................................... 37

*Keyishian v. Board of Regents of University of State of N.Y.*,
  385 U.S. 589 (1967) ........................................................................................................ 9

*Kinney v. Weaver*,
  367 F.3d 337 (5th Cir. 2004) ...................................................................................... 20

*Koontz v. St. Johns River Water Management District*,
  570 U.S. 595 (2013) ..................................................................................................... 20

*Lane v. Franks*,
  573 U.S. 228 (2014) ................................................................................................ 5, 11

*Levin v. Harleston*,
  966 F.2d 85 (2d Cir. 1992) .......................................................................................... 19

*Liu v. Jackson*,
  2010 WL 342251 (Jan. 29, 2010) ............................................................................... 33

*McIntyre v. Ohio Elections Commission*,
  514 U.S. 334, 357 (1995) ............................................................................................ 17

*Mills v. Steger*,
  64 F. App'x 864 (4th Cir. 2003) ................................................................................. 19

*Morgan v. Swanson*,
  659 F.3d 359 (5th Cir. 2011) ................................................................................ 36, 37

*Mt. Healthy City School District Board of Education v. Doyle*,
  429 U.S. 274 (1977) ..................................................................................................... 10

*National Institute of Family & Life Advocates v. Beccera*,
  138 S. Ct. 2361 (2018) ................................................................................................ 22

*Nelson v. University of Texas at Dallas*,
  535 F.3d 318 (5th Cir. 2008) ...................................................................................... 35

*Norris v. Housing Authority of Galveston*,
  980 F. Supp. 885 (S.D. Tex. 1997) ............................................................................ 33

*Noyola v. Texas Department of Human Resources*,
  846 F.2d 1021 (5th Cir. 1988) .................................................................................... 38

*Perry Education Association v. Perry Local Educators' Association,*
    460 U.S. 37 (1983) ................................................ 24

*Perry v. Sindermann,*
    408 U.S. 593 (1972) .......................................... *passim*

*Pickering v. Board of Education,*
    391 U.S. 563 (1968) .......................................... *passim*

*Plyler v. Doe,*
    457 U.S. 202 (1982) ............................................. 32

*Porter v. Epps,*
    659 F.3d 440 (5th Cir. 2011) ............................... 5, 34

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ........................................... 7, 10

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ............................................. 24

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,*
    547 U.S. 47 (2006) .............................................. 23

*Salge v. Edna Independent School District,*
    411 F.3d 178 (5th Cir. 2005) ................................. 12

*Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.,*
    468 S.W.3d 557 (Tex. App. 2014) ......................... 29-30

*Seemuller v. Fairfax County School Board,*
    878 F.2d 1578 (4th Cir. 1989) ............................... 15

*Shatkins v. University of Texas at Arlington,*
    No. 4:06–CV–882–Y, 2009 WL 614788 (N.D. Tex. Mar. 10, 2009) ...................... 13

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ......................................... 14–15

*Springs Window Fashions Division, Inc. v. Blind Maker, Inc.,*
    184 S.W.3d 840 (Tex. App. 2006) ........................... 30

*Thayer v. City of Holton,*
    515 F. Supp. 2d 1198 (D. Kan. 2007) ...................... 13

*Thomas v. Board of Trustees of Galveston Independent School District,*
    515 F. Supp. 280 (S.D. Tex. 1981) .......................... 29

*Turner Broadcasting Systems, Inc. v. F.C.C.,*
    512  U.S. 622 (1994). .......................................... 21

*Turner v. Pleasant,*
    663 F.3d 770 (5th Cir. 2011) ................................... 6

*United States v. Stevens,*
    559 U.S. 460 (2010) ............................................................. 25

*Victor v. McElveen,*
    150 F.3d 451 (5th Cir. 1998) ............................................. 14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ............................................................. 27

*Wash. State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008) ............................................................. 25

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943) .................................................. 7, 22, 23

*Williams v. Reeves,*
    954 F.3d 729 (5th Cir. 2020) ............................................. 36

*Wilson v. Tregre,*
    787 F.3d 322 (5th Cir. 2015) ............................................. 10

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ............................................................. 22

## Other Authorities:

FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, *University of North Texas Investigates Music Theory Journal for Defending 19th Century Composer from Racism Charges* (Aug. 6, 2020), https://bit.ly/3l50WC3 ........................................ 32

Robert Montoya, *Democrats Declare War on Conservatives at University of North Texas*, TEXAS SCORECARD (July 9, 2020), https://bit.ly/32i831c ........................... 32

## INTRODUCTION

Last fall, Dr. Nathaniel Hiers criticized a flier on microaggressions that someone anonymously left in the faculty lounge at the University of North Texas. University officials shamed him, asked him to recant his criticism and reeducate himself on diversity, and then fired him for it. In fact, as alleged in the Complaint, officials admitted *in writing* that they fired him for precisely these three reasons. Compl. Ex. 12 at 1, ECF No. 1-13. They did so swiftly and without following any of the required procedures to terminate a faculty member. These allegations are sufficient to plead that Defendants violated Dr. Hiers' First Amendment, Fourteenth Amendment, and contractual rights.

In spite of this, Defendants filed a 40-page motion to dismiss. They argue that criticizing the microaggressions fliers is not protected speech, that Dr. Hiers was not entitled to notice and a hearing in front of a tribunal before they terminated him under either due process or their own *Misconduct Policy*, and that Dr. Hiers' and Defendant Cherry's written offer and acceptance for Dr. Hiers to teach in the Spring of 2020 was not a binding contract. But their arguments contradict the facts alleged in the Complaint and take no factual inferences in Dr. Hiers' favor, which is contrary to the motion to dismiss standard.

What's more, Defendants lose even on their version of the facts. It has been clearly established for decades that the government may not terminate employees for their protected speech, that it may not punish employees pursuant to vague and overbroad policies, and that it may not do so without giving employees a fair opportunity to defend themselves against the employer's charges.

Similarly, Defendants do not deserve sovereign or qualified immunity, which only apply to the request for damages, for ignoring law that has been clearly established repeatedly through Supreme Court and Fifth Circuit cases, many of which are similar to the facts here. Thus, Defendants' motion to dismiss should be denied.

## I.  Dr. Hiers criticized the microaggressions fliers.

According to the Complaint, on November 25, 2019, Dr. Hiers was off duty in the mathematics faculty lounge and saw a stack of fliers discussing the alleged harmfulness of "microaggressions." Compl. ¶¶ 90–91, ECF No. 1. The fliers were not endorsed by the University and were left anonymously. *Id.* ¶¶ 92–93. They broadly define microaggressions as "verbal and nonverbal" behaviors that, whether "intentional or unintentional," "communicate negative, hostile, and derogatory messages to people rooted in their marginalized group membership." *Id.* ¶¶ 94–95. They explain that statements like "America is a melting pot," "I believe the most qualified person should get the job," and "[b]eing forced to choose Male or Female when completing basic forms" are unacceptable microaggressions. *Id.* ¶¶ 98, 104.

The Complaint alleges that Dr. Hiers firmly rejects bias and prejudice against any group of people and believes that the University should encourage all people, of all backgrounds, to learn how to communicate effectively with one another and to contribute to the vibrant array of ideas and expression on campus. Accordingly, he believes that the concept of "microaggressions" actually hurts diversity and tolerance because it teaches people to see the worst in others, promotes a culture of victimhood, and suppresses alternative viewpoints instead of encouraging growth and dialogue. *Id.* ¶¶ 105–106.

For example, as alleged in the Complaint, someone can say that "America is a melting pot" to convey that America blends many different cultures, races, religions, and other people groups together in a way that benefits everyone and promotes tolerance for other peoples' beliefs and values. But per the fliers, that statement is a "microaggression" because someone *might* really be stating it to minimize racial, cultural, or other differences, or the listener might *subjectively* interpret it in that manner. *Id.* ¶¶ 110–111.

Because Dr. Hiers values diversity, tolerance, and growth, and because he believes

the fliers undermine those values, he communicated these beliefs by jokingly writing, "Please don't leave garbage lying around" on the chalkboard with an arrow pointing to one of the fliers. *Id.* ¶¶ 112–113.

## II. Dr. Hiers defends his criticism, refuses to recant, and is fired for it.

The next day, November 26, the head of the mathematics department, Defendant Schmidt, emailed the entire department a picture of Dr. Hiers' chalkboard message and stated, "Would the person who did this please stop being a coward and see me in the chair's office immediately. Thank you." *Id.* ¶ 123. Dr. Hiers responded to Defendant Schmidt later that day saying that he would come to his office to talk and that he did not "see anything 'cowardly' about commenting on silly political fliers left lying in the lounge. If it's fine for someone to leave stacks of them around the lounge, criticizing them should be fine too." *Id.* ¶ 126.

According to the Complaint, when they met, Defendant Schmidt made it clear that he objected to Dr. Hiers' expression because he opposed Dr. Hiers' views on microaggressions. *Id.* ¶ 127. He stated that Dr. Hiers' message was "stupid" and was the "nuclear option." *Id.* ¶ 128. He then pressured Dr. Hiers to apologize and asked him to take additional diversity training besides what was already required for faculty. *Id.* ¶¶ 128–134. Dr. Hiers declined to apologize, stood by his criticism of microaggressions, and rejected the additional diversity training. During the conversation, Defendant Schmidt never suggested that he might discipline Dr. Hiers. *Id.* ¶ 136.

