UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| NATHANIEL HIERS | § | |
| | § | |
| v. | § | CIVIL NO. 4:20-CV-321-SDJ |
| | § | |
| THE BOARD OF REGENTS OF | § | |
| THE UNIVERSITY OF NORTH | § | |
| TEXAS SYSTEM, ET AL. | § | |

**MEMORANDUM OPINION AND ORDER**

Writing for himself and Justice Brandeis nearly a century ago, Justice Oliver Wendell Holmes extolled what he viewed as a foundational tenet of freedom of expression in our country: "[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought— not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654–55, 49 S.Ct. 448, 73 L.Ed. 889 (1929) (Holmes, J., dissenting). Since that time, the Supreme Court has consistently recognized that the Founders "believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 661, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (quoting *Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)).

This case implicates these bedrock constitutional principles protecting freedom of thought and expression. The setting is a public university, the University of North Texas ("UNT"), and the speaker is a mathematics professor at that university, and a public employee, Nathaniel Hiers. Amidst a slew of constitutional claims asserted by

Hiers following his departure from UNT, a single question is paramount: What can a public employee say, and what can he choose not to say, without fear of reprisal from his employer?

Near the end of the fall 2019 semester, Hiers wrote an anonymous message on a chalkboard in a faculty lounge criticizing the concept of microaggressions. The next day, he identified himself as the author of the message, refused to apologize, and declined to participate in supplemental diversity training. Less than a week later, university officials informed Hiers that his employment as a professor at UNT would not continue in the spring semester.

Hiers subsequently brought this action under 42 U.S.C. § 1983 and Texas law against fifteen university officials.[1] At play are Hiers's constitutional rights to free speech, due process, and equal protection, as well as his alleged contractual right to continued employment. The university officials urge the Court to dismiss Hiers's claims. They say that Hiers's chalkboard message was not constitutionally protected speech and that he had no contract to teach at UNT in the spring semester. Their dismissal motion also raises other defenses, including sovereign and qualified immunity.

---

[1] Hiers sued the following defendants individually and in their official capacities: Laura Wright, Milton Lee, Melisa Denis, Mary Denny, Daniel Feehan, A.K. Mago, Carlos Munguia, Brint Ryan, and John Scott Jr.—all of whom were at all relevant times members of the Board of Regents of the University of North Texas System; Lesa Roe, Chancellor of the University of North Texas System; Neal Smatresk, President of the University of North Texas; Jennifer Evans-Cowley, Provost and Vice President for Academic Affairs of the University of North Texas; Su Gao, Dean of the College of Science of the University of North Texas; Ralf Schmidt, Chair of the Department of Mathematics of the University of North Texas; and William Cherry, Associate Chair of the Department of Mathematics of the University of North Texas. (Dkt. #1).

Although Hiers has not stated plausible claims for all the asserted violations, he has plausibly alleged that his speech was constitutionally protected and that the university officials violated his First Amendment rights. Hiers has also met his burden of showing that the university officials are not entitled to qualified immunity on his retaliation claim because any reasonable university official would have known that it was unconstitutional to discontinue his employment because of his speech. Thus, for the following reasons, the university officials' motion to dismiss, (Dkt. #39), is **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND

UNT hired Hiers as a non-tenured, adjunct professor to teach several linear algebra classes in the fall 2019 semester. (Dkt. #1-5); (Dkt. #39 at 4). Hiers signed UNT's offer letter, which stated that he would teach three classes in the fall semester and that the offer did not "guarantee an appointment in future semesters." (Dkt. #1-5 at 6). Hiers and Defendant William Cherry, UNT's Associate Department Chair of Mathematics, subsequently exchanged emails about Hiers teaching an additional course in the fall. (Dkt. #1-6). After Hiers expressed interest in teaching a fourth class, Cherry indicated he would amend the offer letter to reflect this change. (Dkt. #1-6).

On November 18, 2019, Cherry asked Hiers to teach a class in the spring, and Hiers stated he would happily do so, although no terms of employment were discussed. (Dkt. #1-7). About a week later, Cherry emailed all adjunct professors in mathematics asking for someone to teach another class in the spring. (Dkt. #1-8).

3

Hiers replied that he would like to do so. (Dkt. #1-8). Again, no terms of employment were discussed.

On November 26, 2019—the same day that Hiers stated his desire to teach a second class in the spring—the incident forming the basis of this lawsuit occurred. An anonymous person had placed in the mathematics faculty lounge a stack of flyers, each of which warned faculty against committing "microaggressions" on college campuses. The flyer defines microaggressions and provides examples of statements characterized as microaggressions that it suggests faculty should avoid using in the workplace. For instance, statements such as "I believe the most qualified person should get the job" and "America is the land of opportunity" are cited as microaggressions promoting the "[m]yth of [m]eritocracy." (Dkt. #1-9 at 3).

Upon seeing these flyers, Hiers—in what all parties agree was intended as a joke—picked up a stick of chalk, drew an arrow pointing to one of the flyers, and wrote the following message on a nearby chalkboard: "Please don't leave garbage lying around." (Dkt. #1 ¶ 5); (Dkt. #39 at 5). Because a picture is worth a thousand words:



(Dkt. #1-10).

    Shortly after that, Defendant Ralf Schmidt, UNT's Chair of Mathematics,

emailed the entire mathematics department with a picture of Hiers's chalkboard

message. (Dkt. #1-12). In the email, Schmidt stated, "Would the person who did this please stop being a coward and see me in the chair's office immediately. Thank you." (Dkt. #1-12). Hiers identified himself as the author by replying, "I'll be by in a few minutes. I don't see anything 'cowardly' about commenting on silly political fl[y]ers left lying in the lounge. If it's fine for someone to leave stacks of them around the lounge, criticizing them should be fine too." (Dkt. #1-12).

Hiers then met with Schmidt. (Dkt. #1 ¶ 127). Schmidt scolded Hiers and said that criticizing the flyer on microaggressions was "stupid" and "cowardly." (Dkt. #1 ¶¶ 6, 127–28). Hiers alleges that Schmidt pressured him to apologize "for expressing his views regarding 'microaggressions,'" which Hiers refused to do. (Dkt. #1 ¶¶ 129–31). Schmidt also asked Hiers if he would be "interested" in extra diversity training. (Dkt. #1 ¶ 132). Hiers, who alleges that Schmidt did not express or imply that the added diversity training was mandatory, said that he was not interested and that he was already scheduled to take UNT's standard diversity training in a few days. (Dkt. #1 ¶¶ 133–34).

Hiers completed his mandatory diversity training the next week. (Dkt. #1 ¶ 137). And a day later, Hiers went to the mathematics department office to sign his spring offer letter. (Dkt. #1 ¶ 138). But he never got the chance to do so. On December 2, 2019, Cherry informed Hiers that UNT would no longer employ him to teach in the spring. (Dkt. #1 ¶¶ 137–41); (Dkt. #39 at 6). Hiers requested a detailed explanation for this decision, to which Schmidt responded via email. That email is copied in full below:

Dear Nathaniel,

My decision not to continue your employment in the spring semester was based on your actions in the grad lounge on 11/26, and your subsequent response.

In our conversation you characterized the flyers that upset you as political statements. I looked at them in detail, and they are anything but. Every example of a microaggression listed there makes very much sense, and I am disappointed about your general dismissal of these issues and that you failed to put yourself in the shoes of people who are affected by such comments.

I also think that leaving behind a chalkboard message like you did is not a benign thing to do. Think about how people who see this might react. They don't know who wrote this; it might be a faculty member, grad student or anyone else. The implicit message is, "Don't you dare bringing [sic] up nonsense like microaggressions, or else." This is upsetting, and can even be perceived as threatening.

Finally, I was disappointed at your response during our conversation. Everyone makes mistakes, and I'm all for forgiveness if actions are followed by honest regret. But you very much defended your actions, and stated clearly that you are not interested in any kind of diversity training.

In my opinion, your actions and response are not compatible with the values of this department. So with regret I see no other choice than to not renew your employment. Please know it gives me no pleasure; in fact, we were counting on you, and it causes considerable difficulties to replace you as a teacher.

Sincerely,
Ralf Schmidt

(Dkt. #1-13 at 1).

Hiers sued the university officials based on these allegations, claiming that they (1) abridged his First Amendment rights to free speech; (2) violated his Fourteenth Amendment rights to due process and equal protection under the law; and (3) breached a contract with him for employment in the spring 2020 semester. The university officials now move to dismiss under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). (Dkt. #39). They contend that Hiers has failed to state a claim and that—even if he had—his claims should be dismissed based on sovereign and qualified immunity.

## II. LEGAL STANDARDS

### A. Legal Standard for Rule 12(b)(1) Motions

The power of federal courts is circumscribed by the limits set forth in Article III of the Constitution. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Article III authorizes the use of judicial power "to declare the rights of individuals and to measure the authority of governments" in the resolution of "cases" and "controversies." *Id.* For that reason, a federal court must dismiss a case for lack of subject-matter jurisdiction if the court lacks "the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quotation omitted).

A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction can mount either a facial or a factual challenge. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When, like here, a party makes a Rule 12(b)(1) motion without presenting any evidence, the challenge to subject-matter jurisdiction is facial. *Id.* In assessing such a challenge, the court looks only at the sufficiency of the allegations in the complaint and assumes them to be true. *Id.* If the allegations are sufficient to establish jurisdiction, the complaint stands. *Id.* Because the "burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction," the "plaintiff

constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam).

## B. Legal Standard for Rule 12(b)(6) Motions

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[] [his] claims . . . across the line from conceivable to plausible," a court draws on its own common sense and judicial experience. *Id.* at 679–80 (second alteration in original) (quoting *Twombly*, 550 U.S. at 570). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. In conducting this review, the court's "inquiry is limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

### III. DISCUSSION

The university officials make five principal arguments in their dismissal motion. First, they argue that Hiers's constitutional claims for damages under Section 1983 are barred by sovereign immunity. Second, the university officials urge the Court to dismiss all of Hiers's Section 1983 claims because, in their view, no constitutional violation occurred. Third, the university officials assert that—even if they violated the Constitution—they are entitled to qualified immunity because the facts alleged do not show they violated any clearly established right. Fourth, thirteen of the university officials maintain that the Section 1983 claims against them in their individual capacities fail because Hiers did not adequately plead their personal involvement with the alleged constitutional violations. And finally, the university officials contend that Hiers's state-law claim for breach of contract is both barred by sovereign immunity and meritless. The Court addresses these arguments in turn.

### A. Hiers's Section 1983 Claims

Hiers brings eight claims under 42 U.S.C. § 1983 for alleged violations of his First and Fourteenth Amendment rights to free speech, due process, and equal protection. Before considering the merits of these claims, the Court must address the university officials' assertion of sovereign immunity. After doing so, the Court determines whether Hiers has stated plausible constitutional violations and whether he has overcome the university officials' qualified-immunity defense.

#### i. Sovereign Immunity

The first question the Court must answer is whether sovereign immunity bars Hiers's Section 1983 claims against the university officials in their official capacities.

10

*See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (describing sovereign immunity as a threshold jurisdictional inquiry). Sovereign immunity prevents plaintiffs from suing a nonconsenting state in federal court unless the state has waived sovereign immunity or Congress has expressly abrogated it. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). This jurisdictional bar also prohibits suits against state officials in their official capacities, which are effectively suits against the state itself. *Id.*

But as with most general rules, this one has an exception: *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The *Ex parte Young* exception to sovereign immunity is based on a legal fiction that allows a private party to bring a suit for prospective, injunctive relief against state officials. *City of Austin*, 943 F.3d at 997–98. Whether a suit may proceed under *Ex parte Young* does "not require an analysis of the merits of the claim." *Id.* at 998. Instead, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 998 (cleaned up) (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011)).