The next Monday, Dr. Hiers learned that the University was refusing to allow him to teach the three classes in the spring 2020 semester that they had already agreed to allow him to teach. *Id.* ¶¶ 138–141. This was a surprise because Dr. Hiers and Defendant Cherry, the mathematic department's associate chair, had previously agreed through e-mail that Dr. Hiers would teach those same classes. *Id.* ¶¶ 84–88, 144; Compl. Exs. 6, 7, ECF Nos. 1-7, 1-8.

The next day, Dr. Hiers asked why the University was terminating his contract. About an hour later, Defendant Schmidt explained at length that he fired Dr. Hiers because he criticized the fliers, defended his criticism, and refused to recant his views. Compl. Ex. 12 at 1. He declared, "My decision not to continue your employment in the spring semester was based on your actions in the grad lounge on 11/26, and your subsequent response." *Id.* That is, he fired Dr. Hiers for the views he expressed, both on the chalkboard and in their conversation. Defendant Schmidt went on to write that, despite Dr. Hiers' views, the "microaggression" flier was not "political," that its contents "make[] very much sense," and that he was "disappointed about [Dr. Hiers'] general dismissal of these issues." *Id.* Second, he said that Dr. Hiers' chalkboard message "is upsetting, and can even be perceived as threatening," especially because it was left anonymously. *Id.* Third, he cited Dr. Hiers' refusal to recant and reeducate himself: "Everyone makes mistakes, and I'm all for forgiveness if actions are followed by honest regret. But you very much defended your actions, and stated clearly that you are not interested in any kind of diversity training." *Id.* "[Y]our actions and response are not compatible with the values of this department. So with regret I see no other choice than not to renew your employment." *Id.*

To summarize, the Complaint alleges that Defendant Schmidt disagreed with Dr. Hiers' views on microaggressions and that Schmidt fired Dr. Hiers because he defended his views, would not recant those views, and would not reeducate himself with additional diversity training. These allegations state plausible claims that Defendants violated Dr. Hiers' First and Fourteenth Amendment rights and breached their contract with Dr. Hiers. Thus, Defendants' motion should be denied.

# RESPONSE TO DEFENDANTS' STATEMENT OF THE ISSUES

1. ***Pickering* Applicability.** A government employer may not punish an employee for that employee's speech when it is made on a matter of public concern and it outweighs the employer's interests in the efficiency of public services. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Defendants not only punished Dr. Hiers for his off-duty speech, but committed viewpoint discrimination by allowing others with opposing views to go unpunished, and did so pursuant to an overbroad *Misconduct Policy.* Can the *Pickering* balancing test be applied at the motion to dismiss stage to dismiss Dr. Hiers' First Amendment claims where the Complaint pleads facts sufficient to establish First Amendment violations?

2. **Public Concern.** "Public concern" includes any speech that "can be fairly considered as relating to any matter of political, social, or other concern to the community" or "a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 n.12 (2014). Discussions about microaggressions are a ubiquitous and important issue at the University, in higher education, and the culture. Dr. Hiers criticized the microaggressions flier and defended and explained his views in front of Defendant Schmidt. Does the Complaint plausibly plead facts that Dr. Hiers spoke on a matter of public concern?

3. **Vagueness.** A restriction is void for vagueness if it "fail[s] to provide the kind of notice that will enable ordinary citizens to understand what conduct it prohibits." *City of Chi. v. Morales*, 527 U.S. 41, 56 (1999). Dr. Hiers alleges that he was fired pursuant to the *Misconduct Policy* and that the policy fails to define "misconduct" with any sort of precision or objective terms. Has Dr. Hiers plausibly pled a claim for vagueness?

4. **Procedural Due Process.** If a government employee has a reasonable expectation of employment, the government cannot fire him without giving him adequate notice and a hearing before a tribunal. *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir. 1970). Dr. Hiers had a contract to teach in the Spring of 2020, and Defendants terminated him with no prior warning, much less notice and a hearing. Has Dr. Hiers plausibly pled a claim for a violation of his procedural due process rights?

5. **Equal Protection.** "[A]ll persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and policies that infringe "personal rights protected by the Constitution" receive "strict scrutiny," *id.* at 440. Defendants punished Dr. Hiers for his views on microaggressions, but have not done so for persons with opposite views— namely, Defendant Schmidt or the person who left the fliers. Does the Complaint allege facts to plead a plausible Equal Protection claim?

6. **Personal Involvement.** A supervisory official is personally liable under § 1983 if *either* "(1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440 (5th Cir. 2011). Dr. Hiers alleges that all Defendants affirmatively participated in his firing and that those in authority over Defendant Schmidt also implemented the unconstitutional policies that led to Dr. Hiers' termination. Based on the alleged facts, did Dr. Hiers adequately plead that all Defendants personally participated in his termination?

7. **Breach of Contract.** The Complaint alleges that Defendant Cherry offered Dr. Hiers three classes for the Spring of 2020 and that Dr. Hiers accepted that offer in writing. Defendants then unilaterally rescinded that agreement and fired him in violation of their own *Misconduct Policy*. Has Dr. Hiers adequately pled a claim for breach of contract?

8. **Sovereign Immunity.** Sovereign immunity does not apply to claims for prospective relief or individual-capacity damages claims. *Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). Dr. Hiers has only sued Defendants for both. Does sovereign immunity apply?

9. **Qualified Immunity.** The defense of qualified immunity does not prohibit a damages claims if a plaintiff can show (1) a constitutional right was violated and (2) that the constitutional right was clearly established. *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011). The Supreme Court and Fifth Circuit have repeatedly held that punishing a government employee for his protected speech is unconstitutional in a wide variety of contexts, many of them extremely similar to this case. Has Dr. Hiers adequately plead facts sufficient under applicable law to overcome the defense of qualified immunity?

## LEGAL STANDARD

A 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). Dismissal is not appropriate if the complaint "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This does not require "detailed factual allegations." *Id.* at 555. Instead, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Dr. Hiers' Complaint has easily pled plausible claims for relief, which thus "raise[s] [his] right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and creates more than an "inference" that Defendants are liable, *Iqbal*, 556 U.S. at 678. In fact, Dr. Hiers wins even on Defendants' characterization of many of his claims. Nevertheless, the Court at this early stage must still accept all factual allegations as true and make all reasonable factual inferences in Dr. Hiers' favor.

ARGUMENT

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The Complaint alleges that Defendants fired Dr. Hiers because he criticized microaggressions and defended his views. Dr. Hiers sued Defendants to vindicate his rights. In asking this Court to dismiss these claims and grant them qualified immunity, Defendants ignore this "fixed star" and allegations in the Complaint that they find inconvenient. Dr. Hiers' Complaint more than adequately alleges facts that give rise to an inference of liability for each of his claims. What's more, he wins even on Defendants' version of the facts.

It is well-established that a government employer may not retaliate against an employee for engaging in protected speech, *Rankin v. McPherson*, 483 U.S. 378 (1987), refusing to give up his speech, *Perry v. Sindermann*, 408 U.S. 593 (1972), or for refusing to speak ideas with which he disagrees, *Barnette*, 319 U.S. 624. But Defendants punished Dr. Hiers for all three. His criticism of the microaggressions flier was an important statement against political correctness both in the University community and the culture at large—indeed, Defendants fired him for it.

Defendants now attack Dr. Hiers' speech on a motion to dismiss. They say it is not protected speech on a matter of public concern because it is anonymous, private, joking, and crude. But the manner and audience for expressive activity are irrelevant; courts have time and time again broadly protected all manner of speech, from "F**k the Draft," *Cohen v. California*, 403 U.S. 15 (1971), to jokes about assassinating President Reagan, *McPherson*, 483 U.S 378. And the Complaint alleges that Defendant Schmidt fired Dr. Hiers not only for his initial chalked message, but also for later defending it and refusing to recant his views.

The Complaint further alleges that Defendants contracted with Dr. Hiers to teach in the Spring of 2020, but refused to honor that contract or the procedural protections required before a government can terminate one of its employees. *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir. 1970). Defendants argue that Dr. Hiers was given due process because he met with Defendant Schmidt the day after his chalkboard expression. But this informal meeting in which Defendant Schmidt never even implied that Dr. Hiers would be subject to disciplinary action does not come close to meeting the procedures required, namely notice and a hearing before an impartial tribunal. *Id.*

Defendants also argue that Dr. Hiers deserved no due process because the written offer and acceptance between Dr. Hiers and Defendant Schmidt did not make a binding contract. But this ignores both basic contract law and the Complaint's alleged facts and inferences from those facts, which create more than a plausible claim for relief. Defendants use the same argument to argue that Dr. Hiers has no breach of contract claim, but this fails for the same reasons.