Here, it is undisputed that UNT, like other public universities in Texas, is an arm of the State and thus entitled to sovereign immunity. *See Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 321 (5th Cir. 2008); *U.S. ex rel. Jackson v. Univ. of N. Tex.*, No.4:13-CV-7345, 2015 WL 13743553, at *6 (E.D. Tex. Dec. 4, 2015), *report and recommendation adopted*, No. 4:13-CV-734, 2016 WL 379613 (E.D. Tex. Feb. 1,

11

2016), *aff'd*, 673 F.App'x 384 (5th Cir. 2016). Congress has not abrogated sovereign immunity for Section 1983 suits; nor has the State waived its immunity. *Lewis v. Univ. of Tex. Med. Branch at Galveston*, 665 F.3d 625, 630 (5th Cir. 2011). Thus, because Hiers's suit for money damages against the university officials is effectively a suit against the state itself, sovereign immunity bars his official-capacity claims.

But to the extent Hiers's official-capacity claims seek prospective, injunctive relief against the university officials, those claims survive. In his complaint, Hiers requests an injunction requiring the university officials to reinstate him as a faculty member in UNT's math department. (Dkt. #1 at 29). This request for reinstatement is the sort of prospective, equitable relief that falls within the *Ex parte Young* exception to sovereign immunity. *See Nelson*, 535 F.3d at 324. Thus, Hiers's Section 1983 claims for prospective, injunctive relief against the university officials in their official capacities are not subject to dismissal under Rule 12(b)(1) based on sovereign immunity.

### ii. First Amendment Claims

Turning to the merits, the Court begins its analysis with Hiers's First Amendment claims. Hiers asserts five claims based on the university officials' alleged infringement of his right to freedom of speech: (1) retaliation; (2) content and viewpoint discrimination; (3) unconstitutional conditions; (4) compelled speech; and (5) overbreadth. (Dkt. #1 at 21–25). The Court first considers whether Hiers has adequately pleaded a constitutional violation and then addresses the applicability of qualified immunity as to each claim.

### a. Retaliation

Public employees do not surrender all First Amendment rights because of their employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (collecting cases). But when citizens enter government service, they necessarily accept certain limits on their freedom of speech. *Garcetti*, 547 U.S. at 418. That's because "the government as employer . . . has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). And when "employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community," the government generally has wide latitude in managing its offices "without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). But if employee expression touches on a matter of public concern, the First Amendment prohibits the government from taking an adverse employment action against the employee for such expression without sufficient justification. *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

Hiers was a public university professor, and therefore a public employee, at the time of the challenged conduct. Courts use a four-pronged test to determine whether a public employee's speech is "entitled to constitutional protection from employer discipline." *Hurst v. Lee Cnty.*, 764 F.3d 480, 484 (5th Cir. 2014). To state a claim that the university officials retaliated against him for exercising his right to

free speech, Hiers must show that "(1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (4) the protected speech motivated [UNT's] conduct." *Id.* (quoting *Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011)).

It is undisputed that Hiers suffered an adverse employment decision—termination—and his speech motivated the university officials' termination decision. *See, e.g.*, (Dkt. #1-13 at 1) (email in which Schmidt tells Hiers, "My decision not to continue your employment in the spring semester was based on your actions in the grad lounge on 11/26, and your subsequent response"). That leaves two questions: First, was Hiers speaking on a matter of public concern? And if so, was Hiers's interest in doing so greater than the university's interest in promoting the efficiency of the public services it provides through its employees?[2] *See Garcetti*, 547 U.S. at 418; *Hurst*, 764 F.3d at 484. The university officials do not address the second question, so the Court will focus its analysis on whether Hiers's speech touched on a matter of public concern.

### 1. Public Concern

Whether speech involves a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record."

---

[2] If Hiers's speech was made as part of his official duties, rather than as a citizen, *Garcetti* would dictate dismissal of his retaliation claim. *See Garcetti*, 547 U.S. at 421 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). But it is undisputed that Hiers's speech was not part of his official duties, so *Garcetti* does not apply here.

*Coughlin v. Lee*, 946 F.2d 1152, 1156 (5th Cir. 1991) (citing *Connick*, 461 U.S. at 147–48). This is a question of law, and the "significance of these factors will differ depending on the circumstances of the particular situation." *Moore v. City of Kilgore*, 877 F.2d 364, 369–70 (5th Cir. 1989). Personal complaints and grievances about conditions of employment are not matters of public concern. *Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121, 124 (5th Cir. 1991). Rather, speech addresses a matter of public concern when it relates "to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146. The lynchpin of the inquiry, then, is the extent to which the speech advances an idea that transcends personal interest or conveys a message that impacts our social or political lives. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476, 201 L.Ed.2d 924 (2018) (explaining that "controversial subjects" and "sensitive political topics" such as "climate change, the Confederacy, sexual orientation and gender identity, evolution, and minority religions" are "undoubtedly matters of profound value and concern to the public" (cleaned up)).

Here, Hiers's critique of the flyer on microaggressions transcended personal interest and touched on a topic that impacts citizens' social and political lives. His speech did not address a personal complaint or grievance about his employment. *Cf. Graziosi v. City of Greenville*, 775 F.3d 731, 739 (5th Cir. 2015) (holding that the context factor weighed against the plaintiff when she aired personal grievances regarding an employee-employer dispute on a Facebook page after returning to work from an unrelated suspension). The point of his speech was to convey a message about

the concept of microaggressions, a hot button issue related to the ongoing struggle over the social control of language in our nation and, particularly, in higher education.[3]

True, Hiers's chalkboard message did not illuminate his reasons for disagreeing with the flyer. Hiers did not, for example, articulate his belief that "many of the statements that the fl[y]er condemns as 'microaggressions' can (and should) be interpreted in a benign or positive manner" and that "the fl[y]ers teach people to focus on the worse possible interpretation of the statement, to disregard the speaker's intent, and to impute a discriminatory motive to others." (Dkt. #1 ¶ 107). Had he done so, there would be little doubt—if any—that his speech would be constitutionally

---

[3] *See, e.g.*, Michelle Goldberg, *The Campaign to Cancel Wokeness*, N.Y. TIMES (Feb. 26, 2021), https://www.nytimes.com/2021/02/26/opinion/speech-racism-academia.html ("Critical race theory, the intellectual tradition undergirding concepts like white privilege and microaggressions, is often blamed for fomenting what critics call cancel culture."); Katherine Timpf, *'God Bless You' Listed Among Anti-Muslim 'Microaggressions'*, NAT'L REV. (Mar. 14, 2018), https://www.nationalreview.com/2018/03/god-bless-you-microaggression-against-muslims/ (discussing "Anti-Oppression Library Guide" issued by Simmons College in Boston that characterizes saying "God bless you" after someone sneezes and "Merry Christmas" as microaggressions); Stephanie Saul, *Campuses Cautiously Train Freshmen Against Subtle Insults*, N.Y. TIMES (Sept. 6, 2016), http://www.nytimes.com/2016/09/07/us/campuses-cautiously-train-freshmen-against-subtle-insults.html?emc=eta1&_r=0 (describing how some universities teach freshmen how to avoid microaggressions); Eugene Volokh, *UC Teaching Faculty Members Not to Criticize Race-Based Affirmative Action, Call America 'Melting Pot,' and More*, WASH. POST (June 16, 2015), https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/06/16/uc-teaching-faculty-members-not-to-criticize-race-based-affirmative-action-call-america-melting-pot-and-more/ (noting that the "concept [of microaggressions] is now being used to suppress not just, say, personal insults or discrimination in hiring or grading, but also ideas that the UC wants to exclude from university classrooms"); Fred Barbash, *The War on 'Microaggressions': Has It Created a 'Victimhood Culture' on Campuses?*, WASH. POST (Oct. 28, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/10/28/the-war-over-words-literally-on-some-american-campuses-where-asking-where-are-you-from-is-a-microaggression/ ("The debate over hurtful words, microaggressions, what can be said and what shouldn't be said has been roiling campuses . . . for several years now[.]").

protected. But taken in context, the result is the same: Hiers's speech reflected his protest of a topic (microaggressions) born from the present-day political correctness movement that has become an issue of contentious cultural debate.

The flyer itself, which Hiers effectively incorporated by reference into his message, supplies important content and context. It broadly defines microaggressions as "everyday verbal, nonverbal, and environmental slights, snubs, or insults, whether intentional or unintentional, which communicate hostile, derogatory, or negative messages to target persons based solely upon their marginalized group membership." (Dkt. #1-9 at 3). A microaggression, in other words, can be composed of non-threatening speech, deployed unintentionally, or the result of unconscious stereotypes or bias. *See* (Dkt. #1-9 at 1–2). The flyer contains examples of purported microaggressions that people—in particular, university faculty members—should avoid in the name of reducing the harm to marginalized groups. Statements such as "I believe the most qualified person should get the job" and "America is the land of opportunity" are cited as microaggressions promoting the "[m]yth of [m]eritocracy." (Dkt. #1-9 at 3). And the phrase "America is a melting pot" is listed as a microaggression because of its "[c]olor [b]lindness." (Dkt. #1-9 at 3).

Hiers responded by criticizing the concept of microaggressions promoted by the flyer. That he did so by jokingly referring to the flyer as "garbage" does not deprive his speech of the First Amendment's protection. *See Rankin*, 483 U.S. at 387 (holding that a hyperbole about assassinating the President during a conversation about the President's policies addressed a matter of public concern). After all, humor and satire

are time-tested methods of commenting on a matter of political or social concern. *See Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 470 (3d Cir. 2015). Indeed, from "Greek and Roman antiquity until the present time, commentators on public affairs have colored their writing with satire." *Seemuller v. Fairfax Cnty. Sch. Bd.*, 878 F.2d 1578, 1583 (4th Cir. 1989) (holding that a teacher's satirical letter to the editor published in a school newspaper regarding perceived discrimination based on sex was a matter of public concern). And while Hiers's chalkboard message was not detailed or well-reasoned,[4] it unequivocally advanced his viewpoint on microaggressions. In Hiers's words, the concept of microaggressions described by the flyer, is "garbage." *See Snyder v. Phelps*, 562 U.S. 443, 454, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) ("While these messages may fall short of refined social or political commentary, the issues they highlight . . . are matters of public import . . . [and t]he signs certainly convey [the speaker's] position on those issues[.]").

Arguing that Hiers's speech did not relate to a matter of public concern, the university officials characterize his message as "uncivil" and attempt to draw parallels between this case and those involving the use of profanity or sexually explicit comments in the classroom. (Dkt. #39 at 16–18). This argument is not persuasive.

---

[4] Hiers argues that he explained his views on microaggressions more fully during his conversation with Schmidt and that, once he did so, his speech was no longer anonymous and joking. (Dkt. #43 at 11). But this Court cannot "consider the second statement independently of the first" as doing so would "divorce [the] statement . . . from its context." *See Rankin*, 483 U.S. at 386 n.10. In other words, neither Hiers's chalkboard message nor his later defense of it can be viewed in a vacuum. Rather, the Court must examine the totality of the circumstances surrounding Hiers's speech to determine whether he was punished for speaking on a matter of public concern. *See Coughlin*, 946 F.2d at 1156.

Putting aside whatever one might think about his viewpoint, an objective reader would understand Hiers's criticism of microaggressions as a criticism concerning a hotly contested cultural issue in this country. Moreover, Hiers's method of communicating his criticism did not involve the kind of features that would place it outside the First Amendment's ordinary protection. For example, Hiers's message, while perhaps rude or even offensive, did not amount to "fighting words." *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (describing "fighting words" as words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace" and among those "narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem"). Nor was Hiers's speech obscene as that term is understood. *See Cohen v. California*, 403 U.S. 15, 19–20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Rather, Hiers expressed the kind of pure speech to which the First Amendment provides strong protection. *See Snyder*, 562 U.S. at 461; *Rankin*, 483 U.S. at 387.