Likewise, the Complaint adequately alleges that the *Misconduct Policy* contains a vague and overbroad definition of "misconduct" and Defendants used that definition to punish Dr. Hiers' protected expression. Defendants rely on inapposite. They also simply deny that this happened, but that carries no water on a motion to dismiss.

Defendants next assert that most Defendants were not personally involved, but in doing so they again ignore the facts and factual inferences in the Complaint. Compl. ¶¶ 35, 37. The Complaint more than adequately pleads that they are all involved, either by affirmatively participating in firing Dr. Hiers or by creating or enforcing the policies and practices that led to punishing his protected expression.

Defendants also assert that they have sovereign immunity. But that doctrine only applies to suits against a State, which Dr. Hiers does not bring. Dr. Hiers has sued Defendants both in their individual and official capacities, so he can seek both

prospective relief and damages against Defendants.

Finally, Defendants argue that they are immune from damages under qualified immunity. In seeking qualified immunity, Defendants pretend the relevant First Amendment principles are complex and fact-intensive and that the law against firing public employees for their speech is not clearly established. But there is voluminous caselaw—from the Supreme Court and Fifth Circuit—establishing this proposition repeatedly and in numerous contexts, some of which are nearly identical in all material aspects to this case. Thus, Defendants—all of whom personally participated in terminating Dr. Hiers—are not entitled to immunity, sovereign or qualified.

The Complaint alleges that Defendants unceremoniously shamed Dr. Hiers as a coward, demanded that he recant his views and unlearn his wrong-think, and then unilaterally fired him when he would not submit to their politically correct orthodoxy—demands they even spelled out in writing. These allegations easily satisfy the plausibility requirement to survive a motion to dismiss. In fact, they establish that Defendants have acted directly contrary to the First Amendment and its promise to protect diversity of thought and "the marketplace of ideas," which is nowhere more important than in higher education. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). Thus, Defendants' motion should be denied.

## I. The Complaint pleads that Defendants violated Dr. Hiers' free speech rights in five ways.

The Complaint adequately alleges facts showing that by punishing Dr. Hiers for his speech and refusal to recant, Defendants violated Dr. Hiers' First Amendment rights in five ways. They (1) retaliated against Dr. Hiers for engaging in protected expression on a matter of public concern; (2) placed unconstitutional conditions on his employment; (3) tried to compel his speech by demanding that he recant his views and take remedial "diversity" training; (4) punished him for expressing disfavored viewpoints; and (5) weaponized an unconstitutionally overbroad definition of

"misconduct" in the *Misconduct Policy*. To survive Defendants' motion, Dr. Hiers need only plead facts showing it is plausible that Defendants violated the above rights. The Complaint easily meets this standard, and even Defendants' version of facts shows that they are properly pled.

### A. The Complaint pleads that Defendants retaliated against Dr. Hiers because of his speech.

For over fifty years, the Supreme Court has made it clear that a public employer cannot fire an employee because he engaged in protected speech. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *see Rankin v. McPherson*, 483 U.S. 378 (1987) (employee wrongly fired for joke about assassinating President Reagan); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979) (teacher wrongly fired for criticizing school's desegregation policy); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) (teacher wrongly fired for criticizing school's dress code); *Perry v. Sindermann*, 408 U.S. 593 (1972) (non-tenured professor wrongly fired for criticizing college's educational policies).

To bring a First Amendment retaliation claim, Dr. Hiers must allege that "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (citation omitted). Defendants do not contest prongs (1), (3), or (4), or that he spoke as a citizen. Nor could they. The Court must accept the allegations as true, *see* Compl. ¶¶ 145–68, and Defendants admitted in writing that they fired him because of his expression. Compl. Ex. 12 at 1; *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) ("Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands.") (citation omitted). As to prongs (2) and (3), the allegations establish that Dr. Hiers spoke as a private citizen and that his interest in speech

outweighs the Defendants' interest in the efficient provision of public services. Defendants instead focus their entire argument on mischaracterizing his speech and the relevant caselaw on "public concern." But even these arguments are wrong.

**1. The Complaint pleads that Dr. Hiers' speech addressed a classic matter of public concern.**

The First Amendment broadly protects speech addressing matters of public concern, particularly on important cultural or political matters. Dr. Hiers addressed microaggressions, which are important, controversial, and prevalent at the University, in higher education generally, and in the culture. Defendants insist that Dr. Hiers did not address a public concern because he spoke privately, anonymously, jokingly, and crudely. But the Complaint alleges—and Defendant Schmidt's email admits—that Dr. Hiers was fired for his chalkboard inscription <u>and</u> his defense of it, both of which were protected expression. So when Dr. Hiers talked with Defendant Schmidt, he explained his remarks more fully, and they ceased to be anonymous and joking. Regardless, no case law holds that if matters of public concern are stated jokingly, they somehow lose their protection. In fact, just the opposite is true. *See Rankin*, 483 U.S. 378. Thus, Dr. Hiers' speech was protected because the Complaint alleges it was on a matter of public concern.

**a. Dr. Hiers' speech dealt with controversial cultural and political issues, which are classic matters of public concern.**

The Supreme Court broadly construes "public concern" to include any speech that "can be fairly considered as relating to any matter of political, social, or other concern to the community" or "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (cleaned up). This includes speech on important cultural issues and "controversial subjects such as climate change, the Confederacy, sexual orientation and gender identity, evolution, and minority religions." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emp., Council 31*, 138 S. Ct. 2448, 2476 (2018). In fact, such speech

"occupies the highest rung of the hierarchy of First Amendment values and merits special protection." *Id.* It also includes criticizing an employers' practices or policies when doing so would give to the public "more than the fact of an employee's employment grievance" and contributes to a broader "background of existing community debate." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 187–88 (5th Cir. 2005).

Critiques of a governmental employer's policies or practices are also regularly recognized as matters of public concern. *See, e.g.*, *Perry*, 408 U.S. 593 (Texas junior college's decision not to convert to four-year program); *Mt. Healthy*, 429 U.S. 274 (school dress code); *Givhan*, 439 U.S. 410 (school district's desegregation policy). "Determining whether speech meets this threshold is a fact specific analysis," *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 221 (5th Cir. 1999), and requires a court to assess "the *content*, *form*, and *context* of a given statement, as revealed by the whole record." *Salge*, 411 F.3d at 186.

Here, according to the Complaint, Dr. Hiers' criticism of microaggressions is a quintessential matter of public concern given the news attention and debate it attracts, how controversial it is, and how prevalent it is in workplace culture and higher education. Compl ¶¶ 108–09. The Complaint also explains that Dr. Hiers' speech expresses his views on these important, high-profile issues. *Id.* ¶¶ 105–13. Defendant Schmidt recognized this when he debated the value of the microaggressions flier with Dr. Hiers in his office, *id.* ¶¶ 126–36, and after he fired him, Compl. Ex. 12 at 1 ("In our conversation you characterized the flyers that upset you as political statements. I looked at them in detail, and they are anything but. Every example of a microaggression listed there makes very much sense, and I am disappointed about your general dismissal of these issues . . . .").

Defendants liken Dr. Hiers' critique of a cultural and University issue to personal and personnel disputes, which are not matters of public concern. *See Salge*, 411 F.3d

at 186 ("[A] matter of public concern does not involve solely personal matters or strictly a discussion of management policies that is only interesting to the public by virtue of the manager's status as an arm of the government.") (cleaned up). Dr. Hiers was not praying for someone to get along with a difficult coworker, *Shatkins v. Univ. of Tex. at Arlington*, No. 4:06–CV–882–Y, 2009 WL 614788, at *1 (N.D. Tex. Mar. 10, 2009), hurling expletives at his supervisor, *Thayer v. City of Holton*, 515 F. Supp. 2d 1198, 1202, 1206 (D. Kan. 2007) (calling police chief, *inter alia*, "dumb college boy," "dumb son-of-a-bitch," "prick," and "gutless piece of shit"), or expressing general dissatisfaction with the "status quo" at his job, *Graziosi v. City of Greenville*, 775 F.3d 731, 738 (5th Cir. 2015). He was protesting a particular form of political correctness, one that is highly controversial, ubiquitous in the University, higher education, and the culture. Accordingly, the allegations of the Complaint aptly plead a plausible claim that Dr. Hiers' speech about microaggressions addressed a matter of public concern.

### b. The Supreme Court has held that speech made privately can address a matter of "public concern."

Defendants argue that Dr. Hiers did not address a matter of public concern because he voiced his criticism only in "UNT's faculty lounge." But Defendants also fired him for defending and explaining his remarks to Defendant Schmidt. Compl. ¶¶ 126–36, 145–64. And on a Motion to Dismiss, those facts control. *Iqbal*, 556 U.S. at 678.

What's more, courts have unflinchingly held that it is irrelevant whether an employee's speech was made "before a public audience." *Salge*, 411 F.3d at 187. In fact, "*Pickering*, *Perry*, and *Mt. Healthy* do not support the conclusion that a public employee forfeits his protection against governmental abridgement of freedom of speech if he decides to express his views privately rather than publicly." *Givhan*, 439 U.S. at 414 (employee's criticism of desegregation policy to supervisor was protected

speech as "inherently a matter of public concern"). This is especially true here since Dr. Hiers defended and expressed his remarks the next day to Defendant Schmidt. Compl. ¶¶ 126–35. After all, "when an employee speaks in response to an invitation and on a matter pertinent to that request, the context factor [of public concern] weighs in his favor." *Victor v. McElveen*, 150 F.3d 451, 458 (5th Cir. 1998).