The First Amendment protects "even hurtful speech on public issues to ensure that we do not stifle public debate." *See Snyder*, 562 U.S. at 461. So while Schmidt, the other university officials, and some UNT professors may have taken great offense at Hiers's chalkboard message, that offensiveness is "irrelevant to the question whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387. To be sure, nothing that Hiers said could be more disturbing than a law-enforcement employee's

expressed desire to see violence inflicted on the President of the United States. *See id.* at 386–87 (holding that such speech was constitutionally protected).

The university officials' reliance on *Martin v. Parrish*, 805 F.2d 583 (5th Cir. 1986), only serves to underscore the flaws in their argument. *See* (Dkt. #39 at 16–17). In *Martin*, a university professor was terminated for telling his students while teaching that their attitude was "a bunch of bullshit" and that "if you don't like the way I teach this God damn course there is the door," among other profane phrases. 805 F.2d at 584. Concluding that these "epithets did not address a matter of public concern," *id.* at 585, the Fifth Circuit explained that "surroundings and context are essential" when determining whether constitutional protection is afforded to indecent language, *id.* at 586. Taken in context, the court reasoned, the professor's profanity "constituted a deliberate, superfluous attack on a captive [student] audience with no academic purpose or justification." *Id.* at 586 (cleaned up).

Hiers's speech is meaningfully different from that in *Martin* in terms of both content and context. As to content, Hiers used no profane or vulgar language. When the Fifth Circuit said that schools could punish "lewd, indecent or offensive speech," it did not mean to include all speech that someone somewhere might find subjectively offensive. *See id.* at 585 (quotations omitted). Otherwise, government restrictions would encompass nearly all forms of speech, and the First Amendment would be rendered a nullity in the public-employment context. And as to context, which is "essential," *id.* at 586, Hiers's speech did not take place in a classroom or in front of a captive audience of students. He spoke to his colleagues and supervisors in the

faculty lounge, where professors regularly talk about political and social issues with one another, "and often with a heavy dose of banter." (Dkt. #1 ¶¶ 116–19). Put simply, *Martin* holds no sway here.

The same is true of *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019). There, the Fifth Circuit determined that the use of profanity and sexually explicit discussions about professors' and students' sex lives were not related to the education of college students training to be preschool and grade school teachers and did not touch on a matter of public concern. *Id.* at 853–54. That's because, "*in the college classroom context*, speech that does not serve an academic purpose is not of public concern." *Id.* at 853 (emphasis added). Again, Hiers did not use profanity, speak about professors' or students' personal lives, or speak in the classroom context. So once more, the university officials are comparing apples to oranges.

Switching gears, the university officials point out that it's unclear from the complaint whether there was widespread debate on microaggressions at UNT when Hiers spoke on the subject. That may be true, but it doesn't change the outcome here. And to the extent the university officials rely on *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555 (5th Cir. 2003), to argue otherwise, their reliance is misplaced, *see* (Dkt. #39 at 15).

In *Finch*, the Fifth Circuit rejected the plaintiff's attempt to place her speech in the context of a "national debate over school choice." 333 F.3d at 564. The court did so because the speech dealt with an "internal administrative approach to running a school" that first arose in the context of a follow-up meeting among school principals.

*Id.* Here, in contrast, Hiers's speech directly addressed a newsworthy social and cultural issue (*see supra* n.4) that continues to be an important and sensitive topic in public discourse, especially as it relates to colleges and universities across the country. In recent years, the concept of microaggressions has been vigorously debated by scholars,[5] as well as the subject of congressional testimony.[6] To suggest that speech on such a matter is not of public concern is to deny reality.

---

[5] *Compare* Greg Lukianoff & Jonathan Haidt, THE CODDLING OF THE AMERICAN MIND: HOW GOOD INTENTIONS AND BAD IDEAS ARE SETTING UP A GENERATION FOR FAILURE 46 (2018) ("Teaching students to use the least generous interpretations possible is likely to engender precisely the feelings of marginalization and oppression that almost everyone wants to eliminate."); Scott O. Lilienfeld, *Microaggressions: Strong Claims, Inadequate Evidence*, 12 PERSP. ON PSYCHOL. SCI., 138, 140 (2017) (contending that the concept of microaggressions "discourages or suppresses controversial or unpopular speech, [] fosters a culture of political correctness, [] perpetuates a victim culture among aggrieved individuals, and [] contributes to, rather than ameliorates, racial tensions"); Vikram Amar, *A "Comparative" Analysis of the Academic Freedom of Public University Professors*, 14 FIRST AMEND. L. REV. 293, 293, 295, 297–98 (2016) (discussing the University of North Carolina's and University of California's policies on microaggressions in the context of professors' first amendment rights); Robert Shibley, *Current Threats to Free Speech on Campus*, 14 FIRST AMEND. L. REV. 239, 262–64 (2016) (criticizing microaggressions and explaining why the concept "is, if anything, even more damaging to campus speech, as well as more transparently political, than trigger warnings"), *with* Derald Wing Sue, *Racial Microaggressions in Everyday Life*, PSYCHOL. TODAY (Oct. 5, 2010), https://www.psychologytoday.com/us/blog/microaggressions-in-everyday-life/201010/racial-microaggressions-in-everyday-life.

[6] *See, e.g.*, First Amendment Protections on Public College and University Campuses: Hearing Before the Subcomm. on the Constitution and Civil Justice of the Comm. on the Judiciary, 115th Cong. 6–7 (2017) (Statement of David L. Hudson, Jr., Ombudsman, Newseum Institute First Amendment Center) ("Another threat to free-speech on college campus concerns microaggressions – defined as unintentional, subconscious slights or insults often uttered by members of the majority race against racial minorities."); First Amendment Protections on Public College and University Campuses: Hearing Before the Subcomm. on the Constitution and Civil Justice of the Comm. on the Judiciary, 114th Cong. 66-67 (2015) (Statement of Wendy Kaminer, Writer/Lawyer, and Free Speech Feminist) ("On the left, censorship is an extension of the drive for civil rights. It equates words with actions and insists that equality requires policing offensive words or micro-aggressions . . . . Campus censorship, like Western European bans on hate speech, establishes a right of particular audiences not to be offended at the expense of a universal right to speak.").

The events surrounding Hiers's chalkboard message provide additional context for his speech. On the one hand, no one from the media approached Hiers about his views on microaggressions or about the specific blackboard incident at issue. But on the other hand, Hiers did not speak alone or unprompted. Instead, he spoke within the context of a community debate—though not an obviously robust one—by responding to the anonymous flyer distributor's speech on the same topic. In any event, that Hiers's speech was directed at his coworkers and supervisors, "rather than to Bob Woodward and Carl Bernstein, does not necessarily render the speech any less protected." *See Brown v. Tex. A&M Univ.*, 804 F.2d 327, 337 (5th Cir. 1986) (footnote omitted); *see also Davis v. W. Cmty. Hosp.*, 755 F.2d 455, 461 (5th Cir. 1985) ("The fact, then, that the communications here were inhouse, does not necessarily destroy their protection under the first amendment, but it is part of the context of the communication to be considered in determining whether the speech addressed a matter of public concern.").

Together with content and context, the form of Hiers's criticism of microaggressions also weighs in his favor—though only slightly. When analyzing the form of speech, courts typically look at whether the speech was made publicly or privately. *See, e.g.*, *Lane v. Franks*, 573 U.S. 228, 241, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014) (holding that the speech's form—sworn testimony in a judicial proceeding—fortified the conclusion that the speech was on a matter of public concern); *Graziosi*, 775 F.3d at 739 (concluding that post on mayor's Facebook page was a public form of speech); *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 189–90

23

(5th Cir. 2005) (holding that the form-of-speech factor supported the plaintiff because she had responded to an unsolicited inquiry from a member of the press). Of course, speech does not have to be publicly disseminated to touch on a matter of public concern. *See Connick*, 461 U.S. at 141, 148–49 (determining that a questionnaire circulated to fifteen people in an office touched on a matter of public concern). Even a private remark may be protected if the content and context factors weigh sufficiently in favor of the speaker.[7] *See, e.g.*, *Rankin*, 483 U.S. at 389 (holding that an overheard private remark was constitutionally protected because it was made against a backdrop of national news on a topic of public importance).

Again, Hiers's speech was not made in public or visible to everyone in the larger university community. But neither was it made in private. Similar to the intra-office questionnaire in *Connick*, Hiers's criticism of microaggressions was displayed on a communal chalkboard in a space open to faculty, administrators, and possibly even doctoral graduate students. *See Connick*, 461 U.S. at 141, 148–49. What's more, Hiers alleges that UNT professors regularly discussed all manner of topics, including political and social issues, in the faculty lounge. (Dkt. #1 ¶ 116). So like the Facebook page in *Graziosi*, the chalkboard appears to have served as a sort of bulletin board for the UNT mathematics department. *See* 775 F.3d at 739. Thus, although Hiers did

---

[7] The public nature of certain speech may work in favor of finding that the speech touches on a matter of public concern but can also increase the disruption to the government's interest at step two of the *Pickering* balancing test. *See, e.g.*, *City of San Diego v. Roe*, 543 U.S. 77, 84, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (noting that, unlike the private remark in *Rankin*, the comments were publicized and this publicity was thus more detrimental to the mission and functions of the employer); *Connick*, 461 U.S. at 159 (Brennan, J., dissenting) ("The standard announced by the Court suggests that the manner and context in which a statement is made must be weighed on *both* sides of the *Pickering* balance.").

not sign his name to the chalkboard message, his speech could have triggered a more robust intra-office debate on the topic of microaggressions. After all, Hiers was responding to someone else's anonymous speech when he criticized the flyer, and his anonymity did not last long. Under these circumstances, the form factor weighs slightly in favor of finding that Hiers's speech touched on a matter of public concern.

In sum, the Court concludes that the content, context, and form of Hiers's chalkboard message, as revealed by the whole record, show that his speech touched on a matter of public concern.

### 2. Balancing of Interests

Having determined that Hiers spoke on a matter of public concern, the next step for the Court is to balance his interest in speaking against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

In balancing these interests, courts consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388 (citing *Pickering*, 391 U.S. at 570–73). It is unnecessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Graziosi*, 775 F.3d at 741 (quoting *Connick*, 461 U.S. at 152). But there must be some "reasonable predictions" or "danger" of disruption. *Id.* (citations omitted); *Rankin*, 483 U.S. at 390–91.

Here, the university officials have not addressed the *Pickering* balancing test, effectively conceding the point at this early stage. They have not asserted any interest in restricting the speech at issue—let alone argued that any such interest outweighs Hiers's interest in speaking. Our adversarial system of adjudication "is designed around the premise that parties represented by competent counsel know what is best for them" and "are responsible for advancing the facts and argument entitling them to relief." *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579, 206 L.Ed.2d 866 (2020) (cleaned up). In other words, it is not this Court's role to make arguments on behalf of the university officials.

In short, because one side of the scale sits empty, the *Pickering* balance strongly favors Hiers. The Court thus concludes that Hiers plausibly alleged that his interest in speaking on the topic of microaggressions outweighed UNT's interests— whatever those might be—in restricting his speech. Hiers's retaliation claim passes step two of the *Pickering* balance.