Defendants insist that Hiers "never plausibly alleges that there was widespread community debate on the issue of microaggressions in the UNT workplace." Defs.' Mot. to Dismiss ("MTD") at 15, ECF No. 39. This showing is not required, especially on a motion to dismiss. Nor is a topic as controversial and ubiquitous as microaggressions unimportant or undeserving of discussion. *See supra* Argument I.A.1.a.

And there was debate. Someone, advocating in favor of one perspective on microaggressions, placed the fliers in the faculty lounge. Dr. Hiers, advocating a different view, critiqued them. Compl. ¶¶ 90–115. Defendant Schmidt joined and then ended that debate when he expressed his support for the fliers' views and demanded that Dr. Hiers recant his criticism. The allegations demonstrate that Defendant Schmidt clearly understood the chalkboard inscription as a substantive critique of the fliers, since he labeled Dr. Hiers a "coward" and twice defended the fliers. Compl. ¶¶ 123, 127–28, 150. And Defendants participated in that debate by firing Dr. Hiers when his views on the issue did not agree with theirs.

As the Complaint alleges, "Dr. Hiers wanted to promote diversity, tolerance, and growth in the academic environment" by criticizing microaggressions because he believes the fliers are inimical to all of those things. Compl. ¶ 113. Defendants imply there was no debate because Dr. Hiers' views were unpopular. But the First Amendment's "bedrock principle" is that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Texas v. Johnson*,

491 U.S. 397, 414 (1989)). "Indeed, 'the point of all speech protection is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.'" *Id.* (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995)).

### c. Satire and humor are time-tested methods of speaking on matters of public concern.

Defendants also equate Dr. Hiers' speech with unprotected expletives. Yet, none of his expression was remotely vulgar, as Defendants' own motion proves. Defs.' MTD at 1 (picturing the chalkboard message). And this claim wrongly excludes Dr. Hiers' defense of his remarks and his refusal to recant and submit to re-education training. These subsequent communications made clear that Dr. Hiers was serious about his critique. And these were also the reason Defendants fired him. Compl. ¶¶ 148–64. But even if Dr. Hiers' claims were based solely on the chalkboard expression, which they were not, the Complaint still states valid claims of First Amendment violations.

The tone of the speech—whether humorous, gentle, or caustic—is irrelevant. "The arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'" *Snyder*, 562 U.S. at 453 (quoting *Rankin*, 483 U.S. at 387). That is why the Supreme Court has protected statements like "F**k the Draft," *Cohen*, 403 U.S. at 18, and held that jokes about assassinating the president address matters of public concern. *Rankin*, 483 U.S. at 387. In particular, Dr. Hiers' "use of satire to comment on a matter of public concern [does] not deprive him of the protection afforded by the first amendment." *Seemuller v. Fairfax Cnty. Sch. Bd.*, 878 F.2d 1578, 1583 (4th Cir. 1989). Numerous courts recognize this. The Fourth Circuit held that a letter satirizing allegations of sexism by physical education teachers was protected speech and part of a long tradition of using humor to make social commentary: "From Greek and Roman antiquity until the present time, commentators on public affairs have colored their writing with

satire." *Id.* In another case, bumper stickers stating "D.C. Fire Department—It's Not Just a Job, It's a Joke Too!" were protected speech because they conveyed "a loss of discipline and good order in the Fire Department." *Fire Fighters Ass'n v. Barry*, 742 F. Supp. 1182, 1190 (D.D.C. 1990). And jokes about "high capacity" liberals and "assault liberal[s]" on gun control were also "obviously a matter of public concern." *Buker v. Howard Cnty.*, No. MJG–13–3046, 2015 WL 3456757, at \*2, \*7 (D. Md. May 27, 2015).

Defendants, on the other hand, liken this kind of satirical humor to expletives and sexual harassment. Dr. Hiers used a teasing remark to critique an idea. This is nothing like the cases Defendants cite. Defs.' MTD at 28–31. Dr. Hiers did not use expletives—in or out of class. *Martin v. Parish*, 805 F.2d 583, 584–85 (5th Cir. 1986) (teacher repeatedly used expletives in class); *but see Cohen*, 403 U.S. 15 ("F\*\*k the Draft" jacket). Nor did he employ "extreme profanity on a regular basis," talk about students' sex lives, or make derogatory remarks about women. *Buchanan v. Alexander*, 919 F.3d 847, 850–51 (5th Cir. 2019); *Brooks v. Denver Pub. Schs.*, No. 17–cv–01968–REB–MEH, 2017 WL 5495793, at \*1, \*9 (D. Colo. Nov. 16, 2017) (plaintiff admitted that sharing "really graphic" joke with coworkers and joking about a "birthday spank line" while drunk at a work party were inappropriate and graphic). To call "garbage" an expletive—especially when used to describe an idea—is an insult to expletives. Rather, Dr. Hiers was asserting the lack of value of the fliers, just like Cohen used his jacket to "assert[] the evident position on the inutility or immorality of the draft." *Cohen*, 403 U.S. at 18.

### d. The First Amendment protects anonymous speech.

Defendants also take issue with Hiers' decision to make his chalkboard expression anonymous. In fact, "anonymous" or "anonymously" appears 28 times in their motion, including four times in their headings. But this is wrong on the facts and the law.

Factually, the Complaint alleges that Defendants fired Dr. Hiers for defending his

remarks in person to Defendant Schmidt, Compl. ¶¶ 150–61, and for refusing to change his views, *id.* ¶¶ 162–66. Defendants argue that "because Hiers didn't sign his name to the message, his joke would not realistically lead to some future academic debate." Defs.' MTD at 29–30. Ironically, they forget that Dr. Hiers was responding *to someone else's anonymous speech.* Compl. ¶¶ 91–93. And if Dr. Schmidt had not stifled the discussion the next morning by labeling him as a coward, it is also likely that someone else would have responded to Dr. Hiers' argument. At any rate, a truncated debate did occur—with Defendant Schmidt, who contested Dr. Hiers' views in their meeting and in his e-mail. *id.* ¶¶ 127–29, 150–53, and with all of the Defendants who weighed in on the debate by participating in the firing of Dr. Hiers because his views did not align with theirs.

Legally, it is irrelevant whether speech is anonymous. The First Amendment has long protected anonymous speech as "a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). "It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *Id.* Even the Founding Fathers wrote *The Federalist Papers* under pseudonyms. Dr. Hiers may not have been writing a treatise on American government, but he was certainly putting himself at risk and protesting a controversial issue. The anonymity of some of his speech, which didn't stay anonymous for long, does not diminish its value or its constitutional protection in the least.

## 2. The Complaint pleads facts that easily satisfy the other requirements to demonstrate his speech was constitutionally protected.

Defendants do not contest the other requirements for Dr. Hiers to demonstrate that the First Amendment protects his speech, namely that he spoke as a citizen and

that "his interest in the speech outweighs the [University's] interest in the efficient provision of public services." *Wilson*, 787 F.3d at 325.

First, the Complaint alleges that Dr. Hiers spoke as a citizen because he was *not* speaking pursuant to his official job responsibilities. Compl. ¶¶ 208–09. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Conversely, "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423. This extends to "discussing politics with a co-worker." *Id.* Speaking off duty in the faculty lounge to other professors was, under any measure, not a part of Hiers' official job duties and thus occurred in his capacity as a citizen.

Furthermore, the Supreme Court recognized that professors are different than other public employees and that "expression related to academic scholarship or classroom instruction implicates additional constitutional interests" beyond the "customary employee-speech jurisprudence." *Id.* at 425. And so it declined to extend the "official duties" test to faculty: "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* Multiple circuits have thus declined to apply this test to university faculty. *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 562–64 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014). Thus, when Dr. Hiers critiqued ideas he considered harmful, he spoke "as a citizen" for First Amendment purposes.

And second, a professor's interest in engaging in free expression is greater than any interest a university may have in efficiency, since a "[u]niversity community as a whole[] is less likely to suffer a disruption in its provision of services as a result of

public conflict" than other public agencies. *Mills v. Steger*, 64 F. App'x 864, 872 (4th Cir. 2003). In one case, a professor used profanity, threats (with violent overtones), and other dehumanizing terms in the campus paper, but the balancing test still favored him because "the vigorous exchange of ideas and resulting tension between an administration and its faculty is as much a part of college life as homecoming and final exams." *Bauer v. Sampson*, 261 F.3d 775, 779–81, 785 (9th Cir. 2001). Similarly, when a professor published "denigrating comments concerning the intelligence and social characteristics of blacks," he so enraged students that they physically disrupted his classes and required the university to post security in his classroom. *Levin v. Harleston*, 966 F.2d 85, 87, 90 (2d Cir. 1992); *Levin v. Harleston*, 770 F. Supp. 895, 902–07 (S.D.N.Y. 1991). Even so, there was "no question" that his speech was protected under *Pickering*'s balancing test. *Levin*, 770 F. Supp. at 921.