* * *

"Preserving the 'freedom to think as you will and to speak as you think' is both an inherent good, and an abiding goal of our democracy." *Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018) (quoting *Whitney*, 274 U.S. at 375) (Brandeis, J., concurring)). The university officials allegedly flouted that core principle of the First Amendment when they discontinued Hiers's employment because of his speech. Accepting the allegations as true, the Court concludes that Hiers plausibly alleged that the university officials violated his right to freedom of speech.

### b. Viewpoint Discrimination

In addition to retaliation, Hiers asserts a separate First Amendment claim for viewpoint discrimination. Hiers alleges that the university officials terminated his employment because they disagreed with the content of his speech and his viewpoint on microaggressions. (Dkt. #1 ¶¶ 220–29). These allegations are consistent with Schmidt's termination letter, which indicates that Hiers's employment at UNT was discontinued because his expression and viewpoint on microaggressions were "not compatible with the values of [the math] department." (Dkt. #1-13 at 1).

Typically, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Such "viewpoint discrimination" generally is presumed unconstitutional and viewed with strict scrutiny. *Id.* That's because when "the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.*

In this case, however, the university officials argue that the *Pickering* analysis, not strict scrutiny, applies to Hiers's viewpoint-discrimination claim because he was a public employee when the challenged action occurred. The parties cite no Supreme Court or Fifth Circuit precedent directly addressing this issue, and the Court has found none. But other district courts and courts of appeals have indicated that *Pickering* applies to viewpoint-discrimination claims brought by public employees. *See, e.g.*, *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642 (9th Cir. 2006); *Knight v. Conn.*

*Dep't of Pub. Health*, 275 F.3d 156 (2d Cir. 2001); *Cochran v. City of Atlanta*, 289 F.Supp.3d 1276, 1292–94 (N.D. Ga. 2017) ("The Court finds that *Pickering* is the appropriate test to assess Plaintiff's viewpoint discrimination claim.").

This Court need not evaluate the persuasive value of those authorities or otherwise decide whether *Pickering* applies to Hiers's viewpoint-discrimination claim. The university officials' only argument for dismissing this claim is that Hiers's speech did not touch on a matter of public concern and, as a result, is not protected by the First Amendment. This argument fails for the same reason the university officials' retaliation argument fails: Hiers's speech addressed a matter of public concern and is therefore protected under *Pickering*. Again, the university officials have not identified what interest, if any, they had in suppressing Hiers's speech. So even if *Pickering* applies rather than some higher form of scrutiny, the facts alleged support a plausible conclusion that the university officials engaged in unconstitutional viewpoint discrimination when they discontinued Hiers's employment. Thus, Hiers has plausibly alleged that the university officials violated his First Amendment rights by engaging in viewpoint discrimination.

### c. Unconstitutional Conditions of Employment

Hiers also claims that the university officials subjected him to unconstitutional conditions in violation of his First Amendment rights. (Dkt. #1 ¶¶ 245–50). The unconstitutional-conditions doctrine "examines the extent to which government benefits may be conditioned or distributed in ways that burden constitutional rights or principles." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 286 (5th Cir. 2005).

Invoking that principle, Hiers alleges that the university officials conditioned the benefit of continued employment on his willingness to surrender his constitutionally protected rights to freedom of speech, due process, and equal protection. (Dkt. #1 ¶¶ 246–49).

The Fifth Circuit has described *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), as the "*locus classicus* of the 'unconstitutional conditions' doctrine." *Kinney v. Weaver*, 367 F.3d 337, 357 (5th Cir. 2004) (en banc). *Perry* involved a non-tenured professor who alleged that the board of regents of a public college refused to renew his teaching contract because he publicly criticized the university's administrative policies. 408 U.S. at 594–95. The Supreme Court held that these allegations presented a bona fide First Amendment claim because the denial of a government benefit, such as a teaching position, cannot be predicated on the exercise of a constitutional right. *Id.* at 597–98. In doing so, the Court summed up what is now referred to as the unconstitutional-conditions doctrine:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.

408 U.S. at 597.

Here, Hiers's unconstitutional-conditions claim largely mirrors his retaliation claim. He asserts that the university officials denied him the benefit of a teaching position at UNT because he exercised his right to freedom of speech. (Dkt. #43 at 19–

21). And he acknowledges that the *Pickering* balancing test applies to his unconstitutional-conditions claim. (Dkt. #43 at 20). But the university officials have not argued that Hiers's unconstitutional-conditions claim should be dismissed as duplicative of his retaliation claim. So the Court need not and will not consider whether Hiers can separately claim retaliation and unconstitutional conditions for the same underlying conduct. *See Sineneng-Smith*, 140 S.Ct. at 1579 (explaining that our adversarial system of adjudication "is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (cleaned up)).

The university officials, instead, urge this Court to dismiss Hiers's unconstitutional-conditions claim for two reasons. First, they contend that they did not expressly condition Hiers's continued employment at UNT on him refraining from expressing his views on microaggressions or publicly supporting the concept of microaggressions. (Dkt. #39 at 25). In other words, the university officials say that Hiers's unconstitutional-conditions claim fails because there was no explicit quid pro quo. The Court is not persuaded.

For one thing, the university officials cite no authority to support their argument. And, based on *Perry* and its progeny, the unconstitutional-conditions doctrine is not so rigid. The college administrators in *Perry*, for example, did not give the plaintiff official notice or warning before they decided to discontinue his employment. *See* 408 U.S. at 595. Yet the Supreme Court held that the college

30

administrators could not deny the plaintiff the teaching position because of his constitutionally protected speech. *Id.* at 598.

Likewise here, the university officials could not constitutionally condition Hiers's employment on his willingness to surrender his protected right to freedom of speech. But based on the alleged facts, that is exactly what they did. Hiers has plausibly alleged that the university officials denied him employment not only because of his failure to initially self-censor but also because did not express honest regret for expressing his views on microaggressions and declined to attend *additional* diversity training. (Dkt. #1 ¶¶ 8–9, 148–51, 161–62, 164–68, 231–32). Denying Hiers public employment on these grounds struck at the heart of his First Amendment right to "decide for himself . . . the ideas and beliefs deserving of expression, consideration, and adherence." *See Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

Second, the university officials point to *Meriwether v. Trustees of Shawnee State Univ.*, No. 1:18-CV-753, 2019 WL 4222598 (S.D. Ohio Sept. 5, 2019), as support for the notion that Hiers's unconstitutional-conditions claim fails for the same reasons as his retaliation claim. (Dkt. #39 at 25). In *Meriwether*, the district court concluded that the plaintiff's unconstitutional-conditions claim, like his retaliation claim, failed because his speech did not address a matter of public concern. *See* 2019 WL 4222598, at *16, *21. Here, as explained above, *see supra* Part III(A)(ii)(a)(1), Hiers's speech touched on a matter of public concern and was therefore protected under the First Amendment. Taking the district court's decision in *Meriwether* on its

own terms, then, the case is readily distinguishable. In any event, the Sixth Circuit later reversed the dismissal of the *Meriwether* plaintiff's First Amendment claims, so the relevant reasoning from the district court's decision has no persuasive value. *See Meriwether v. Hartop*, 992 F.3d 492, 511–12 & n.5 (6th Cir. 2021) ("The district court's conclusions about Meriwether's remaining free-speech claims were all premised on the notion that his speech was not protected. Because that premise was legally erroneous, we vacate all of the district court's free-speech holdings.").

For these reasons, the university officials' arguments for dismissing Hiers's unconstitutional-conditions claim lack merit. Hiers has plausibly alleged that the university officials violated his First Amendment rights by subjecting him to unconstitutional conditions.

### d. Compelled Speech

Hiers also claims that the university officials violated his First Amendment rights by compelling his speech.[8]

---

[8] The university officials argue that Hiers's compelled-speech claim is governed by *Pickering*. But unlike a retaliation claim, it is not clear that the standard *Pickering* test applies to a public-employee compelled-speech claim. In *Janus*, the Supreme Court expressed deep skepticism about such a notion. *Janus*, 138 S.Ct. at 2473. When the speech is not part of an employee's official duties, said the Court, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Id.* Notably, the Court pointed out that it has "never applied *Pickering* in such a case." *Id.* at 2473. It is true that these doubts about the general applicability of *Pickering* to public-employee compelled-speech claims were dicta. *Id.* But there is dicta, and then there is Supreme Court dicta. *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) ("We are not bound by dicta, even of our own court. . . . Dicta of the Supreme Court are, of course, another matter."). In any event, the university officials' failure to identify what valid state interest they had in compelling Hiers's speech means that his compelled-speech claim survives the dismissal stage under the standard *Pickering* test. So this Court need not decide whether a more rigorous form of scrutiny should apply to Hiers's compelled-speech claim.

The autonomy to speak freely necessarily includes the freedom to remain silent. Because "*all* speech inherently involves choices of what to say and what to leave unsaid, . . . one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (quotations omitted). The Supreme Court has "held time and again that freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." *Janus*, 138 S. Ct. at 2463 (quotation omitted). Thus, the government cannot—for example—coerce affirmations of belief, compel unwanted expression, or force one speaker to support the message of another. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Hurley*, 515 U.S. at 573.

Compelled speech is deeply suspect in the Supreme Court's jurisprudence—and for good reason given the unique harms it presents. The ability to decide not only what to say but what not to say is essential to a free and self-governing democracy. *Id.* at 2464. As the Supreme Court put it in *Janus*:

> When speech is compelled, . . . additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, . . . a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence.

*Id.*

Limiting the choice of what not to say diminishes autonomy, stymies the search for truth, and extinguishes the debates necessary for the continuous improvement of our Republic. These societal and personal harms are why "prominent members of the founding generation condemned laws requiring public employees to affirm or support beliefs with which they disagreed." *Id.* at 2471 & n.8 (citing Thomas Jefferson, Oliver Ellsworth, and Noah Webster as examples). And they are why Justice Jackson warned us about the "[c]ompulsory unification of opinion" in *Barnette*. 319 U.S. at 641.

Here, Hiers alleges that the university officials scolded him for his chalkboard message—saying that criticizing the flyer was "stupid" and "cowardly"—and pressured him to apologize for expressing his views on microaggressions. (Dkt. #1 ¶¶ 6, 123, 127–31, 166, 231–32, 235). Based on the complaint and its attachments, particularly Schmidt's email detailing the reasons for Hiers's termination, it is not clear what this apology would have entailed. On the one hand, Hiers may have been pressured to apologize for the way he delivered his message—attacking a colleague's belief in a flippant manner—rather than for the viewpoint he expressed.

But Hiers's allegations, on the other hand, also give rise to a plausible inference that this apology would have involved him recanting his contrary beliefs about microaggressions. After all, Hiers alleges that the university officials terminated him not only because he refused to apologize for his speech but also because he declined to attend additional diversity training. (Dkt. #1 ¶¶ 8–9, 148–51, 161–62, 164–68, 231–32). Taking these allegations as true and viewing them in the

light most favorable to Hiers, it is plausible that the university officials unconstitutionally punished Hiers for refusing to affirm a view—the concept of microaggressions—with which he disagrees. *See Barnett*, 319 U.S. at 642 ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

The university officials do not assert any interest in requiring Hiers to recant his views on microaggressions and apologize for his speech. As noted above, in arguing for dismissal of the retaliation claim, the university officials do not argue that they had an interest in controlling Hiers's speech—much less one that outweighs his interest in speaking. The university officials' failure to identify what valid state interest they had in compelling Hiers's speech means that the *Pickering* balance weighs in his favor and that his compelled-speech claim survives the dismissal stage.