A balancing test that favors professors whose speech sparks violence certainly favors Dr. Hiers. He adequately pleaded facts showing that his speech did not disrupt any classes, meetings, or other University activities. Compl. ¶¶ 120, 182, 183. And regardless, Defendants must make a "particularly strong showing that [his] speech interfered with workplace functioning before taking action." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1053 (6th Cir. 2001). They cannot do this, since they do not identify any "countervailing considerations . . . against the employees' right to believe as they chose." *Click v. Copeland*, 970 F.2d 106, 112 (5th Cir. 1992).

## B. The Complaint pleads that Defendants subjected Dr. Hiers to unconstitutional conditions by demanding that he recant his views.

Defendants again rely on the "public concern" analysis to argue that Dr. Hiers has no unconstitutional conditions claim. This argument falls flat for the reasons above. They also argue that the University never tried to place conditions on Dr. Hiers' employment. But Defendants ignore the Complaint's allegations of their coercive actions toward Dr. Hiers. In addition, Supreme Court precedent directly holds that

the unconstitutional conditions doctrine applies to a public university that refuses to rehire a non-tenured professor because of his protected speech. *Perry*, 408 U.S. at 597.

The unconstitutional conditions doctrine is well-established. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." *Id.* at 597; *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 437 (5th Cir. 2014) (quoting *Perry*). This applies "even if he has no entitlement to that benefit." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674 (1996). The Supreme Court has repeatedly applied this doctrine in the public employment context. *Id.* at 674–75 (collecting cases). And it employs the *Pickering* balancing test to determine whether speech is protected. *Id.* at 674–76.[1]

Moreover, the Supreme Court has repeatedly employed this doctrine to strike down restrictions on educators' expression. *See, e.g.*, *Keyishian*, 385 U.S. 589 (professor objecting to loyalty oath); *Perry*, 408 U.S. at 597 (professor criticizing college's educational requirements); *Givhan*, 439 U.S. at 416 (teacher criticizing desegregation policies); *Mt. Healthy*, 429 U.S. at 283 (teacher criticizing dress code).

Here, the Complaint alleges Defendants fired Dr. Hiers for exercising his right to free speech. The only way he could have avoided termination, according to them, was to recant his views and participate in additional diversity training, or to have self-censored initially. But this attacks "the heart of the First Amendment . . . that each person should decide for himself or herself the ideas and beliefs deserving of

---

[1] Lest there be any confusion, the Supreme Court has clarified that *Perry* and its progeny are part of "the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *see also Umbehr*, 518 U.S. at 680 (recognizing "the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents."); *Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir. 2004) (en banc) (describing *Perry* as "the *locus classicus* of the 'unconstitutional conditions' doctrine).

expression, consideration, and adherence. Our political system and cultural life rest upon this ideal." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Defendants claim that there were no unconstitutional conditions because they never explicitly gave Dr. Hiers an opportunity to forfeit his constitutional rights. But they did exactly that when Defendant Schmidt ordered the "coward" who wrote on the chalkboard to come and see him. Defendants also explicitly stated that they fired Dr. Hiers because he did not express "honest regret" and was "not interested in any kind of diversity training." Compl. Ex. 12 at 1.

And as a matter of law, it is irrelevant whether Dr. Hiers himself knew of the condition beforehand; the unconstitutional conditions doctrine is not so formal. In *Perry*, a Texas college refused to renew the contract for one of its non-tenured professors after he criticized its policies. 408 U.S. at 595. The college denied that it fired him for the criticism and gave him no warning or hearing. *Id.* It did not negotiate or ask the professor to waive his constitutional rights. Still, the Supreme Court held that "refus[ing] to renew the teaching contract on an impermissible basis—as a reprisal for the exercise of constitutionally protected rights" was impermissible. *Id.* at 598. And in *Givhan* and *Mt. Healthy*, the Supreme Court never assessed whether the teachers were given a chance to retract their views before they were terminated.

Defendants ignore these facts, but that cannot save them. Even under their narrative, Dr. Hiers' claim has been adequately plead and falls squarely in line with controlling Supreme Court precedent.

### C. The Complaint pleads that Defendants compelled Dr. Hiers to speak an unwanted message by demanding that he recant his views and complete diversity training.

Defendants similarly argue that they never tried to compel Dr. Hiers' speech because they never "threatened [him] to stay silent" or "required [him] to publicly announce his support for the concept of microaggressions." Defs.' MTD at 35. But again, this ignores the Complaint and their own writing, which stated that they fired

Dr. Hiers because he never took re-educational diversity training or expressed "honest regret" about his views. Compl. Ex. 12 at 1. These facts both are true and, at this stage, must be taken as true, and they adequately demonstrate a compelled speech claim.

It has long been clear that the state cannot "force[] an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977). This is a "fixed star in our constitutional constellation." *Barnette*, 319 U.S. at 642. "Compelling individuals to mouth support for views they find objectionable"—as the Complaint alleges Defendants have done here—"violates that cardinal constitutional command," *Janus*, 138 S. Ct. at 2463, and "is always demeaning." *Id.* at 2464. Thus, a law requiring "involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." *Barnette*, 319 U.S. at 633.

This applies broadly to many types of compulsion, whether it is affirming political allegiance (*Barnette*), apparent affirmation of an ideological point of view (*Wooley*), conditioning a subsidy on affirming a view (*Agency for Int'l Dev. v. All. for Open Soc'y Int'l., Inc.*, 570 U.S. 205 (2013)), or even posting informational notices for state-sponsored services that contradict one's beliefs, *Nat'l Inst. of Family & Life Advocates v. Beccera*, 138 S. Ct. 2361 (2018). Even an "indirect discouragement" runs afoul of the First Amendment. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004).

Here, Defendant Schmidt called Dr. Hiers a coward, said his speech was "stupid" and the "nuclear option," and pressured him to apologize and take remedial diversity training for his speech. Compl. ¶¶ 123–32. Then Defendants fired him and admitted that they did so because he did not express "honest regret," "very much defended [his] actions, and stated clearly that [he was] not interested in any kind of diversity training." Compl. Ex. 12 at 1.

Defendants argue that Dr. Hiers can't maintain a compelled speech claim because

he "doesn't allege that he ever spoke or refrained from speaking about microaggressions as a result of UNT's conduct." Defs.' MTD at 35. But the First Amendment does not require a plaintiff to violate his conscience to maintain a claim. The case they cite merely states that a compelled speech claim will not lie when someone's own speech is not at issue:

> This Court has found compelled-speech violations where the complaining *speaker's own message* was affected by the speech it was forced to accommodate. Here, however, the schools are not speaking when they host interviews and recruiting receptions. They facilitate recruiting to assist their students in obtaining jobs. Thus, a law school's recruiting services lack the expressive quality of, for example, the parade in *Hurley*.

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 49 (2006) (emphasis added) (citing *Hurley*, 515 U.S. at 566).

*Rumsfeld* does *not*, as Defendants contend, require Dr. Hiers to violate his conscience by actually acquiescing to the government's compulsion. Indeed, the students in *Barnette* chose expulsion over reciting the pledge of allegiance. 319 U.S. at 630. And the pro-life pregnancy centers in California never advertised abortions as the state demanded. *NIFLA*, 138 S. Ct. at 2370.

Finally, Defendants state that Dr. Hiers "was never required to *publicly* announce his support for the concept of microaggressions or to otherwise *publicly* apologize for his conduct." Defs.' MTD at 35. But again, whether the government seeks to compel speech in public or private is wholly immaterial.

For these reasons, Dr. Hiers has adequately alleged a claim of compelled speech.

**D. The Complaint pleads that Defendants fired Dr. Hiers for the content and viewpoint of his speech.**

Dr. Hiers has also pled facts showing it is plausible that Defendants unconstitutionally punished Dr. Hiers for the content and viewpoint of his speech. Defendants do not refute this claim specifically, but the facts show and support the inference that Defendants engaged in impermissible viewpoint discrimination. Dr. Hiers, like many other professors, engaged in the open and free expression of ideas,

both political and non-political, serious and lighthearted, in the faculty lounge. Compl. ¶ 116. But when he expressed his views on microaggressions, Defendants took swift action to condemn and punish him.

It is well-established that in any type of forum, the government must refrain from discriminating against speakers based on their viewpoint. *Perry Educ. Ass'n v. Perry Local Educators' Assoc.*, 460 U.S. 37, 46 (1983) (school could limit access to teacher mailboxes "as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"). After all, viewpoint discrimination is "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), and a "poison to a free society," *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring).