The university officials raise a few arguments in response. First, relying on *Wilkins v. Daniels*, 744 F.3d 409, 415 (6th Cir. 2014), they argue that Hiers's claim fails because "there were no state mandated penalties compelling [his] speech or silence on a particular topic." (Dkt. #39 at 23). But *Wilkins* is unhelpful to the university officials. In that case, the Sixth Circuit explained that "to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is regulatory, proscriptive, or compulsory in nature." 744 F.3d at 415 (quotation omitted). Because the *Wilkins* plaintiffs had several options (fourteen, to be exact) to avoid the statutory

penalty at issue, the alleged compulsion was "wholly subjective" and thus insufficient to trigger the First Amendment. *Id.* at 416. By contrast, Hiers has plausibly alleged that the university officials discontinued his employment—that is, punished him— because he did not express honest regret about his views and speech on microaggressions. There is nothing "wholly subjective" about that.

Second, the university officials contend that Hiers "was never threatened to stay silent on the issue of microaggressions." (Dkt. #39 at 23). But compulsion "need not take the form of a direct threat or a gun to the head." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004). Indeed, even an "indirect discouragement" may constitute compulsion depending on the circumstances. *Id.* (quotation omitted). Here, according to the complaint, Schmidt called Hiers a "coward," labeled his speech "stupid," and pressured him to apologize for expressing his views on microaggressions. (Dkt. #1 ¶¶ 123–32). The university officials then terminated Hiers's employment, according to the complaint, because he stood by his criticism of microaggressions, did not apologize for his message, and declined to participate in extra diversity training. (Dkt. #1 ¶¶ 146–168). These allegations—again, taken as true and viewed in the light most favorable to Hiers—support a plausible inference of compulsion.

Finally, the university officials argue that Hiers "was never required to *publicly* announce his support for the concept of microaggressions or to otherwise *publicly* apologize for his conduct." (Dkt. #39 at 23 (emphasis added)). But they cite no authority, and the Court has found none, indicating that it matters whether the

government seeks to compel speech in public or in private. To the contrary, precedent establishes that the government violates the First Amendment when it tries to compel public employees to affirm beliefs with which they disagree. Period. *See Janus*, 138 S.Ct. at 2463–64. So this argument also fails.

At bottom, Hiers has plausibly alleged that the university officials violated his First Amendment rights by attempting to compel his speech.

### e. "Overbreadth" Challenge to UNT's Misconduct Policy

Hiers also brings a First Amendment "overbreadth" claim challenging the constitutionality of UNT's Misconduct Policy. (Dkt. #1 at 24). Relevant here is the term "misconduct," which the policy defines as "behavior that significantly impairs the function of teaching, research and creative activity, or service." (Dkt. #1-2 at 2). Misconduct includes, but is not limited to, (1) failure to perform the terms of employment, (2) violation of the Board of Regents' rules, (3) violation of professional and personal conduct related to resource use, and (4) actions that impair or prevent other members of the university community from fulfilling their responsibilities or that create a clear and present danger to members of the university community. (Dkt. #1-2 at 1–2). The policy also provides that a "faculty member's conduct that falls outside the scope of employment shall constitute misconduct when the activity adversely affects the mission or reputation of the university."[9] (Dkt. #1-2 at 2).

---

[9] It is undisputed that Hiers was a "faculty member" when the university officials decided to discontinue his employment. Thus, the Misconduct Policy applied to his actions. *See* (Dkt. #1-5 at 1) (offering Hiers the position of "Adjunct Faculty"); (Dkt. #1-4 at 1) (defining "Adjunct" as "a non-tenured faculty member").

Hiers contends that this definition of misconduct unconstitutionally captures protected speech because the policy does not define or limit the terms "impair or prevent" and "create a clear and present danger." According to Hiers, the policy restricts protected speech and, again, does so too broadly. Without defining "adversely affects the mission or reputation of the university," says Hiers, the Misconduct Policy can be read to encompass any type of behavior. Before considering the merits of this claim, the Court pauses to address some confusion about the overbreadth doctrine and what kind of challenge Hiers is asserting here.

An overbreadth claim is not an as-applied challenge; it is a species of facial attack. *United States v. Stevens*, 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). A plaintiff who invokes the overbreadth doctrine is claiming that a statute, ordinance, or policy "is facially invalid" because "it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008). Such challenges "are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the [policy] from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

The overbreadth doctrine allows a party to bring a First Amendment claim asserting the rights of third parties if "a [policy] is *constitutionally applied to the litigant* but might *be unconstitutionally applied to third parties* not before the court." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (emphasis added). Indeed, "the principal advantage of the overbreadth doctrine is

that it enables a litigant to benefit from the [policy's] unlawful application *to someone else*." *Serafine v. Branaman*, 810 F.3d 354, 364 (5th Cir. 2016) (cleaned up). To be clear, "Article III standing retains vigor even in an overbreadth claim." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010). But the overbreadth doctrine relaxes prudential standing principles to allow a plaintiff, who has suffered injury under one provision, to champion the free speech rights of parties not before the court to establish that the provision is unconstitutionally overbroad. *Broadrick*, 413 U.S. at 612.

Of course, Hiers could also bring an as-applied challenge to the Misconduct Policy—it just would not be an overbreadth claim. *See Serafine*, 810 F.3d at 362 ("[L]itigants are permitted to raise both as-applied and overbreadth challenges in First Amendment cases[.]"). And in fact, the most sensible reading of Hiers's complaint, though not entirely clear, is that he has asserted an as-applied challenge. *See* (Dkt. #1 ¶ 244 ("Defendants' Misconduct Policy and their enforcement of this policy is therefore unconstitutionally overbroad as-applied and violates Dr. Hiers' right to free speech under the First Amendment of the U.S. Constitution." (emphasis added))); *see also, e.g.*, (Dkt. #1 ¶¶ 60, 243). On the other hand, a couple of paragraphs in the complaint also appear to support a facial challenge based on overbreadth. *See* (Dkt. #1 ¶¶ 239–40). And Hiers's response to the university officials' dismissal motion suggests that he is challenging UNT's Misconduct Policy as applied to him and facially based on overbreadth. (Dkt. #43 at 25 (maintaining that the university officials applied the Misconduct Policy to Hiers and citing the standard for an

overbreadth claim)). Given this ambiguity, the Court will analyze Hiers's attack on the Misconduct Policy as both an as-applied challenge and an overbreadth challenge.

## 1. As-Applied Challenge to the Misconduct Policy

With that understanding, the Court first considers Hiers's as-applied challenge to UNT's Misconduct Policy "because it is the narrower consideration." *See Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019). The university officials argue that Hiers lacks standing to make such a claim because, in their view, the Misconduct Policy played no role in the decision not to renew Hiers's teaching contract. It is true, as the university officials point out, that the Misconduct Policy is not referenced in Schmidt's email informing Hiers of UNT's nonrenewal decision. But the university officials' argument ignores the allegations in Hiers's complaint and the high bar for dismissal at the Rule 12(b)(6) stage.

Throughout the complaint, Hiers alleges that the university officials took "retaliatory and unconstitutional actions against [him] pursuant to the unbridled authority that their unconstitutional faculty restrictions [(i.e., the challenged provisions of UNT's Misconduct Policy)] grant them." (Dkt. #1 ¶ 214); *see also* (Dkt. #1 ¶¶ 227, 233, 247, 258, 268). He also alleges that the university officials "have unconstitutionally discriminated against [him] for engaging in protected expression and restricted his expression" by classifying his "expression on 'microaggressions' as 'misconduct[.]'" (Dkt. #1 ¶ 243). Based on this classification of his speech, Hiers claims that the Misconduct Policy as applied to his speech is unconstitutionally overbroad in violation of the First Amendment. (Dkt. #1 ¶ 244).

Although Hiers will eventually need to provide evidence that the university officials applied the Misconduct Policy to him in making their nonrenewal decision, the Court must accept these allegations as true at this stage. Alleging that the university officials classified Hiers's speech about microaggressions as misconduct is more than a mere legal conclusion and is specific enough to connect the Misconduct Policy to the adverse employment decision at issue. And when this allegation is read in the context of the complaint as a whole and viewed in the light most favorable to Hiers, it is plausible that the university officials applied the Misconduct Policy to Hiers when they discontinued his employment.

The university officials also argue that Hiers does not have standing because "there is no meaningful chance that this policy could chill his speech going forward as [he] is no longer employed with UNT." (Dkt. #39 at 23). But the injury that allegedly resulted from the application of the Misconduct Policy—Hiers's termination—already occurred. *See Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012) ("In order to have standing . . . a litigant alleging chill must still establish that a concrete harm—i.e., enforcement of a challenged statute—*occurred* or is imminent." (quotation omitted and emphasis added)). Hiers has alleged a concrete injury— application of the Misconduct Policy in a way that abridged his free-speech rights— and the relief he has requested would redress his purported injury. That is all Hiers must do at this stage to establish standing. *See Hous. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 617 (5th Cir. 2007) (explaining that standing requires a plaintiff to show that "(1) it has suffered, or imminently will suffer, a concrete and

particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury").

Turning to the merits, the Court has already determined that Hiers's speech about microaggressions touched on a matter of public concern, *see supra* Part III(A)(ii)(a)(1), and was therefore protected under the First Amendment. Thus, Hiers has stated a plausible claim that the university officials applied the Misconduct Policy to him in violation of his First Amendment rights.

### 2. Overbreadth (Facial) Challenge to the Misconduct Policy

Hiers's facial challenge to UNT's Misconduct Policy—to the extent he intends to raise one—is more problematic.[10]

The overbreadth doctrine is "strong medicine," *Broadrick*, 413 U.S. at 613, and is "ordinarily more difficult to resolve" than an as-applied challenge because it "requires consideration of many more applications than those immediately before the court," *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). A policy may be facially invalidated based on the overbreadth doctrine only if "a substantial number of its applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)). The litigant challenging the policy must show "a

---

[10] Generally, a court should "proceed to an overbreadth issue" only if "it is determined that the statute would be valid as applied." *Serafine*, 810 F.3d at 362–63. In this case, however, the Court analyzes Hiers's overbreadth claim as a facial attack out of an abundance of caution because it is unclear what type of challenge he is asserting.

realistic danger that the [policy] itself will significantly compromise recognized First Amendment protections of parties not before the court." *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) (cleaned up). Such facial challenges should be granted "sparingly and only as a last resort." *Id.* at 762 (quoting *Broadrick*, 413 U.S. at 613).

Here, Hiers has failed to state a plausible claim that UNT's Misconduct Policy is facially unconstitutional based on overbreadth. Hiers contends that the Misconduct Policy is unconstitutionally overbroad because "it defines misconduct to include virtually any protected speech using phrases like 'activity that adversely affects the mission or reputation of the university.'" (Dkt. #43 at 25). Although such language could be read to encompass some forms of constitutionally protected speech, Hiers has alleged no facts showing how substantial the overbreadth might be in relation to its legitimate application. Nor has Hiers meaningfully grappled with precedent upholding similarly broad language in the public-employee context.

The Supreme Court's decision in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), is instructive. In *Arnett*, the Supreme Court rejected an overbreadth challenge to a provision of the Lloyd-La Follette Act authorizing the suspension or dismissal of a government employee "for such cause as will promote the efficiency of the service." *Id.* at 158. Although this language could scarcely be broader, the Supreme Court reasoned that greater specificity was not feasible "[b]ecause of the infinite variety of factual situations in which public statements by Government employees might reasonably justify dismissal for 'cause.'" *Id.* at 161.

According to the Court, the provision restricted "only that public speech which improperly damages and impairs the reputation and efficiency of the employing agency, and it thus imposes no greater controls on the behavior of federal employees than are necessary for the protection of the Government as an employer." *Id.* at 162.