As explained above, Defendants admittedly punished Dr. Hiers for his views on microaggressions and told him that his expression and defense of it "are not compatible with the values of this department." Compl. Ex. 12 at 1. Yet Defendants took no action against the person that left the fliers in the faculty lounge. Compl. ¶¶ 135, 156. Defendants' discriminatory actions are unconstitutional viewpoint discrimination. *See Burnham v. Ianni*, 119 F.3d 668, 676 (8th Cir. 1997) (suppressing unpopular views from university history department's display case was "unreasonable both in light of the purpose served by the forum and because of its viewpoint-based discrimination"). Since Dr. Hiers was a "member of the class of speakers for whose especial benefit the forum was created," Defendants "violate[d] the First Amendment" by denying him "access . . . solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

### E. The Complaint pleads that Defendants enforced overbroad speech restrictions.

Defendants argue that Dr. Hiers lacks standing to challenge the *Misconduct Policy* for overbreadth because the University never applied it to him and that the policy is not overbroad because employers can broadly punish different kinds of misconduct. But the first point is wrong, again, because Defendants ignore the high hurdle for them to succeed on a motion to dismiss. The Complaint alleges that Defendants applied the *Misconduct Policy* to Dr. Hiers. The end. Compl. ¶¶ 238–44. And as to the second point, Defendants cannot rely on overbroad terms that encompass a substantial amount of protected speech. Thus, the Complaint states a valid claim that the *Misconduct Policy* is unconstitutionally overbroad and that it has been applied to Dr. Hiers.

A regulation is facially overbroad under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

Here, Dr. Hiers has sufficiently alleged an overbreadth claim. The *Misconduct Policy* authorizes the University to discipline professors like Dr. Hiers for anything the University deems "misconduct." But it defines misconduct to include virtually any protected speech using phrases like "activity that adversely affects the mission or reputation of the university." Compl. Ex. 2 at 2, ECF No. 1-3. Without further guidance, faculty members are left to guess at the University's mission or what the University might consider harmful to its reputation. And given its apparent endorsement of certain political ideologies, misconduct reaches a substantial amount of core protected speech. *See Gasparinetti v. Kerr*, 568 F.2d 311 (3d Cir. 1977) (regulation prohibiting police from "publicly disparag[ing] or comment[ing] unfavorably or disrespectfully on the official action of a superior officer" held to be overbroad). Here, the Complaint alleges that the University fired Dr. Hiers for

dissenting from their orthodoxy on microaggressions.

Defendants argue that the overbreadth claim fails as a matter of law under *Arnette v. Kennedy*, 416 U.S. 134 (1974). Not so. There, the Lloyd-LaFollette Act allowed a federal employee to be removed only for "such cause as will promote the efficiency of the service." *Id.* at 162. The Supreme Court emphasized that the above language "was not written upon a clean slate." *Id.* at 160. Rather, the Act had a lengthy legislative history and extensive administrative guidance that narrowed and elucidated the challenged provisions. *Id.* But here, there are no limiting regulations and no legislative history that restrict the regulation from punishing protected speech. Further, the Complaint alleges that Defendants considered Dr. Hiers' protected political expression as misconduct deserving of termination, so the *Misconduct Policy* necessarily covers protected expression. In *Arnette*, the plaintiff had no evidence that he was discharged for protected speech.

For this same reason, the Defendants' standing arguments fall flat. They state that Hiers has no standing because he has not chilled his speech and that he will not chill his speech going forward. Defs.' MTD at 35. But Dr. Hiers has adequately alleged that the Defendants applied the overbroad *Misconduct Policy* to him and that he was injured—fired—from his job because of it, Compl. ¶¶ 238–44, so he has adequately pled facts to establish standing.

## II. The Complaint pleads that Defendants violated Dr. Hiers' Fourteenth Amendment rights by enforcing vague policies, denying him procedural due process, and violating his equal protection rights.

### A. The Complaint pleads that Defendants punished Dr. Hiers with a misconduct policy that is unconstitutionally vague.

Defendants repeat most of their overbreadth argument to argue that the *Misconduct Policy* is not vague. But this fails for many of the same reasons as above.

A restriction is void for vagueness if it "fail[s] to provide the kind of notice that will enable ordinary citizens to understand what conduct it prohibits" or if it

"authorize[s] and even encourage[s] arbitrary and discriminatory enforcement." *City of Chi. v. Morales*, 527 U.S. 41, 56 (1999). The latter is unconstitutional because it "impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). And a law that touches on "sensitive areas of basic First Amendment freedoms," *id.*, is subject to "a more stringent vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

Here, the *Misconduct Policy* fails to adequately give fair notice of what kind of "misconduct" is prohibited and is therefore unconstitutionally vague. "Misconduct" is defined non-exhaustively and contains many subjective terms like "activity [that] adversely affects the mission or reputation of the university," or "[a]ction[s] that impair or prevent other members of the university community." Compl. Ex. 2 at 1–2. Courts have rejected that a university's "mission or reputation" provides adequate guidelines to restrain officials' discretion. *See Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) ("The definition of the groups falling within the 'educational mission of the school' is so vague that Centennial has virtually unlimited discretion in deciding which groups qualify and which do not.") (citing *Bd. of Educ. v. Mergens*, 496 U.S. 226, 244 (1990)); *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring) (allowing schools to censor speech based on the schools' "educational mission" "would give public school authorities a license to suppress speech based on political and social issues based on disagreement with the viewpoint expressed . . . . [and] strikes at the very heart of the First Amendment").

These subjective and imprecise terms do not apprise faculty like Dr. Hiers of the type of speech that might be covered and they invite subjective and arbitrary enforcement by University administrators like Defendants. The Complaint adequately alleges that Defendants fired Dr. Hiers pursuant to this vague policy for the same reasons as above. *See supra* Argument I.E. For these reasons, the Complaint

states a valid claim that the *Misconduct Policy* is impermissibly vague.

**B. The Complaint pleads that Defendants denied the minimal and required procedural due process protections before firing Dr. Hiers without notice.**

As alleged in the Complaint, Dr. Hiers had a contract to teach in the Spring of 2020. As a professor at a public university, the University was obliged to follow certain procedures before it could terminate Dr. Hiers. Yet it followed none of the required procedures. These allegations easily state a plausible claim that the University violated Dr. Hiers' procedural due process rights. Defendants deny that Dr. Hiers had a reasonable expectation of employment and argue that, even if he did, his meeting with Defendant Schmidt satisfied the required procedures. But the former ignores the binding contract, and the latter glibly conflates an informal meeting with notice and a hearing before a tribunal.

A government employer violates an employee's procedural due process rights where the employee has a "protectable property interest" in continued employment. *Coats v. Pierre*, 890 F.2d 728, 732 (5th Cir. 1989). "A university professor has a protectable property interest in his position . . . if he can demonstrate a reasonable expectation of continued employment." *Id.*

If there is a protectable property interest, the state must follow certain procedural guidelines when terminating the employee. *Ferguson*, 430 F.2d at 856. Before a public university can fire a professor, for example, it must at least (a) advise him "of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist," (b) advise him "of the names and the nature of the testimony of witnesses against him," (c) provide him "a meaningful opportunity to be heard in his own defense," and (d) "that hearing should be before a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges." *Id.* at 856. This rule applies regardless of whether an employee is at-will or tenured. *See, e.g.*, *Houston Fed'n of Teachers, Local 2415 v. Houston Indep. Sch. Dist.*,

251 F. Supp. 3d 1168, 1173 (S.D. Tex. 2017) ("Probationary and term contracts create a protected property interest in employment during the term of the contract."). And "in the absence of some 'extraordinary situations where valid governmental interest is at stake,' due process requires an opportunity for a hearing prior to the deprivation of any property interest." *Thomas v. Bd. of Trs. of Galveston Indep. Sch. Dist.*, 515 F. Supp. 280, 287 (S.D. Tex. 1981) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)).

### 1. The Complaint pleads that Dr. Hiers had a reasonable expectation of continued employment because he had a contract to teach for the spring 2020 semester.

The Complaint alleges facts showing it is plausible that Dr. Hiers had a reasonable expectation of employment for the Spring of 2020—indeed, he had a written contract for it—but Defendants terminated him without providing him any of the required procedures to allow him to defend himself. Compl. ¶¶ 168–78. These facts must be taken as true and any inferences made in favor of Dr. Hiers. This agreement constituted a "contract of employment with a state" which created a protectable property interest. *Thomas*, 515 F. Sup. at 285.

Defendants argue that Dr. Hiers had no actual contract because (1) there were no essential terms, and (2) the previous offer letter disclaimed any "previous written or oral commitment." Defs.' MTD at 40. The first argument is wrong because the Complaint alleges that Dr. Hiers and Defendants understood the essential terms of the contract based on the parties' previous course of conduct. *1320/1390 Don Haskins, Ltd. v. Xerox Commercial Sols., LLC*, 584 S.W.3d 53, 63 (Tex. App. 2018) ("[A] court may imply terms that are reasonably implied . . . . by the aid of common usage and reasonable implications of fact . . . . or by usage of trade or by course of dealing between the parties."); *Schuhardt Consulting Profit Sharing Plan v. Double Knobs Mountain Ranch, Inc.*, 468 S.W.3d 557, 567 (Tex. App. 2014) ("An implied agreement may arise from the regular course of conduct between the parties and 'the

facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement thereto.'") (citation omitted). The allegations of the Complaint establish that the material terms were already agreed upon—the going rate was $3,600 per class per semester; his duties would be substantially similar to many of the classes he had taught at the University since 2013, Compl. ¶¶ 75–76; the classes he would teach were set; and the term was for Spring 2020 with a fixed beginning and end date. These allegations must be taken as true, and any inferences made from them must be in favor of Dr. Hiers.