*Arnett*'s reasoning applies here. The Misconduct Policy's definition of "misconduct," when read in context, is aimed to protect the university's "reputation and efficiency." On its face, the definition is not a censorial provision aimed at specific groups or viewpoints. *See Broadrick*, 413 U.S. at 616 (identifying content and viewpoint neutrality as a factor weighing against facial invalidation based on overbreadth). Rather, as illustrated by the policy's examples of actions considered to be "misconduct," the challenged definition is directed primarily at conduct that would be disruptive to the university—not "at speech as such." *Arnett*, 416 U.S. at 162.

This distinguishes the Misconduct Policy from the regulation at issue in *Gasparinetti v. Kerr*, 568 F.2d 311, 316 (3d Cir. 1977), the primary case Hiers relies on. In *Gasparinetti*, the Third Circuit concluded that a regulation prohibiting police from "'publicly disparag[ing] or comment[ing] unfavorably or disrespectfully' on the official actions of superior officers or on the orders of the Department" was unconstitutionally overbroad. *Id.* at 316. Unlike UNT's Misconduct Policy, this regulation directly prohibited criticism of a public employer's policies or practices— speech about matters of public concern. *Id.*

Hiers attempts to distinguish *Arnett* on the ground that the Lloyd-La Follette Act's legislative history and accompanying regulations narrowed the language at

issue in that case. (Dkt. #43 at 26). But Hiers cites no authority to support his argument, and this Court is aware of none. To the contrary, the Fifth Circuit has applied *Arnett*'s holding in a different context and—in rejecting an overbreadth and vagueness challenge—noted that the Act's language was not meaningfully limited by its accompanying regulations. *See Davis v. Williams*, 617 F.2d 1100, 1101, 1104 & n.9 (5th Cir. 1980) (en banc) (upholding regulation that permitted discharge for "[c]onduct prejudicial to [the] good order" of the fire department). Precedent compels this Court to reach the same conclusion. Because Hiers has not plausibly alleged that UNT's Misconduct Policy is facially unconstitutional based on overbreadth, the Court will dismiss this claim without prejudice.

### iii. Fourteenth Amendment Claims

The Court now turns to Hiers's Fourteenth Amendment claims for violations of due process and equal protection.

### a. Void-For-Vagueness Challenge to UNT's Misconduct Policy

Hiers claims that UNT's Misconduct Policy is unconstitutionally vague and seeks an injunction against its prospective enforcement. (Dkt. #1 ¶¶ 251–58); (Dkt. #1 at 29). According to Hiers, the policy's definition of "misconduct" fails to inform ordinary people what conduct is prohibited and allows for arbitrary and discriminatory enforcement. (Dkt. #43 at 26–27).

A law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The Supreme Court

has made clear that there is substantially more room for imprecision in rules with only civil or employment consequences than would be tolerated in a criminal code. *See Arnett*, 416 U.S. at 159; *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). In a civil action, a law is void for vagueness only if it "commands compliance in terms so vague and indefinite as really to be no rule or standard at all" or if it is "substantially incomprehensible." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 507 (5th Cir. 2001) (quotation omitted); *see also Jones v. City of Lubbock*, 727 F.2d 364, 373 (5th Cir. 1984) (same). Nevertheless, a civil rule that contains "quasi-criminal penalties may be subject to the more stringent review afforded criminal statutes." *Ford Motor Co.*, 264 F.3d at 508; *see also Vill. of Hoffman Ests.*, 455 U.S. at 499–500 (holding that an ordinance's "quasi-criminal" character may warrant a relatively strict test).

Hiers contends that the Misconduct Policy is unconstitutionally vague because it defines misconduct "non-exhaustively and contains many subjective terms" like "activity [that] adversely affects the mission or reputation of the university" and "[a]ction[s] that impair or prevent other members of the university community [from fulfilling their responsibilities]." (Dkt. 43 at 27 (quoting Dkt. #1-3 at 1–2)). The Court disagrees. When these words are given their ordinary meaning and read in context of the policy as a whole, the standard laid out is understandable and hardly incomprehensible.

The Misconduct Policy's broad language does not prevent a person of ordinary intelligence from understanding what kind of conduct will result in discipline. Other

public-employment policies with similarly general, and often broader, standards have survived void-for-vagueness challenges. In *Arnett*, the Supreme Court held that an employment standard permitting dismissal for "such cause as will promote the efficiency of the service" was not unconstitutionally vague. 416 U.S. at 159–60. In *San Filippo v. Bongiovanni*, the Third Circuit upheld a regulation authorizing dismissal of university professors for "failure to maintain standards of sound scholarship and competent teaching." 961 F.2d 1125, 1137 (3d Cir. 1992) (applying *Arnett*). And in *Fowler v. Board of Education of Lincoln County*, the Sixth Circuit rejected a void-for-vagueness challenge to an employment policy prohibiting "conduct unbecoming a teacher." 819 F.2d at 664–66 (6th Cir. 1987) (applying *Arnett*). UNT's Misconduct Policy, while not meticulously delineated, is considerably more definite than these policies.

Hiers cites *Gregoire v. Centennial School District*, 907 F.2d 1366, 1374 (3d Cir. 1990), and Justice Alito's concurrence from *Morse v. Frederick*, 551 U.S. 393, 423, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), for the notion that the terms "mission or reputation" render UNT's Misconduct Policy unconstitutionally vague. But neither case involved a due process claim—much less the void-for-vagueness doctrine—or a public-employment policy. So those cases are not helpful to Hiers.

The Court recognizes that UNT's Misconduct Policy is not a model of clarity. But that is not the constitutional test for vagueness. The definition of "misconduct" and the policy's examples of prescribed conduct, taken together, are sufficiently clear that an ordinary faculty member would have a reasonable opportunity to know what

conduct would put them at risk of discipline or discharge. Thus, Hiers has failed to state a plausible claim that UNT's Misconduct Policy is unconstitutionally vague. The Court will dismiss this claim without prejudice.

### b. Procedural Due Process

Hiers alleges that the university officials violated his Fourteenth Amendment right to procedural due process when they decided not to continue his employment for the spring 2020 semester without giving him notice and a hearing. A procedural due process claim requires the plaintiff to "identify a protected life, liberty, or property interest and prove that governmental action resulted in a deprivation of that interest." *Wilkerson v. Univ. of N. Tex.*, 878 F.3d 147, 155 (5th. Cir. 2017) (quotation omitted). The existence of a protected property interest is a threshold issue when reviewing a procedural due process claim: "If there is no protected property interest, there is no process due." *Spuler v. Pickar*, 958 F.2d 103, 106 (5th Cir. 1992).

A property interest is more than "an abstract need," a "desire," or a "unilateral expectation." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701 33 L.Ed.2d 548 (1972). To have a protected property interest, the plaintiff must show "a legitimate claim of entitlement" created and defined by "existing rules or understandings that stem from an independent source such as state law." *Id.* Although state law is the source of the property interest, whether that interest rises to the level of a constitutionally protected interest is a question of federal constitutional law. *Stem v. Gomez*, 813 F.3d 205, 211 (5th Cir. 2016); *see also Town*

*of Castle Rock v. Gonzales*, 545 U.S. 748, 756–57, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005).

Hiers argues that, though he lacked tenure, he had a legitimate claim of entitlement to continued employment at UNT because his November 2019 email exchanges with Cherry created a binding contract for him to teach during the spring 2020 semester. The problem for Hiers is that no such contract ever existed. To be enforceable under Texas law, "a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 345 (1955)). The agreement's terms must not only confirm that the parties intended to be contractually bound but also enable a court to understand the parties' obligations and provide an appropriate remedy when the contract is breached. *Id.* Essential terms in the context of employment agreements typically include, among others, "compensation, duties[, and] responsibilities." *City of Houston v. Williams*, 353 S.W.3d 128, 139 (Tex. 2011) (quoting *Martin v. Credit Prot. Ass'n, Inc.*, 793 S.W.2d 667, 669 (Tex. 1990)). The November 2019 emails between Hiers and Cherry contain insufficient terms to create an enforceable contract. *See* (Dkt. #1-7, #1-8).

Attempting to head off this conclusion, Hiers argues that the material terms were understood and agreed upon based on the parties' previous course of conduct. It is true that an "implied agreement may arise from the *regular* course of conduct between the parties." *Schuhardt Consulting Profit Sharing Plan v. Double Knobs*

*Mountain Ranch, Inc.*, 468 S.W.3d 557, 567 (Tex. App.—San Antonio 2014, pet. denied) (emphasis added). But here, there is no regular course of dealing between Hiers and Cherry—much less facts from which an implied contact can be inferred. *See id.* (finding implied agreement regarding the timing of payments existed because, "[f]or almost two years, [one party] accepted twenty-two out of twenty-four payments made after the first, but before the tenth of the month").

When Hiers accepted his initial fall 2019 teaching position, he signed a seven-page offer letter that contained detailed terms of employment. (Dkt. #1-5). Notably, this contract expressly foreclosed any property interest in future employment beyond the contract term. (Dkt. #1-5 at 1 ("Your appointment for this semester does not guarantee an appointment in future semesters, but does make you eligible for consideration.")). And when Hiers and Cherry subsequently exchanged emails about Hiers teaching an additional course not included in the that letter, Cherry indicated the letter would need to be amended to reflect this change. (Dkt. #1-6). This course of conduct does not support a plausible conclusion that the November 2019 email exchanges between Hiers and Cherry gave rise to an implied contract.

What's more, following his November 2019 email exchanges with Cherry, Hiers went to the math department's office "to sign the offer letter" for the spring 2020 semester. (Dkt. #1 ¶ 138). Why would Hiers need to sign an offer letter if the emails he exchanged with Cherry only a couple weeks earlier created a binding contract? Hiers doesn't meaningfully grapple with that question, but the answer is clear: his email exchanges with Cherry lack the elements of a contract. *See Dall./Fort Worth*

*Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 369 (Tex. 2019) ("A contract must state its essential terms with a reasonable degree of certainty and definiteness, sufficient to confirm that both parties actually intended to be contractually bound and to enable a court to understand and enforce the parties' obligation and provide an appropriate remedy when breached." (quotation omitted)).

Without a contract to teach beyond the fall 2019 semester, Hiers was, at most, an at-will employee for the spring 2020 semester. *Heggemeier v. Caldwell Cnty.*, 826 F.3d 861, 870 (5th Cir. 2016) (per curiam) ("Texas law imposes a strong presumption in favor of at-will employment." (quotation omitted)). That means his continued employment at UNT was terminable at any time by either party, with or without cause, unless an express rule or policy altered his at-will status. *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993); *Heggemeier*, 826 F.3d at 871. Hiers does not point to any such rule or policy, and the Court is aware of none.

To the contrary, Texas law disavows expectations of future employment for faculty members who do not have tenure. *See* Tex. Educ. Code § 51.943(g) ("Nothing in this section shall be deemed to provide a faculty member who does not hold tenure additional rights, privileges, or remedies or to provide an expectation of continued employment beyond the period of a faculty member's current contract."). Texas law also provides that unilaterally issued employment manuals, handbooks, or policies do not, without more, create contractual rights in employees or otherwise modify at-will employment. *Heggemeier*, 826 F.3d at 871. So UNT's Misconduct Policy, which outlines grievance procedures for its employees, did not create a contractual right or

protectable property interest in Hiers's continued employment. *See Byars v. City of Austin*, 910 S.W.2d 520, 524 (Tex. App.—Austin 1995, writ denied) (rejecting employee's claim that personnel manual gave rise to a protected property interest); *Zimmerman v. H.E. Butt Grocery Co.*, 932 F.2d 469, 472 (5th Cir. 1991) (per curiam) (holding that although a handbook "contained fairly detailed procedures for discipline and discharge," it "did not provide that employees would only be discharged for good cause" and did not alter an employee's at-will status).