Second, Defendants argue that they did not have a contract with Dr. Hiers for the Spring 2020 semester because the Fall 2019 offer letter disclaims any oral or written commitments made prior to the letter. But the Complaint alleges facts establishing that Defendants did enter into a contract with Dr. Hiers and all plausible facts and inferences must be construed in Dr. Hiers' favor. Defendants' argument cannot overcome that high hurdle.

Moreover, this argument misstates the intent of that provision. The language in the Fall 2019 letter relied upon by Defendants states that "[n]o previous written or oral *commitment* will be binding on the University" except what was specified in the letter. Compl. Ex. 4 at 2, ECF No. 1-5. This is a "merger clause," because it "memorializes the parties' intent to integrate or absorb their prior negotiations, agreements, or understandings" into the written document. *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 870 (Tex. App. 2006). This clause simply provides that *once the agreement is signed*, neither party can use evidence of a prior agreement to modify the terms of the written agreement. This provision is not applicable to the present situation because the parties never signed a written agreement which contained that provision. Rather, the Complaint alleges that Defendants contracted for Dr. Hiers to teach in the Spring of 2020 through the email exchanges on November 18–19. If Dr. Hiers had signed the Spring 2020 offer

letter it would have memorialized and may have even superseded that email agreement, but the University refused to let Dr. Hiers sign it and instead terminated him. Thus, this clause is inapplicable to the present situation.

In addition to the offer and acceptance creating a contract, the essential terms were already understood and agreed upon by both parties. If not, the University would never have prepared an offer letter for Dr. Hiers. At a minimum, the allegations of the Complaint establish a "reasonable expectation of continued employment." *Coats*, 890 F.2d at 732.

### 2. The Complaint pleads that Defendants denied Dr. Hiers any procedural due process.

The second due process prong is also straightforward. Before terminating Dr. Hiers, Defendants made no attempt to satisfy even the "[m]inimal procedural due process requirements," *i.e.*, sufficient notice, a hearing, and a tribunal. *Thomas*, 515 F. Supp. at 290. The Court need not determine the plausibility of this prong or make any factual inferences, since Defendants admit these key facts.

Defendants argue that Defendant Schmidt provided Dr. Hiers all of the required due process when he required Dr. Hiers to go to his office on November 26. By doing so, they admit that they provided no other protections for Dr. Hiers.

This assertion also mischaracterizes the nature of the discussion—and the Court must accept Dr. Hiers' allegations. Compl. ¶¶ 127–36. Although they discussed Dr. Hiers' speech on microaggressions, the Complaint alleges that Defendant Schmidt never told Dr. Hiers this could get him fired; he never apprised him of who was offended (other than Defendant Schmidt); and he certainly never gave Dr. Hiers a full and fair opportunity to evaluate the charges and present a defense to the charges in front of an impartial tribunal. Compl. ¶¶ 174–78.

Their arguments about grievance procedures and UNT Policy § 6.051 miss the mark. Dr. Hiers is not concerned with his own right to present a grievance, but with

the University's unilateral termination of him without complying with the proper procedural requirements required by due process and its own *Misconduct Policy*.

Thus, the Complaint adequately pleads a procedural due process claim.

## C. The Complaint pleads that Defendants violated Dr. Hiers' equal protection rights because they treat similarly situated professors differently.

Defendants argue that Dr. Hiers does not adequately plead an equal protection claim because a "class-of-one" claim is not viable for a public employee. But the Complaint makes clear that Dr. Hiers' equal protection claim rests not on that theory, but on the principle that "all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and that policies that infringe "personal rights protected by the Constitution" receive "strict scrutiny," *id.* at 440, and are "presumptively invidious." *Plyler v. Doe*, 457 U.S. 202, 216–17 (1982).

As alleged in the Complaint, Defendants punished Dr. Hiers for criticizing microaggressions. *See, e.g.*, Compl. ¶¶ 123–84. But they took no action against the person who left the fliers supporting microaggressions. Discovery will also show that Defendants have punished or condoned punitive action against other members of the University for having the same or similar views as Dr. Hiers. *See, e.g.*, FOUND. FOR INDIVIDUAL RIGHTS IN EDUC., *University of North Texas Investigates Music Theory Journal for Defending 19th Century Composer from Racism Charges* (Aug. 6, 2020), https://bit.ly/3l50WC3; Robert Montoya, *Democrats Declare War on Conservatives at University of North Texas*, TEXAS SCORECARD (July 9, 2020), https://bit.ly/32i831c. These actions easily show that it is plausible that Defendants violated Dr. Hiers' Equal Protection rights because of his views on microaggressions and political correctness.

## III. The Complaint pleads that Defendants breached an enforceable contract and can fix that breach by reappointing Dr. Hiers as a professor.

The Complaint states a plausible claim for breach of contract. It alleges that

Defendant Cherry offered Dr. Hiers a teaching position for three sections of mathematics classes in the Spring of 2020, that Dr. Hiers accepted that offer, and that Defendants refused to honor that contract or the contractual terms in the *Misconduct Policy* when firing him. Contrary to these allegations, Defendants argue that they cannot be held liable for a contract that they themselves have full power to execute, and that there was no intent to contract despite the written offer and acceptance. This is wrong on both counts.

Defendants cite a decision from another district interpreting unsettled state contract law. But in that case, the court only dismissed the individual-capacity claims, not the official-capacity claims. *Norris v. Hous. Auth. of Galveston*, 980 F. Supp. 885, 892 (S.D. Tex. 1997). Dr. Hiers acknowledges that he cannot sue the University itself for breach of contract. *Liu v. Jackson*, 2010 WL 342251, at *4 (Jan. 29, 2010) (barring plaintiff's breach of contract claims against University of North Texas under sovereign immunity). But Defendants cite to no law holding that they cannot be sued, in their official capacity, for their actions to breach a contract with Dr. Hiers that they are responsible to enforce. In fact, accepting Defendants' argument would mean that Dr. Hiers, or anyone who contracts with the University, cannot sue *anyone* for breach of contract. This cannot be the law.

## IV. The Complaint pleads that all Defendants are personally liable as they enacted and enforced unconstitutional policies against Dr. Hiers.

Defendants argue that they cannot be individually liable for Dr. Hiers' termination unless they interacted personally with Dr. Hiers. Defs.' MTD at 44. But this ignores well-established law and misconstrues the Complaint, which easily alleges facts making it plausible that Defendants personally participated.

A supervisory official is personally liable under § 1983 if either "(1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional

injury." *Porter v. Epps*, 659 F.3d 440 (5th Cir. 2011) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)) (emphasis added). Here, the Complaint alleges that all Defendants affirmatively participated in terminating Dr. Hiers, implemented unconstitutional policies that led to firing him, or both. Thus, the Complaint alleges sufficient facts to establish personal liability for each Defendant.

First, all Defendants directly participated in the decision to terminate Dr. Hiers. The Complaint alleges that each Defendant "were aware of the retaliatory and unconstitutional actions taken against Dr. Hiers and did not instruct University personnel, including other Defendants, to change or reverse those actions to comply with constitutional mandates," and that each Defendant "independently and in consultation with each other, participated in the retaliatory and unconstitutional firing of Dr. Hiers." Compl. ¶¶ 35, 37.

These allegations are more than adequate to plausibly show Defendants' personal participation. The Fifth Circuit has held that similar allegations against a school board were sufficient on a motion to dismiss because they "make[] no attempt to hold the individual defendants liable for actions or decision of their subordinates with which they had no involvement, but rather seek[] to establish each defendant's responsibility for his or her own actions." *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443–44 (5th Cir. 1999). And this makes sense, since these officials have general authority to oversee personnel decisions and since the plaintiff had not yet had the benefit of discovery to uncover the inner workings of the defendants' decisions.

Indeed, the Complaint alleges that Board Defendants, Defendants Roe, Smatresk, Evans-Cowley, and Gao all have plenary oversight authority of personnel below them, including Defendant Schmidt, Defendant Cherry, and formerly Dr. Hiers. Compl. ¶¶ 23–34. In fact, Defendant Smatresk has express "authority to appoint, evaluate, promote, transfer, and terminate the Institution's employees" and to review all

personnel decisions made by those under him. *Id.* ¶ 29; Compl. Ex. 1 at 8–9.

Second, all Defendants are also personally liable because they implemented unconstitutional policies pursuant to which Dr. Hiers was fired. As the Complaint details, Board Defendants have express authority under the Board of Regents Rules to adopt the *Misconduct Policy* or the other policies and practices that allowed Defendants Schmidt and Cherry to terminate Dr. Hiers. Compl. ¶¶ 18–22. And Defendants Roe, Smatresk, Evans-Cowley, and Gao all have authority to implement and enforce those same policies. *Id.* ¶¶ 23–34. As such, these Defendants are not just liable in their individual capacities, but they are in fact the proper individuals to sue to challenge the implementation and enforcement of the University's unconstitutional policies against Dr. Hiers. *See Porter*, 659 F.3d at 446.