At bottom, Hiers had no legally cognizable claim of entitlement to employment at UNT for the spring 2020 semester. He therefore fails to plead a constitutionally protected property interest, and the Court must dismiss his Section 1983 claim for procedural due process violations.

### c. Equal Protection Claim

The Court turns next to Hiers's Equal Protection claim. Hiers claims that the university officials violated his right to equal protection by punishing him for expressing his views on microaggressions while not taking similar actions against other university employees, such as the individual who left the flyers in the faculty lounge, for expressing contrary views. (Dkt. #1 ¶¶ 264–72).

The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting *Plyer v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). State actors "do not escape the strictures of the Equal Protection Clause in

their role as employers." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 597, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008). Under the Equal Protection Clause, "strict scrutiny applies to classifications that infringe on a fundamental right (such as the right to free speech and expression) or involve a protected classification." *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 226 (5th Cir. 2009).

Although equal protection cases usually concern governmental classifications that impact particular groups of citizens in different ways, the Supreme Court has recognized an equal protection claim for discrimination against a "class of one." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Allowing class-of-one claims effectuates the purpose of the Equal Protection Clause, which is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* (quotation omitted). A class-of-one claimant may prevail by showing he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.*

But the Supreme Court has clarified that a "class of one" claim is not viable in the context of public employment. *Engquist*, 553 U.S. at 598. In *Engquist*, the Court emphasized the government's broader powers in its role as an employer managing its own personnel than as a sovereign regulating the public. *Id.* This longstanding principle rendered class-of-one equal-protection claims inappropriate in the public-employment context because of the inherent need for "discretionary decisionmaking

based on a vast array of subjective, individualized assessments." *Id.* at 603. Applying a class-of-one theory to the government's employment decisions would unduly interfere with public employers' ability to manage their workforce and would "constitutionalize the employee grievance." *Id.* at 609 (quoting *Connick*, 461 U.S. at 154). At the same time, the Court explained that its holding did not affect application of the Equal Protection Clause to public employers "when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Id.* at 605.

Here, the university officials argue that Hiers's equal protection claim is based on a class-of-one theory and, in any event, must be dismissed because the complaint does not adequately plead a similarly situated comparator. As to the first point, it is unclear what type of equal protection claim is pleaded in Hiers's complaint. Hiers alleges that the university officials violated his right to equal protection "[b]y punishing [him] for expressing his views on 'microaggressions,' but not punishing professors who express opposite views on those same subjects."[11] (Dkt. #1 ¶ 265).

---

[11] The Court notes that Hiers's "equal protection claim largely mirrors [his] claim that [the university officials] have impermissibly burdened [his] rights to free speech" under the First Amendment. *See A.M. ex rel. McAllum*, 585 F.3d at 226 n.9. As the Fifth Circuit has explained:

> It is generally unnecessary to analyze laws which burden . . . the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights. Laws which classify persons in their exercise of these rights will have to meet strict tests for constitutionality without need to resort to the equal protection clause. Should the laws survive substantive review under the specific guarantees they are also likely to be upheld under an equal protection analysis[.]

*Id.* (quotation omitted).

Hiers also alleges that he is "similarly situated to other professors in the mathematics department, the College of Science, the University, and the University System," that the university officials have treated him differently from other professors, and that the university officials' actions "have no rational basis." (Dkt. #1 ¶¶ 266–67, 270).

These allegations lend support to a class-of-one equal-protection claim. They suggest that Hiers was treated differently because of characteristics that are unique to him—his chalkboard message—rather than because of his membership in a particular group. But as explained above, the class-of-one theory is not cognizable in this context. *Engquist*, 553 U.S. at 598. Thus, to the extent Hiers's complaint pleads a class-of-one theory, his equal protection claim fails as a matter of law.

Perhaps recognizing as much, Hiers contends that his equal protection claim is not based on a class-of-one theory. (Dkt. #43 at 32). While Hiers's claim is not artfully pleaded, and his one-page argument is poorly developed, at least one allegation in the complaint may support a class-based theory. Hiers alleges that the university officials "take no adverse employment actions against professors or other members of the University who support 'microaggressions,' but they take adverse employment action against professors, like [ ] Hiers, who question that paradigm." (Dkt. #1 ¶ 267). This allegation, when considered in the context of the entire complaint, suggests that Hiers was discriminated against because of his membership in a group of individuals who oppose the concept of microaggressions.

But even if that's true, Hiers cannot mount an equal protection claim because he has failed to adequately plead a similarly situated comparator. The Equal

Protection Clause "keeps governmental decisionmakers from treating differently persons who are *in all relevant respects* alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (emphasis added). It is this comparative element that distinguishes the Equal Protection Clause from the Due Process Clause. *See Ross v. Moffitt*, 417 U.S. 600, 609, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974) ("'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. 'Equal protection,' on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable.").

In response to the university officials' dismissal motion, Hiers points to one possible comparator: "the person who left the fl[y]ers supporting microaggressions." (Dkt. #43 at 32). But Hiers does not allege that this person was a non-tenured, adjunct professor like himself. To the contrary, Hiers alleges that the flyers were left anonymously and were not endorsed by UNT. *See* (Dkt. #1 ¶ 92); (Dkt. #43 at 2). These allegations are insufficient to support a reasonable inference that the person who left the flyers on microaggressions in the faculty lounge is directly comparable to plaintiff in all relevant respects. *See Nordlinger v. Hahn*, 505 U.S. at 10.

The Court also concludes that Hiers's general allegation that he "is similarly situated to other professors in the mathematics department, the College of Science, the University, and the University System" without any factual support does not satisfy *Iqbal* and *Twombly*. *See* (Dkt. #1 ¶ 266). In other words, Hiers has not pleaded enough to "nudge[]" his equal protection claim "across the line from conceivable to

plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570). The Court will, therefore, dismiss this claim without prejudice.

### iv. Lack of Personal Involvement

All university officials other than Cherry and Schmidt argue that they should be dismissed altogether because Hiers has failed to allege their personal involvement in the alleged unconstitutional actions. They are correct that, to state a Section 1983 claim, a plaintiff must allege a state official's personal involvement in or his or her "collaboration, direction, or approval of" the alleged constitutional violation. *Reimer v. Smith*, 663 F.2d 1316, 1323 (5th Cir. 1981). But Hiers has alleged that these university officials were "aware of the retaliatory and unconstitutional actions taken against [him] and did not instruct University personnel, including other Defendants, to change or reverse those actions to comply with constitutional mandates." (Dkt. #1 ¶ 35). The complaint also pleads that each individual defendant "independently and in consultation with each other, participated in the retaliatory and unconstitutional firing of [ ] Hiers." (Dkt. #1 ¶ 37).

Although Hiers will eventually need to provide evidence of such knowledge of, consultation about, and participation in his firing, at the dismissal stage the Court accepts these allegations as true. Alleging that each university official knew about and consulted on Hiers's firing before that decision was made is more than a mere legal conclusion. These allegations are also specific enough at the Rule 12(b)(6) stage to connect each of the university officials to the adverse employment decision, which

serves as the basis for Hiers's retaliation, viewpoint-discrimination, compelled-speech, equal-protection, and due-process claims.

### v. Qualified Immunity

To recap, Hiers has plausibly alleged First Amendment violations based on (1) retaliation, (2) viewpoint discrimination, (3) unconstitutional conditions (4) compelled speech, and (5) as-applied overbreadth. That is the end of the inquiry as to Hiers's official-capacity claims. But the question remains whether the university officials in their individual capacities are entitled to qualified immunity.

Qualified immunity is a court-created doctrine that limits when state officials may be sued in their individual capacities for alleged constitutional violations. A plaintiff seeking to defeat qualified immunity must show (1) that the official violated a statutory or constitutional right and (2) that the asserted right was "clearly established" at the time of the challenged conduct. *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016). At the Rule 12(b)(6) stage, "the facts alleged must be taken in the light most favorable to the party asserting the injury." *Id.* (cleaned up). Hiers has met the first prong at this stage, so the Court proceeds to the second.

At the second step, a plaintiff must show that the contours of the asserted right are "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012) (cleaned up). Because this standard protects all but the plainly incompetent or those who knowingly violate the law, courts do not deny immunity unless existing precedent placed the constitutional or statutory question

"beyond debate." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quotation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted).

To be clearly established, ordinarily a preexisting Supreme Court or Fifth Circuit decision, or the weight of authority from other circuits, must make it apparent to reasonable state officials that their conduct is unlawful. *Morgan*, 659 F.3d at 371–72. In recent years, the Supreme Court has repeatedly admonished lower courts not to define clearly established law "at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (quotation omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id*. (quotation omitted).

At the same time, neither the Supreme Court nor the Fifth Circuit has ever required "the very action in question" to have "previously been held unlawful," *Anderson*, 483 U.S. at 640. That's because the central concept behind qualified immunity is that of "fair warning." *Anderson*, 845 F.3d at 600 (quotation omitted). Thus, the "law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id*. (quotation omitted).

With these principles in mind, the Court considers whether Hiers's First Amendment rights—as to each of the alleged constitutional violations—were clearly established at the time of the challenged conduct (i.e., December 2019).

### a. Hiers's Retaliation Claim

Let's begin with Hiers's retaliation claim. Hiers argues that *Rankin v. McPherso*n, 483 U.S. 378, 107 S.Ct. 2891, 2895, 97 L.Ed.2d 315 (1987), would have put reasonable officials in the university officials' shoes on adequate notice that the First Amendment prohibited them from discontinuing his employment in retaliation for his speech. The Court agrees.

In *Rankin*, a public employee at the constable's office who opposed President Reagan's policies said to her coworker, "[I]f they go for him again, I hope they get him" upon learning of John Hinckley Jr.'s attempted assassination of the President. *Id.* at 381. The Supreme Court reasoned that the statement, made within the context of criticism of the President's policies, was an expression of displeasure with those policies. *Id.* at 386–87. Thus, the Court concluded that the First Amendment protected the government employee's speech, despite the incendiary nature of the comment and the fact that it was made during a private conversation. *Id.* Because the employee's speech addressed a matter of public concern, and the defendant was unable to articulate an interest that outweighed the employee's interest in speaking, the Court concluded that the employee's discharge was improper. *Id.* at 392.

The circumstances in *Rankin* are closely analogous to those present here. The content of Hiers's speech, a joke that microaggression literature is garbage, is much

60

like that of the hyperbole in *Rankin*, a statement supporting an assassination attempt on the President. *See id.* at 382 (noting that the plaintiff told her supervisor that she made the statement but "didn't mean anything by it"). Both inflammatory statements, when viewed in context, are "fairly considered as relating to [a] matter of political, social, or other concern to the community." *See Connick*, 461 U.S. at 146. And in both cases, the public did not see or hear the offending comment. *See Rankin*, 483 U.S. at 386 n.11 ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern.").

Of course, Hiers's speech was not made to a single coworker in private conversation. He expressed his opposing view on a controversial topic in a way that was visible to his colleagues, his supervisors, and anyone else who entered the faculty lounge. More so than in *Rankin*, then, the form of Hiers's message bolsters the conclusion that he spoke on a matter of public concern. If the private comment in *Rankin* touched on a matter of public concern, any reasonable university official would know that Hiers's message did too. *Rankin* thus places the question of the unconstitutionality of the university officials' conduct "beyond debate." *See Morgan*, 659 F.3d at 371.

The university officials' attempts to distinguish *Rankin* are unpersuasive. They argue that the private remark in *Rankin* was made during a political discussion about the President's policies and followed a news report about an attempt on the President's life, whereas Hiers made an anonymous joke about microaggressions. The Court declines to cabin *Rankin* so narrowly. *Rankin* provides reasonable notice to

61

government employers that the First Amendment prohibits them from retaliating against an employee for making a nonpublic comment that addresses a topic of legitimate news interest, despite the offensive or inappropriate character of the comment. *See Rankin*, 483 U.S. at 386 n.11, 387. The factual distinctions between *Rankin* and this case, therefore, do not alter the conclusion that the law was clearly established at the relevant time.