## V. Sovereign immunity offers Defendants no refuge.

Defendants observe that Dr. Hiers cannot seek damages against Defendants in their official capacities. Dr. Hiers is well aware of this, which is why all Defendants are also properly sued in their individual capacities. Compl. ¶ 48.

Also, sovereign immunity does not attach to Defendants even in their official capacity for Dr. Hiers' claims for prospective relief. *Aguilar v. Tex. Dep't. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (no sovereign immunity where claims are "brought against individual persons in their official capacities . . . and the relief sought [is] declaratory or injunctive in nature and prospective in effect"). Nor does it apply to Dr. Hiers' demand for reinstatement because, but for his wrongful termination, Dr. Hiers would still be employed there as a mathematics professor. *Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 322 (5th Cir. 2008) ("Plaintiff's claim for prospective relief (reinstatement), however, is not barred by sovereign immunity. The Eleventh Amendment does not protect state officials for prospective relief when it is alleged that the state officials acted in violation of federal law.").

## VI. The Complaint pleads facts showing that Defendants do not deserve qualified immunity at all.

Controlling Supreme Court caselaw unequivocally establishes that the Complaint's allegations of Defendants' actions—firing Dr. Hiers for engaging in protected speech—is and has for many decades been unconstitutional. Defendants ignore this and instead argue that they deserve qualified immunity from Dr. Hiers' damages claims because the law in this area is unsettled. They take particular aim at Dr. Hiers' First Amendment claims. But this is where their violations are most clearly established. The Court should also keep in mind that qualified immunity does not apply to Dr. Hiers' requests for prospective relief. *Williams v. Reeves*, 954 F.3d 729, 736 (5th Cir. 2020).

"The basic steps of our qualified-immunity inquiry are well-known: a plaintiff seeking to defeat qualified immunity must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (cleaned up). Courts can address the prongs in either order. *Id.*

For a law to be "clearly established," there must be a "controlling authority" or a "robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (cleaned up). "The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney*, 367 F.3d at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). Thus, "[t]he *sine qua non* of the clearly established inquiry is 'fair warning.'" *Morgan*, 659 F.3d at 372 (quoting *Hope*, 536 U.S. 730 at 741).

### A. The Complaint pleads that Defendants violated clearly established First Amendment law by firing Dr. Hiers.

The arguments above demonstrate that directly controlling caselaw applies to Hiers' claims. Defendants may ignore these on-point precedents, but courts do not.

36

Hiers' First Amendment claims on retaliation, unconstitutional conditions, and compelled speech in particular rely on a litany of Supreme Court cases which have held that a government employer may not fire an employee, especially an educator, for engaging in protected speech or try to condition their employment on giving up their speech rights. *See supra* Parts I.A–C; *Rankin*, 483 U.S. 378 (employee wrongly fired for joke about assassinating President Reagan); *Givhan*, 439 U.S. 410 (teacher wrongly fired for criticizing school's desegregation policy); *Mt. Healthy*, 429 U.S. 274 (teacher wrongly fired for criticizing school's dress code); *Perry*, 408 U.S. 593 (professor wrongly fired for criticizing junior college's educational policies). And the Fifth Circuit has repeatedly denied qualified immunity to government employers who ignore this well-settled rule. *See, e.g.*, *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 475 (5th Cir. 2014); *Juarez v. Aguilar*, 666 F.3d 325, 336 (5th Cir. 2011); *Kinney*, 367 F.3d at 374 (en banc); *Harris*, 168 F.3d at 223–24.

Defendants argue that overcoming qualified immunity is nearly impossible for an educator alleging a First Amendment claim because "First Amendment jurisprudence" is "abstruse and complicated." Defs.' MTD at 50 (quoting *Morgan*, 755 F.3d at 761). But *Morgan* dealt with student speech and claims of *religious* expression, which themselves raise difficult Establishment Clause questions, none of which are present here. *See Morgan*, 755 F.3d at 762–63 (Benavides, concurring).

The *Morgan* court also found a lack of "factually analogous precedent," but that is far from the case here. Many of the seminal cases in this area deal with teachers and professors commenting on cultural issues or criticizing school policies or management. *See supra* Secs. I.A–C. In fact, *Perry v. Sindermann* involved a non-tenured Texas professor who was wrongly fired because he criticized his college's policies and regulations. It is on all fours with this case, except that Dr. Hiers' claim is even stronger because he spoke out about a broader cultural issue and in response to another individual's (not the University's) speech.

Defendants also argue that qualified immunity should apply because the *Pickering* balancing test is such a fact-intensive, ad hoc analysis. Defs.' MTD at 49 (quoting *Noyola v. Tex. Dep't of Human Resources*, 846 F.2d 1021, 1025 (5th Cir. 1988)). But the Fifth Circuit has directly rejected this notion when school officials argued that they deserved qualified immunity because "a right can rarely be considered clearly established when the law requires the balancing of interests in determining whether the Plaintiffs' speech is constitutionally protected" under *Pickering*. *Harris*, 168 F.3d at 223. The Fifth Circuit quickly denied qualified immunity to the school officials, holding that "[t]he Defendants are not insulated from their unconstitutional conduct merely because a balancing test is involved." *Id.* at 224. Indeed, subsequent caselaw dealing with wrongfully terminated government employees since *Noyola* in 1988 have only further clarified "the contours of the right in question" "with a high degree of particularity." *Morgan*, 659 F.3d at 371–72.

For example, in an en banc opinion, the Fifth Circuit explained that "it is entirely appropriate to deny qualified immunity when the balance of cognizable interests weighs so starkly in the plaintiff's favor. *Kinney*, 367 F.3d at 372 (citing *Boddie v. City of Columbus*, 989 F.2d 745, 750 (5th Cir. 1993), and *Frazier v. King*, 873 F.2d 820, 826 (5th Cir. 1989)). Here, Defendants do not even attempt to argue that their interests as employers outweigh Dr. Hiers' interest in engaging in expressive activity. This is "fatal to [their] claim of qualified immunity." *Boddie*, 989 F.2d at 750.

Nor does overcoming qualified immunity require that "the very action in question has previously been held unlawful," or even that a "materially similar" set of facts have been held unlawful. *Kinney*, 367 F.3d at 350. And here, Defendants ignore material facts—the Complaint alleges they fired Dr. Hiers both for his chalkboard speech and his defense of it—and they quibble over immaterial ones—the tone, audience, and anonymity of the chalkboard speech. The Supreme Court and Fifth Circuit have repeatedly held that the government may not fire its employees for their

protected speech, so Defendants are not entitled to qualified immunity for Dr. Hiers'
First Amendment claims.

**B. The Complaint pleads facts showing that Hiers' remaining claims rest on clearly established law.**

Defendants do not argue the particulars of their qualified immunity defense for
Dr. Hiers' other claims, but the Court should deny qualified immunity to those claims
as well. As shown above, Dr. Hiers' First Amendment claims for viewpoint
discrimination and overbreadth, due process, equal protection, and breach of contract
all rest on on-point Supreme Court or Fifth Circuit precedent or on a large body of
persuasive law that clearly establishes the rights at issue.

In particular, Dr. Hiers' procedural due process claim rests on clearly established,
factually analogous, controlling Supreme Court and Fifth Circuit precedent. *Boddie*,
401 U.S. at 379, and *Ferguson*, 430 F.2d at 856, establish unequivocally that Dr. Hiers
was entitled to minimal due process and procedural protections, such as a
pre-termination hearing before an impartial tribunal. His lack of tenure is
immaterial because the Complaint alleges that he had a contract to teach for the
Spring of 2020 or, at the very least, a reasonable expectation of one. Accordingly, no
Defendant deserves qualified immunity on any claim.

CONCLUSION

For the reasons above, this Court should deny Defendants' motion to dismiss.

Respectfully submitted on the 27th day of August, 2020.

/s/ Michael R. Ross

MICHAEL R. ROSS*
TYSON C. LANGHOFER*
DAVID A. CORTMAN
**ALLIANCE DEFENDING FREEDOM**
20116 Ashbrook Place, Suite 250
Ashburn, VA 20147
Telephone: (480) 444–0020
Facsimile: (202) 347–3622
mross@ADFlegal.org
tlanghofer@ADFlegal.org
dcortman@ADFlegal.org

THOMAS S. BRANDON, JR.
TEXAS BAR NO. 02881400
**WHITAKER CHALK SWINDLE & SCHWARTZ, PLLC**
301 Commerce Street, Suite 3500
Fort Worth, TX 76102
Telephone: (817) 878-0532
Facsimile: (817) 878-0501
tbrandon@whitakerchalk.com

*Admitted Pro Hac Vice*
*Attorneys for Plaintiff Nathaniel Hiers*

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of this foregoing document has been served on Defendants by electronic notification through the ECF system of the United States District Court for the Eastern District of Texas, Sherman Division, on the 27th day of August, 2020.

/s/ Michael R. Ross

Michael R. Ross