Citing *Noyola v. Tex. Dep't of Hum. Res.*, 846 F.2d 1021, 1025 (5th Cir. 1988), the university officials also contend that government officials are rarely denied immunity from liability arising out of First Amendment disputes because of the *Pickering* balancing required in such cases. (Dkt. #39 at 37–38). This assertion is generally true. Yet "*Noyola* is at its predictive nadir when, as in this case, there is no true balancing required because the defendant official[s] ha[ve] not set forth any substantial legitimate interest." *Kinney*, 367 F.3d at 371 n.41. Because the university officials in this case have not offered "any relevant, legitimate interests to put on their side of the *Pickering* scales," it is "entirely appropriate to deny qualified immunity" at this stage. *Id.* at 372; *see also Harris v. Victoria Indep. Sch. Dist.*, 336 F.3d 343, 345 (5th Cir. 1999) (per curiam) (collecting cases holding that qualified immunity is unavailable when there is no governmental interest to balance).

The Court thus concludes that, in light of *Rankin*, reasonable officials in the university officials' shoes would have known that Hiers's speech touched on a matter of public concern and that discontinuing his employment because of his speech

violated the First Amendment. Accordingly, the university officials are not entitled to qualified immunity on Hiers's retaliation claim.

### b. Hiers's Remaining First Amendment Claims

Hiers's remaining First Amendment claims based on viewpoint discrimination, compelled speech, unconstitutional conditions, and overbreadth are a different story. For *each* of these claims, Hiers has the burden to point out the clearly established law. *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019). He has not done so.

As to the claims for compelled speech and unconstitutional conditions, Hiers cites four cases—*Rankin*; *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)—that he believes show the university officials violated clearly established law. (Dkt. #43 at 37). Although *Rankin* is factually analogous to this case, it did not involve compelled speech or application of the unconstitutional-conditions doctrine. Thus, as to these theories of liability, *Rankin* does not define Hiers's asserted rights with sufficient particularity to show that "the violative nature of [the university officials'] *particular* conduct is clearly established." *See Mullenix*, 577 U.S. at 12 (quotation omitted).

*Givhan*, *Mt. Healthy*, and *Perry* are also materially distinguishable for purposes of the clearly-established-law prong. For starters, none of these cases addressed compelled speech. So Hiers's reliance on them to support his compelled-speech claim is misplaced. *See Mullenix*, 577 U.S. at 12.

As to Hiers's unconstitutional-conditions claim, these cases are also readily distinguishable because they involved employees who criticized their employer's policies or practices, not who criticized a third-party's view in a rude or flippant manner. *Givhan* addressed a teacher's private complaints about her school's racially discriminatory employment policies and practices—an inherent matter of public concern—made while the school was the subject of a desegregation order. 439 U.S. at 411–13; *accord Victor v. McElveen*, 150 F.3d 451, 456 (5th Cir. 1998) ("[T]he content of [the plaintiff's] speech was inherently of public concern because it was a protest against racial discrimination."). *Mount Healthy* concerned a teacher's critique of his school's dress code policy to a disc jockey at a local radio station, who "promptly announced the adoption of the dress code as a news item." 429 U.S. at 282. And in *Perry*, the professor publicly criticized the policies of his college's board of regents and testified before committees of the Texas Legislature. 408 U.S. at 594–95.

By contrast, Hiers did not criticize UNT's policies or practices; he responded to an anonymous flyer not endorsed by UNT in any way. (Dkt. #1 ¶¶ 90–93). Nor did he testify before any government body about the concept of microaggressions. And as noted above, no one from the media approached Hiers about his views on microaggressions or his chalkboard message. *Perry*, *Givhan*, and *Mount Healthy* are therefore not sufficiently analogous to place the constitutional question as to Hiers's unconstitutional-conditions claim "beyond debate." *Morgan*, 659 F.3d at 371.

The Court now turns to Hiers's claims for viewpoint discrimination and overbreadth. Hiers summarily asserts—in a single sentence—that the university

officials are not entitled to qualified immunity from liability arising out of these alleged constitutional violations. According to Hiers, these claims "all rest on on-point Supreme Court or Fifth Circuit precedent or on a large body of persuasive law that clearly establishes the rights at issue." (Dkt. #43 at 39). Yet Hiers does not point to any such precedent or consensus of persuasive authority in his response to the university officials' dismissal motion. To the extent he relies on general principles derived from the cases cited in his response, *see* (Dkt. #43 at 23–25), such broad generalizations are "exactly the kind of proposition[s] that will not suffice for the purposes of qualified immunity analysis," *see Morgan v. Swanson*, 755 F.3d 757, 761 (5th Cir. 2014) (per curiam) (rejecting the plaintiff's argument that "his right to distribute religious material is clearly established because 'regardless of forum, viewpoint discrimination regarding private speech is unconstitutional'"). Thus, considering the particular conduct at issue, Hiers has not shown that his claims for viewpoint discrimination and overbreadth rest on clearly established law.

## B. State-Law Claim for Breach of Contract

In addition to his Section 1983 claims, Hiers brings a cause of action under Texas law for breach of contract. (Dkt. #1 ¶¶ 273–82). Hiers argues that the university officials breached his purported contractual rights to (1) teach in the spring 2020 semester and (2) receive notice and the opportunity to be heard as outlined in UNT's Misconduct Policy. (Dkt. #1 ¶ 274). As with Hiers's Section 1983 claims, the Court must first address the university officials' assertion of sovereign immunity. *Pennhurst*, 465 U.S. at 121 (holding that "[a] federal court must examine each claim in a case" to determine whether it is barred by sovereign immunity).

Hiers concedes that he cannot sue the university itself for breach of contract. (Dkt. #43 at 33). But Hiers maintains, without citing any legal authority to support his position, that sovereign immunity does not bar his breach-of-contract claim against the university officials in their official capacities. He is wrong.

As explained above, sovereign immunity prohibits suits against state officials in their official capacities, which are effectively against the state itself, unless this immunity has been waived or the state has consented to the suit. *City of Austin*, 943 F.3d at 997; *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (explaining that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and, therefore, "is no different from a suit against the State itself"). Hiers has not attempted to argue that either Congress or Texas has waived sovereign immunity as to breach-of-contract claims; nor does he contend that the Texas Legislature has consented to this suit.[12] *In re City of Galveston*, 622 S.W.3d 851, 855 (Tex. 2021) ("The State's immunity from suits arising from breach of contract is waived only by the Legislature's consent, either by statute or—as was the case for over 150 years—by its express consent on a dispute-by-dispute basis."). Sovereign immunity thus bars Hiers's official-capacity contract claim.

---

[12] Under Chapter 2260 of the Texas Government Code, the State of Texas retains immunity from suit in breach-of-contract cases but provides for an administrative process to resolve breach-of-contract claims. *See* TEX. GOV'T CODE §§ 2260.006, 2260.051. The only alternative to Chapter 2260's administrative remedy is to petition the Texas Legislature to waive its immunity from suit. *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 597 (Tex. 2001) ("[T]here is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature."); *City of Galveston*, 622 S.W.3d at 859 n.34. Hiers does not argue that he pursued either option.

To be clear, Hiers cannot invoke *Ex parte Young*, which permits suits for prospective relief against state officials based on an ongoing violation of *federal* law, to sidestep sovereign immunity as to his breach-of-contract claim. *Pennhurst*, 465 U.S. at 106. Because *Ex parte Young*'s purpose is to breathe life into the Supremacy Clause and stop violations of federal rights, "the exception does not apply when plaintiffs seek to vindicate state-law rights." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 451 (5th Cir. 2022).

The same is not true for the university officials in their individual capacities. Sovereign immunity does not "deprive federal courts of jurisdiction over state law claims against state officials strictly in their individual capacities." *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1271 (5th Cir. 1992). And thus, sovereign immunity does not erect a barrier against Hiers's individual-capacity claim for breach of contract. But this claim, nonetheless, fails for two independent reasons.

First, as explained above, Hiers has not plausibly alleged that he had a contract to teach in the spring 2020 semester or any contractual right based on UNT's Misconduct Policy. Without a contract, there can be no breach of contract. *See Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019) ("Breach of contract requires pleading. . . that (1) a valid contract exists . . . .").

Second, even if Hiers had plausibly alleged the existence of an enforceable contract, that contract was with UNT—not the university officials in their individual capacities. It is an elementary rule of Texas law that, except for certain theories not asserted here, privity of contract is an essential element for recovery in an action

based on a contractual theory. *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). And in Texas, "the general rule is that actions taken by an agent on behalf of the principal do not bind the agent." *Norris v. Hous. Auth. of the City of Galveston*, 980 F.Supp. 885, 893 (S.D. Tex. 1997); *see also Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) ("Corporations, by their very nature, cannot function without human agents. As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts."). An agent is not liable on a contract made for a disclosed principal unless the agent "has either expressly or impliedly assumed such liability." *Mediacomp, Inc. v. Cap. Cities Commc'n, Inc.*, 698 S.W.2d 207, 211 (Tex. App.—Houston [1st Dist.] 1985, no writ).

Here, Hiers alleges that both of his purported contracts were "between the University and [himself]." (Dkt. #1 ¶¶ 275, 278). There are no allegations in Hiers's complaint that Cherry or any of the other university officials expressly or impliedly assumed individual liability for UNT, a disclosed principal, on either of the purported contracts. Because Hiers fails to plausibly allege that he was in privity of contract with the university officials in their individual capacities, he cannot hold them individually liable for breach of contract. *See Razor USA, LLC v. Tamex Forwarding, Inc.*, No. 5:16-CV-282, 2018 WL 2335464, at *3 (S.D. Tex. Mar. 29, 2018) (determining that claim for breach of contract failed because the plaintiff did not show that the defendant agent expressly or impliedly assumed liability on behalf of a disclosed principal); *Norris*, 980 F.Supp. at 892–93 (concluding that a breach-of-contract claim failed because the plaintiff could not show the defendants acted in their individual

capacities when they signed a contract on behalf of the employer housing authority).
Accordingly, the Court will dismiss Hiers's breach-of-contract claim against the
university officials in their individual capacities.

## IV. CONCLUSION

For the foregoing reasons, the university officials' Motion to Dismiss,
(Dkt. #39), is **GRANTED in part** and **DENIED in part**.

It is therefore **ORDERED** as follows:

1. Hiers's Section 1983 claims for damages against the university officials
   in their official capacities are **DISMISSED without prejudice** for
   lack of jurisdiction based on sovereign immunity.

2. Hiers's facial overbreadth claim, to the extent one is asserted in the
   complaint, and his equal-protection, void-for-vagueness, and
   procedural-due process-claims are **DISMISSED without prejudice**
   for failure to state claim upon which relief can be granted.

3. Hiers's compelled-speech, viewpoint-discrimination, unconstitutional
   conditions, and as-applied overbreadth claims against the university
   officials in their individual capacities are **DISMISSED without
   prejudice** based on qualified immunity.

4. Hiers's breach-of-contract claim against the university officials in their
   official capacities is **DIMISSED without prejudice** for lack of
   jurisdiction based on sovereign immunity.

5. Hiers's breach-of-contract claim against the university officials in their
   individual capacities is **DISMISSED without prejudice** for failure to
   state a claim upon which relief can be granted.

6. All other relief sought in the university officials' dismissal motion is
   **DENIED**.
   **So ORDERED and SIGNED this 11th day of March, 2022.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE